# ESTADO LIBRE ASOCIADO DE PUERTO RICO
## TRIBUNAL DE APELACIONES
### PANEL ESPECIAL

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>JUAN CARLOS ACOSTA RAMÍREZ<br><br>Apelante | KLAN202100742 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Casos Núms.:<br>K EG2016G0024<br>K EG2016G0025<br>K EG2016G0026<br><br>Sobre:<br>Inf. Art. 265 C.P. (3 cargos) |
| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>ALEX EMILLE MARTÍNEZ MORALES<br><br>Apelante | KLAN202100817 | Casos Núms.:<br>K EG2016G0022<br>K EG2016G0023<br>K EG2015M0001<br><br>Sobre:<br>Inf. Art. 265 C.P. 4to. Grado (2 cargos)<br>Art. 265 C.P. |
| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>ELIANA CUERVO SIERRA<br><br>Apelante | KLAN202100937 | Casos Núms.:<br>K BD2015G0572<br><br>Sobre:<br>Inf. Art. 210 (B) C.P. |
| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>EDIL AMOS DANOIS ROMÁN<br><br>Apelante | KLAN202100938 | Casos Núms.:<br>K BD2016G0378 al K BD2016G0392<br>K ST2016G0085 al K ST2016G0100<br><br>Sobre:<br>Art. 193 C.P. (11c)<br>Art. 210 (B) C.P. (4c)<br>Art. 217 C.P. (3c)<br>Art. 218 C.P. (5c)<br>Art. 224 C.P. (5c)<br>Art. 211 C.P. (3c) |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Candelaria Rosa y el Juez Marrero Guerrero

Marrero Guerrero, Juez Ponente.

## SENTENCIA

En San Juan, Puerto Rico, a 26 de febrero de 2025.

## I.

Comparecen el señor Juan Carlos Acosta Ramírez, el señor

Alex Emille Martínez Morales, la señora Eliana Cuervo Sierra y el

señor Edil Amos Danois Román (en conjunto, apelantes) mediante distintos recursos de apelación, que consolidamos por su intrínseca relación, y solicitan que revoquemos varias *Sentencias* dictadas por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI). En estas, tras hallarlos culpables por varios delitos relacionados con unas obras de construcción en el Capitolio de Puerto Rico, el TPI sentenció a los apelantes a cumplir penas de reclusión con el beneficio de sentencia suspendida. Además, el Foro Primario ordenó la inclusión de los apelantes al Registro de Personas Convictas por Corrupción y le impuso la pena de restitución a los señores Acosta Ramírez, Martínez Morales y Danois Román.

Con el beneficio de la comparecencia de todas las partes y por contar con la transcripción de la prueba oral (TPO), nos encontramos en posición de resolver. Se adelante la confirmación de los dictámenes apelados.

Veamos el trasfondo fáctico y procesal que sostiene nuestra determinación.

**II.**

Por hechos suscitados entre los años 2010 al 2013, los apelantes enfrentaron acusación por varios delitos graves. Al señor Acosta Ramírez se le presentaron tres (3) cargos por omisión en el cumplimiento del deber, en violación al Artículo 265 del Código Penal de Puerto Rico de 2004 (4to grado), 33 LPRA sec. 4893, derogado pero vigente al momento de los hechos. Se alegó que el apelante, ilegal, voluntaria, a sabiendas y criminalmente, siendo funcionario o empleado público como Gerente de Servicios Administrativos de la Superintendencia del Capitolio de Puerto Rico, omitió cumplir con los deberes impuestos por el Reglamento de Compras y Servicios de la Superintendencia del Capitolio, revisado el 29 de agosto de 2008 (Reglamento de Compras), y el Reglamento de Normas sobre el

Presupuesto, Desembolsos y la Contabilidad de la Superintendencia del Capitolio al gestionar y/o autorizar el pago doble de unas órdenes de compra, lo que causó la pérdida de fondos públicos. Según el Ministerio Público, para el año 2011, el señor Acosta Ramírez autorizó tres (3) pagos para una misma obra de construcción, siendo estos: uno de $49,292.33 en la orden de compra 12250128, otro de $49,292.23 en la orden de compra 12250172, y uno de $40,000.00 en la orden de compra 122501172-M. Por otro lado, se adujo que el señor Acosta Ramírez gestionó y/o solicitó el pago doble a favor de Restaura Contractors, Inc. (Restaura) por una obra de construcción, un doble pago de $7,000.00 mediante la orden de compra 11250334 y otro de $14,000.00 por la orden de compra 11250914.

Al señor Martínez Morales se le imputó un (1) cargo por apropiación ilegal agravada, tipificado en el Artículo 193 del Código Penal de 2004, *supra*, sec. 4821 y tres (3) cargos por omisión en el cumplimiento del deber, de los cuales dos (2) eran cuarto grado, en violación del Artículo 265 del Código Penal de 2004, *supra*, sec. 4893. El Ministerio Público alegó que, desde febrero de 2011, el señor Martínez Morales, ilegal, voluntaria, criminalmente y a sabiendas, siendo funcionario y/o empleado público como Gerente de Proyectos de Construcción del Capitolio, omitió cumplir con su deber de dirigir y supervisar la planificación, los estudios, el desarrollo y el diseño de ingeniería para los proyectos de construcción, remodelación, restauración y ampliación de las facilidades de la Superintendencia del Capitolio para comprobar que los mismos cumplían con los procedimientos, las especificaciones, las normas de seguridad ocupacional y con la reglamentación local y federal aplicable, lo que ocasionó la pérdida de un exceso de $10,000.00 de fondos públicos. En específico, se arguyó que el señor Martínez Morales no supervisó el proceso de licitación para la remodelación del Salón Protocolar,

objeto de las órdenes de compra 11250180 y 11250181, al no percatarse que únicamente un licitador era real mientras los demás eran ficticios y que en dos (2) ocasiones certificó dos (2) órdenes de compra para un mismo proyecto. Asimismo, se alegó que, para noviembre de 2011, el señor Martínez Morales certificó que los proyectos de construcción se realizaron y cumplieron con las especificaciones requeridas para proceder con el pago al suplidor, lo que ocasionó la pérdida de fondos públicos. Se arguyó que el 29 de agosto de 2011, certificó el trabajo de la orden de compra 12250172, pagado con fondos de la Superintendencia del Capitolio a favor de Restaura por la cantidad de $49,292.33, certificado nuevamente el 17 de noviembre de 2011 en la orden de compra 12250172-M por la suma de $37,200.00 a favor de la misma compañía. A su vez, que el 17 de septiembre de 2010 autorizó la restauración del Salón de Audiencias del Senado María Martínez, objeto de la orden de compra 11250334 en beneficio de Restaura por la cantidad de $7,000.00 sufragados con fondos de la Superintendencia del Capitolio y en enero de 2012 certificó el mismo trabajo con la orden de compra 11250334-M para pagarle $7,000.00 a Restaura mediante un cheque del Banco Gubernamental de Fomento de Puerto Rico (BGF).

A la señora Cuervo Sierra se le presentó un (1) cargo de fraude por infracción al Artículo 210 B del Código Penal de 2004, *supra*, sec. 4838. Se alegó que la señora Cuervo Sierra en común y mutuo acuerdo con el señor Danois Román, entre marzo a agosto de 2012, realizó actos que privaron a la Superintendencia del Capitolio y/o afectaron sus derechos y/o intereses patrimoniales sobre bienes inmuebles y/o muebles en perjuicio del Estado, consistente en que siendo dueños y/o representantes de Restaura y Fasan Construction (Fasan), hicieron colusión entre ambas compañías y que, por cada corporación pertenecientes a un mismo dueño, presentaron

cotizaciones en la requisición de bienes y/o servicios de la Superintendencia del Capitolio para cumplir con el requisito de tres (3) cotizaciones y obtener una ventaja indebida al controlar la adjudicación de las siguientes órdenes de compra, cuyo costo se manipuló: 12250942, 12250961, 12250975, 12251047, 12251048, 12251049, 12251050, 12251052, 12251053, 12251072, 12251074, 12251106, 12251122, 12251123, 12251125, 12251126, 12251127, 12251128, 12251135, 12251153, 12251157, 12251160 12251161, 12251176, 12251183, 13250051, 13250058, 13250059, 13250065, 13250066, 13250144, 13250146, 13250154, 13250184, 13250191, 13250192 y 13250202. Se alegó que dicha acción privó la capacidad de la Superintendencia del Capitolio en lograr una competencia real entre suplidores y alcanzar mejores precios y/o servicios.

Por último, por hechos acontecidos entre los años 2010 al 2012, al señor Danois Román se le acusó de treinta y un (31) cargos, concernientes a once (11) por apropiación ilegal agravada, Artículo 193 del Código Penal de 2004, *supra*, sec. 4821; cuatro (4) por fraude, Artículo 210 (B) del Código Penal de 2004, *supra*, sec. 4838; tres (3) por posesión y traspaso de documentos falsificados, Artículo 217 del Código Penal de 2012; 33 LPRA sec. 5287; cinco (5) por falsificación de documentos, Artículo 218 del Código Penal de 2004, *supra*, sec. 4846; cinco (5) cargos por posesión y traspaso de documentos falsificados, Artículo 224 del Código Penal de 2004, *supra*, sec. 4852, y tres (3) cargos por falsedad ideológica, Artículo 211 del Código Penal de 2012, *supra*, sec. 5281. Con respecto al delito de apropiación ilegal, se alegó que el señor Danois Román, como propietario de Restaura y Fasan, de forma ilegal, voluntaria, maliciosa y criminalmente, se apropió sin violencia ni intimidación de las siguientes sumas pertenecientes al Estado:

1. $1,487.71, $6,165.04 y $32,658.47, por concepto de seguros cobrados con fondos públicos de la Superintendencia del

Capitolio bajo las órdenes de compra 10250836, 10200730, 11250334, 11250914, 11251100, 12250128, 12250142, 12250171, 12250299, 12250315, 12250381, 12250420, 11250547, 11250785, 11251143, 11251144, 12250162, 12250163, 12250164, 12250170, 12250275, 12250285, 12250416, 12250545, 12250640, 12250335, 12250455, 12250741, 12250760, 12250782, 12250783, 12250822, 12250893, 12250898, 12250942, 12250961, 12250968, 12250974, 12250975, 12251043, 12251047, 12251048, 12251050, 12251052, 12251053, 12251072, 12251074, 12251106, 12251122, 12251123, 12251125, 12251127, 12251128, 12251135, 12251153, 12251072, 12251072, 12251074, 12251106, 12251122, 12251123, 12251127, 12251128, 12251135, 12251153, 12251157, 12251160, 12251248, 12251249, 12251296, 12251297, 12251338, 13250051, 13250058, 13250059, 13250065, 13250066, 13250144, 13250146, 13250184, 13250190, 13250191, 13250192, 13250226, 13250227, 13250242, 13250279, 13250280, 13250281, 13250305, 13250307, 13250310, 13250311, 13250312, 13250313, 13250314, 13250323, 13250332, 13250334, 13250335, 13250392, 13250393, 13250394, 13250424, 13250452, 13250466, 13250467, 13250478, 13250479, 13250480 y 13250485, sin que el apelante cumpliese con su deber de emitir los pagos de las pólizas en la Corporación del Fondo del Seguro del Estado (CFSE) por las obras realizadas.

2. $232,650.24, $531,063.75 y $146,612.85, consistentes en que utilizó el equipo y personal de la compañía Restauraciones Liste (RL) para realizar trabajos a nombre de Restaura bajos las órdenes de compra 10250730, 10250836, 11250179, 11250180, 11250181, 11250547, 11251143-M, 12250783, 12250961, 12250968, 12251123, 12251047, 12250161, 12250162, 12250163, 12250164, 12250171, 12250275 y 12250640, cobrados mediante cheques emitidos por la Superintendencia del Capitolio y el BGF.

3. $45,841.86 y $37,200.00 por cobrar en tres (3) ocasiones un trabajo realizado en las nuevas oficinas de servicios administrativos, a razón de que el 23 de septiembre de 2011 recibió un cheque de $45,841.86 emitido por la Superintendencia del Capitolio bajo la orden de compra 12250128; el 28 de septiembre de 2011 recibió otro cheque de $45,841.77 bajo la orden de compra 12250172, y posteriormente recibió un tercer cheque de $37,200.00 bajo la orden de compra 12250172-M.

4. $14,090.40 por el doble pago de un trabajo realizado en la oficina de la Senadora Sila M. González, para el cual recibió un cheque el 4 de abril de 2011 por la Superintendencia del Capitolio bajo la orden de compra 11250914 y el 8 de marzo de 2012 en un cheque de $116,232.40 expedido por el BGF a favor de Restaura, en el que se incluyó el pago de la orden de compra 11250914.

5. $7,000.00 por el doble pago de un trabajo realizado en el Salón de Audiencia María Martínez, para el cual recibió un cheque el 28 de octubre de 2010 por la Superintendencia del Capitolio bajo la orden de compra 11250334 y el 8 de marzo de 2012 en un cheque de $116,232.40 expedido por el BGF a favor de

Restaura, en el que se incluyó el pago de la orden de compra 11250334.

6. $48,232.40, ya que con la ayuda y/o cooperación de los funcionarios públicos Martínez Morales, Jamilette Ramírez Sánchez y Gladys Alberti Torres, cotizó y se le adjudicó dos (2) órdenes de compra, 11250180 y 11250181, por el mismo proyecto de restauración del Salón Protocolar, recibiendo el 3 de febrero de 2011 el pago de $49,959.20 y el 24 de febrero de 2011 la cantidad de $48,232.40.

En lo concerniente al delito de fraude, se alegó que, de forma ilegal, voluntaria, criminal y fraudulenta, el señor Danois Román como dueño y/o representante de Restaura, utilizó el equipo y personal de RL para realizar trabajos en la Superintendencia del Capitolio bajo las órdenes de compra 11251143-M, 12250783, 12250961, 12250968, 12251123, 12251047, 12250161, 12250162, 12250163, 12250164, 12250171, 12250275, 12250640, 10250730, 10250836, 12250179, 12250180, 12250181 y 11250547, cobrados por el apelante. El Ministerio Público sostuvo que dichos actos privaron a RL y/o afectaron sus derechos y/o intereses patrimoniales sobre bienes muebles en su perjuicio. Asimismo, se alegó que el señor Danois Román, en común y mutuo acuerdo con la señora Cuervo Sierra, hizo colusión entre las compañías Restaura y Fasan, al presentar cotizaciones por cada corporación pertenecientes al mismo dueño para cumplir con el requisito de tres (3) cotizaciones y manipular los costos para obtener una ventaja indebida en el proceso de adquisición de bienes y/o servicios y asegurar la adjudicación de treinta y siete (37) órdenes de compra a su favor. El Ministerio Público arguyó que dichos actos privaron la capacidad de la Superintendencia del Capitolio de obtener una competencia real entre suplidores que pudiera conllevar un mejor precio y/o servicio.

En relación con el delito de posesión y traspaso de documentos falsificados, tipificado en el Artículo 224 del Código Penal de 2004, *supra,* sec. 4852, el Ministerio Público adujo que desde el mes de diciembre de 2011, ilegal, voluntaria y criminalmente, a sabiendas y

con la intención de defraudar, el señor Danois Román falsificó la firma del señor Manuel Liste Liñeira (señor Liste Liñeira), al crear cotizaciones falsas a nombre de RL que poseyó y circuló a la Superintendencia del Capitolio en las órdenes de compra 13250202, 12250640, 12250641, 12250782, 12250783, 12250822, 122250893, 12251074, 12251127, 12251128, 12250968, 12250974, 12250975, 12251047, 12251048, a sabiendas de que dichos documentos eran falsos, falsificados e imitados con la intención fraudulenta de controlar las cotizaciones recibidas por la Superintendencia del Capitolio y ser el licitador que ofreciera el precio más bajo para lograr la otorgación de las órdenes. Se alegó que desde septiembre de 2012, el señor Danois Román incurrió en los mismos actos constitutivos del delito de posesión y traspaso de documentos falsificados, tipificado en el Artículo 217 del Código Penal de 2012, *supra*, sec. 5287. En específico, se imputó que el apelante falsificó la firma del señor Liste Liñeira y creó cotizaciones a nombre de RL que poseyó y circuló a la Superintendencia del Capitolio, a sabiendas de que dichos documentos eran falso, falsificado e imitado con la intención fraudulenta de controlar las cotizaciones y ser el licitador que ofrecía el precio más bajo para lograr la otorgación de los contratos en las órdenes de compra 13250226, 13250262, 13250263, 13250305, 13250323, 13250332, 13250334, 13250335, 13250392, 13250393, 13250466, 13250467 y 13250479.

En torno a los delitos de falsificación de documentos y falsedad ideológica, el Ministerio Público alegó que ilegal, voluntaria y criminalmente, con la intención de defraudar, el señor Danois Román falsificó la firma del señor Liste Liñeira, al crear una cotización falsa a nombre de RL con la intención fraudulenta de controlar las cotizaciones recibidas para varias órdenes de compra para ser el licitador que ofreciera el menor precio, lo que le creó el derecho a

recibir la otorgación de las órdenes y afectó el derecho de la Superintendencia del Capitolio a la libre competencia y evaluación para el mejor uso de los fondos públicos.

Posterior a la consolidación de los casos, el juicio en su fondo por tribunal de derecho comenzó a celebrarse el 5 de marzo de 2018 y culminó el 22 de octubre de 2022.

Como prueba de cargo, el Ministerio Público presentó el testimonio de Luis Rivera Irizarry, Maurelice Mota Vélez, Ángel Luis Pérez Ayala, Eduardo Cosme López, Nancy Rivera Domínguez, Karen Rivera Ortiz, Luis Fernando Giraldo Arroyave, Oscar Mendoza Martínez, Armando Álvarez Suárez, Vanessa Acobis Ross, el señor Liste Liñeira, Manuel José Liste Reyes, Sandra Rodríguez Rodríguez, Warren Figueroa Cruz, José Candelas Vázquez, Sonymar Torres Rivera, Giovanni Narváez Oliver, Héctor J. Figueroa Ramos, Zuleika González Sánchez, Jesús Cruz Velázquez. Por su parte, la defensa presentó el testimonio del señor Pablo Sastre Fernández. A continuación, sintetizamos los testimonios vertidos ante el TPI.

**<u>Luis Rivera Irizarry</u>**

Desde enero de 2011, el señor Rivera Irizarry laboraba como Auxiliar de Servicio en la División de Corporaciones del Departamento de Estado.[1] Testificó que, según las constancias del Departamento, Ekho no existió como corporación.[2] Además, declaró que el 4 de mayo de 2012, el señor Danois Román incorporó a Fasan y Restaura, pero dichas corporaciones se cancelaron en el 2016 por incumplimiento con los informes anuales.[3] Aseveró que, en los

---

[1] TPO del 5 de marzo de 2018, págs. 64-65.
[2] El Ministerio Público alegó que la División de Gerencia de Proyectos presentó cotizaciones falsas a la División de Compras de la Superintendencia del Capitolio, para cumplir con el mínimo de tres (3) compañías distintas que pertenecían a Ekho Construction (Ekho), una compañía inexistente; Millennium Engineering Group (MEG), cuya dueña era la señora Karen Rivera Ortiz; RL, firmadas por el señor Danois Román a nombre del señor Liste Liñeira, y Constructora Lingua, firmadas a nombre del señor Giraldo Arroyave.
[3] *Íd.*, págs. 68-85.

informes anuales, ambas compañías reflejaron no tener empleados.[4] No obstante, afirmó que desconocía si el señor Danois Román realmente incorporó a Fasan y Restaura, puesto que el Registro Electrónico de Corporaciones no corrobora la identidad de los incorporadores.[5]

**Maurelice Mota Vélez**

Desde enero de 2013, ejerció como Directora de Auditoría Interna en la Superintendencia del Capitolio.[6] Relató el procedimiento de compras, a tenor con el Reglamento de Compras de la Superintendencia del Capitolio.[7] Declaró que, según se le refirió, en enero de 2013 comenzó a evaluar cuarenta y tres (43) órdenes de compra realizadas entre julio a diciembre de 2012.[8] Particularizó que encontró cotizaciones adoleciendo del nombre del proponente, con firma ilegible, o cuyo nombre era un ponche; las cotizaciones aparentaban ser alteradas al tacharse el precio con tinta líquida y anotarse la cantidad en bolígrafo; las dos (2) corporaciones que compitieron estaban registradas en el Departamento de Estado por el mismo incorporador y dirección; los números telefónicos en algunas cotizaciones eran de otros comercios, mientras otras carecían de dirección, número telefónico y fecha de presentación.[9] Halló que el registro de cotizaciones no coincidía con las cotizaciones físicas y reflejaba que un proponente no cotizó, sin evidenciar su intención de no cotizar.[10] Por ello, precisó que se le imposibilitó corroborar si se cumplió con el requisito de un mínimo de tres (3) cotizaciones.[11] Encontró que las cotizaciones carecían de detalles y que el servicio cotizado era distinto al solicitado, sin anotarse el cambio.[12] Señaló

---

[4] *Íd.*, págs. 82-86.
[5] *Íd.*, págs. 94-95.
[6] *Íd.*, págs. 149-150.
[7] *Íd.*, págs. 156-161.
[8] *Íd.*, págs. 152-153.
[9] TPO del 7 de marzo de 2018, pág. 22.
[10] *Íd.*, págs. 22-23.
[11] *Íd.*, pág. 23.
[12] Íd.

que en una obra de construcción en el Edificio Medicina Tropical, se fragmentaron seis (6) órdenes de compra adjudicadas a Restaura, para un total de $279,341.00, sin realizarse una subasta formal.[13] A saber, la 13250058, 13250059, 13250262, 13250263, 13250332 y 13250430. Asimismo, indicó que el documento *Informe de Recibo e Inspección* para procesar el pago, conocido como "la viuda", debía ser firmado por el señor Mendoza Martínez, quien era el receptor.[14] En el contrainterrogatorio, indicó que el señor Martínez Morales no estaba facultado para autorizar los desembolsos.[15] Además, precisó que la persona encargada para certificar la legalidad, exactitud, propiedad, necesidad y corrección del gasto un comprobante de desembolso, era el Superintendente o su representante autorizado.[16] Por otra parte, consintió que el señor Danois Román no tenía un monopolio, dado que existían otros contratistas en su área de trabajo.[17]

**Ángel Luis Pérez Ayala**

Desde enero de 2013, fungió como Director de Compras en la Superintendencia del Capitolio.[18] Concretó que, como parte de sus funciones, custodió las órdenes de compra[19] y estableció un sistema computarizado para verificar si dichas órdenes cumplían con la reglamentación de la Superintendencia del Capitolio.[20] No obstante, admitió que algunos documentos estaban custodiados en otra oficina y desconocía cómo las pasadas administraciones archivaron las órdenes de compra.[21] Aceptó desconocer si las órdenes de compra se alteraron y cuándo ocurrió; no las evaluó ni pudo identificar si estaban archivadas en su oficina dado que sólo certificó que la copia

---

[13] *Íd.*, págs. 105-113.
[14] TPO del 8 de marzo de 2018, págs. 181-185.
[15] *Íd.*, págs. 55-56.
[16] *Íd.*, págs. 59-60.
[17] *Íd.*, pág. 65.
[18] TPO del 11 de abril de 2018, pág. 50.
[19] *Íd.*, págs. 27.
[20] *Íd.*, págs. 21-23.
[21] *Íd.*, págs. 63-69.

era fiel y exacta al original basado en el número de orden de compra y la cantidad de páginas.[22]

**Eduardo Cosme López**

Desde enero de 2013, trabajó como Director de Finanzas en la Superintendencia del Capitolio.[23] Explicó el funcionamiento del Sistema MIP, por el cual se monitoreó los fondos asignados al Capitolio.[24] Manifestó que el Sistema MIP, el cual era accesible para los empleados de los Departamentos de Finanzas y Compras, era el sistema de contabilidad computarizado en el que se separaban los fondos para las órdenes de compra.[25] Detalló que una vez se originaba una requisición, dicho documento pasaba al supervisor del área solicitante de la compra, quien lo remitía al Departamento de Compras y luego al Departamento de Finanzas para cerciorarse que los fondos estaban disponibles y obligarlos para emitir el pago cuando el trabajo o el producto estuviese realizado.[26] Una vez los fondos estaban obligados, el Departamento de Compras indicaba que se podía entregar el producto o realizar el trabajo.[27] Afirmó que una vez terminado el producto, el área solicitante de la compra certificaba el trabajo o producto y el suplidor realizaba la factura que se entregaba al área de pre-intervención del Departamento de Finanzas para verificar que todos los documentos cumpliesen con las normas y posteriormente, dicha factura se trasladaba al área de pagaduría que emitía el cheque de pago.[28] Puntualizó que durante su incumbencia, se utilizó un sistema alterno de compras, denominado EROC.[29] Estableció que custodió las órdenes de compra, facturas y los

---

[22] TPO del 16 de abril de 2018, págs. 71-134; TPO del 23 de abril de 2018, págs. 21-25, 39, 65-66, 79-81, 89-90, 93-96; TPO del 25 de abril de 2018, págs. 33-35, 59-61, 77-78; TPO del 10 de septiembre de 2018, págs. 82-84, 119, 122.
[23] TPO del 12 de septiembre de 2018, págs. 12-13.
[24] *Íd.*, págs. 15-37; TPO del 26 de septiembre de 2018, págs. 17-18, 22-26.
[25] TPO del 12 de septiembre de 2018, págs. 16-17.
[26] *Íd.*, págs. 17-18.
[27] *Íd.*, pág. 19.
[28] *Íd.*, págs. 22-23.
[29] *Íd.*, pág. 38.

comprobantes de pago,[30] pero afirmó que no los revisó ni controló quién tenía contacto con los archivos terminados.[31]

**Nancy Rivera Domínguez**

La señora Rivera Domínguez trabajó como Compradora en la Superintendencia del Capitolio desde el año 2000 y para los años 2010-2012 fungió como Supervisora Interina en el área de compras.[32] Identificó que el señor Martínez Morales era gerente del área de proyectos de construcción para los años 2010 al 2012.[33] Detalló el procedimiento de compras desde que recibía las requisiciones de compra, la verificación de firmas del gerente del área, almacén y jefe administrativo, el proceso de los compradores, el proceso con las hojas de cotizaciones hasta la obtención de la orden de compra oficial.[34] Como Supervisora, firmó el récord de cotizaciones y las órdenes de compra, siendo necesario para procesar dichas órdenes.[35] Puntualizó que durante los años 2011 al 2012, le llamó la atención que se procesaron muchas órdenes a favor de Restaura.[36] Además, en vez de llegar la requisición de compra para comenzar la cotización con los suplidores, las requisiciones en las que licitaba Restaura venían unidas con cotizaciones principalmente de Restaura, MEG y RL, lo que resultó en que las subastas siempre se adjudicaran a favor de Restaura.[37] Mencionó que el señor Danois Román era el representante de Restaura y firmaba las cotizaciones de dicha corporación.[38] Durante su testimonio, se repasó el registro de cotizaciones y órdenes de compras sobre obras de construcción y reparaciones, algunas exceptuadas por situaciones de emergencias,

---

[30] TPO del 26 de septiembre de 2018, págs. 40-41.
[31] *Íd.*, págs. 70-76.
[32] TPO del 27 de septiembre de 2018, págs. 17-18.
[33] *Íd.*, págs. 22-23.
[34] *Íd.*, págs. 22-35.
[35] TPO del 1 de octubre de 2018, pág. 52.
[36] *Íd.*, pág. 60.
[37] *Íd.*, págs. 61-72; TPO del 11 de octubre de 2018, pág. 29.
[38] TPO del 11 de octubre de 2018, pág. 32; TPO del 18 de octubre de 2018, págs. 8-80, 114-115.

adjudicadas a favor del Restaura, cotizadas por el señor Danois Román,[39] y a favor de Fasan, cotizadas por la señora Cuervo Sierra.[40]

Por otro lado, afirmó que la firma del señor Acosta Ramírez tenía el propósito de certificar que había disponibilidad de fondos para costear las obras.[41] En el contrainterrogatorio, aceptó que el señor Martínez Morales nunca le instruyó procesar una orden de compra.[42] Aseveró que, según el Reglamento del Capitolio, la firma del señor Mendoza Martínez era la autorizada para generar el pago en la Superintendencia del Capitolio, mas no la firma del señor Martínez Morales.[43] Además, declaró que no era incorrecto que las requisiciones llegaran a la Oficina de Compra, unidas a las cotizaciones.[44] Por otra parte, manifestó que el señor Liste Liñeira y su hijo no le informaron que el señor Danois Román carecía de autorización para actuar a nombre de RL.[45]

El 16 de enero de 2019, el TPI declaró a la señora Rivera Domínguez como testigo no disponible dado que el Ministerio Público comentó que retiraría el convenio de inmunidad para radicarle cargos criminales.[46]

**Karen Rivera Ortiz**

Era ingeniera, planificadora licenciada, y la socia mayoritaria de MEG.[47] Declaró que entre los años 2010 al 2012, tuvo tres (3) contratos en el área de inspección de proyecto de la Superintendencia del Capitolio. Entre sus funciones se encontraba, verificar que la construcción estuviese conforme con los planos, dirigir las reuniones

---

[39] TPO del 18 de octubre de 2018, págs. 7-133; TPO del 22 de octubre de 2018, págs. 6-78.
[40] TPO del 22 de octubre de 2018, págs. 39-62.
[41] TPO del 27 de septiembre de 2018, pág. 69.
[42] TPO del 24 de octubre de 2018, pág. 40.
[43] *Íd.*, pág. 94-95.
[44] *Íd.*, pág. 92.
[45] TPO del 7 de noviembre de 2018, pág. 69.
[46] TPO del 16 de enero de 2019. Durante el juicio, el TPI admitió el testimonio vertido por la señora Rivera Domínguez en la vista preliminar. No obstante, un panel hermano de este Tribunal revocó la referida determinación mediante el recurso KLCE201900321.
[47] TPO del 29 de noviembre del 2018, págs. 138-139.

de proyecto y entregar los informes de inspección a la Oficina de Gerencia de Proyectos.[48] La testigo describió el contenido de las cotizaciones que enviaba a la Superintendencia del Capitolio como Presidenta de MEG.[49] Durante su testimonio, se le mostraron varias cotizaciones a nombre de MEG, las cuales estableció que no las preparó dado que carecían de la fecha, su firma, su autorización ni la sección de términos y condiciones.[50] Identificó varias cotizaciones que contenía su firma digital, pero aseveró que no plasmó su firma digital, ella ni otra persona de MEG los autorizó, desconocía quien preparó los documentos a nombre de MEG, más no llevó las cotizaciones a la Superintendencia del Capitolio para los proyectos.[51] A saber:

| Exhibit | Propuesta de MEG | Testimonio de la señora Rivera Ortiz |
|---|---|---|
| 122 | Construcción de la rampa del Edificio Medicina Tropical (orden de compra 13250051).[52] | Expuso que el documento tenía el formato de MEG, pero desconocía quien lo preparó, más que contenía su nombre sin su firma y sin la fecha. Afirmó que no realizó cotización para el proyecto. |
| 125 | Trabajos de electricidad en el Edificio Antiguo de Recursos Naturales (orden de compra 13250058).[53] | Afirmó que el documento no tenía fecha ni firma, más que no lo preparó. |
| 126 | Arreglos en la oficina del tercer piso del Edificio Antiguo de Recursos Naturales (orden de compra 13250059).[54] | Puntualizó que el documento no tenía firma, más desconocía quién lo preparó. |
| 128 | Construcción del *playground* de niños en el Capitolio (orden de compra 13250066).[55] | Testificó que el documento no tenía firma ni fecha, desconocía quién lo preparó. Asimismo, afirmó que no autorizó preparar dicha propuesta. |
| 130 | Remodelación de la oficina de la Senadora Evelyn Vázquez (orden de compra 13250146).[56] | Afirmó que carecía de firma y de fecha, más que nunca fue autorizado por alguien en MEG ni por su persona. |
| 135 | Instalación de puerta de madera en la Oficina de la Superintendencia del Capitolio (orden de compra 13250192).[57] | Alegó que carecía de firma y de fecha, más que nunca fue autorizado por MEG. |
| 147 | Mejoras en las puertas francesas de la Cámara de | Subrayó que la propuesta contenía su firma digital, pero que no autorizó |

---

[48] *Íd.*, págs. 140-141.
[49] *Íd.*, págs. 144-145.
[50] *Íd.*, págs. 151-184, 193-195.
[51] *Íd.*, págs. 163-183.
[52] *Íd.*, págs. 151-152.
[53] *Íd.*, págs. 154-157.
[54] *Íd.*, págs. 157-158.
[55] *Íd.*, págs. 158-159.
[56] *Íd.*, pág. 161.
[57] *Íd.*, págs. 161-162.

| | | |
|---|---|---|
| | Representantes (orden de compra 13250305).[58] | utilizar ni estampar su firma para esta propuesta. |
| 149 | Arreglos en la oficina del representante Ángel Pérez Otero (orden de compra 13250310).[59] | Manifestó que el documento carecía de fecha, no autorizó ni estampó su firma digital ni sometió dicha propuesta en la Superintendencia del Capitolio. |
| 150 | Reparación de estructura eléctrica en la oficina del representante Jorge Colbert Toro (orden de compra 13250311).[60] | Puntualizó que no autorizó que se plasmara su firma digital y nadie de MEG estaba autorizado a presentar dicha propuesta ante la Superintendencia del Capitolio. Asimismo, planteó que la propuesta carecía de fecha. |
| 151 | Mejoras en la oficina del Senador José Dalmau Santiago (orden de compra 13250312).[61] | Afirmó que el documento carecía de fecha, no autorizó a persona alguna a plasmar su firma digital ni a presentar dicha propuesta en la Superintendencia del Capitolio. |
| 152 | Reparación de paredes y cielo raso en la oficina del representante Luis Vega Ramos (orden de compra 13250313).[62] | Testificó que el documento carecía de fecha, no estaba autorizado por ella, ni por persona alguna de MEG para plasmar su firma digital y presentarlo en la Superintendencia del Capitolio. |
| 153 | Instalación de puertas de metal a prueba de incendios para los ascensores del Edificio Baltasar Corrada del Río (orden de compra 13250314).[63] | Manifestó que el documento carecía de fecha, más que no estaba autorizado por ella ni por personal alguno de MEG para plasmar su firma y utilizar el documento. |
| 154 | Construcción de pared en la Plaza Rafael Hernández (orden de compra 13250323).[64] | Afianzó que la referida propuesta no contenía fecha ni estaba autorizada por su persona ni por personal de MEG. |
| 155 | Arreglo del pasillo del tercer nivel del Edificio Antiguo de Recursos Naturales (orden de compra 13250332).[65] | Adujo que la propuesta carecía de fecha y no autorizó plasmar su firma digital ni presentarla ante la Superintendencia del Capitolio. |
| 156 | Construcción de cuarto para colocar cajero automático (ATH) en el Edificio Medicina Tropical (13250334).[66] | Arguyó que la propuesta carecía de fecha y no autorizó plasmar su firma digital ni presentarla ante la Superintendencia del Capitolio. |
| 157 | Construcción de cuarto para colocar cajero automático (ATH) en el Edificio Medicina Tropical (13250334-M).[67] | Subrayó que el documento carecía de fecha, más no estaba autorizado por su persona ni por el personal de MEG. |
| 158 | Arreglo de las tuberías sanitarias de la oficina del representante Jorge Colbert Toro (orden de compra 13250335).[68] | Planteó que el documento carecía de firma, más que no autorizó plasmar su firma digital ni a alguien de MEG para utilizarla. |
| 159 | Instalación de *cyclone fence* temporera para la Plaza de los Presidentes (orden de compra 13250392).[69] | Manifestó que el documento carecía de fecha, más no estaba autorizado por su persona ni el personal de MEG. |
| 160 | Instalación de pluma de agua en la Plaza San Juan | Sostuvo que el documento carecía de firma, más que no autorizó plasmar su firma digital ni a alguien de MEG para utilizarla. |

[58] *Íd.*, págs. 162-164.
[59] *Íd.*, págs. 164-165.
[60] *Íd.*, págs. 166-167.
[61] *Íd.*, págs. 167-168.
[62] *Íd.*, págs. 168-170.
[63] *Íd.*, págs. 170-171.
[64] *Íd.*, págs. 171-172.
[65] *Íd.*, pág. 172.
[66] *Íd.*, págs. 172-173.
[67] *Íd.*, págs. 173-174.
[68] *Íd.*, págs. 174-175.
[69] *Íd.*, págs. 175-176.

| | | |
|---|---|---|
| | Bautista (orden de compra 13250393).[70] | |
| 161 | Suplido de *hose bib* para el edificio de los anexos (orden de compra 13250394).[71] | Afirmó que el documento carecía de firma, más que no autorizó plasmar su firma digital ni a alguien de MEG para utilizarla. |
| 163 | Arreglo de plomería en la Plaza San Juan Bautista (orden de compra 13250452).[72] | Atestó que el documento carecía de firma, más que no autorizó plasmar su firma digital ni a alguien de MEG para utilizarla. |
| 165 | Arreglo del área de la antigua cafetería del Capitolio (orden de compra 13250467).[73] | Subrayó que el documento carecía de firma, más que no autorizó plasmar su firma digital ni a alguien de MEG para utilizarla. |
| 167 | Arreglo de la oficina del Senador Larry Seilhamer Rodríguez (orden de compra 13250479).[74] | Afirmó que el documento carecía de firma, más que no autorizó plasmar su firma digital ni a alguien de MEG para utilizarla. |
| 170 | Arreglo de oficina de asesores de la Presidencia de la Cámara de Representantes (orden de compra 13250508).[75] | Atestó que el documento carecía de firma, más que no autorizó plasmar su firma digital ni a alguien de MEG para utilizarla. |

Por otra parte, manifestó que MEG nunca ofreció servicios de construcción, sino de inspección.[76] Estableció que sus servicios de inspección consistían en verificar que las construcciones estuvieran en cumplimiento con los planos, dirigir reuniones de proyectos y entregar los informes de inspección.[77] Relató que durante el referido periodo efectuó solamente tres (3) proyectos de inspección en la Superintendencia del Capitolio, los que estuvieron relacionados con la remodelación del tercer nivel del Edificio Medicina Tropical, la Plaza Identidad y los talleres de mecánica del Senado.[78] Particularizó que entre los años 2010 al 2011 se reportaba con el apelante Martínez Morales y desde mitad del 2012 a finales del 2013 con la señora Acobis Ross.[79] En el contrainterrogatorio, afirmó que, para los años 2010 al 2012, el señor Danois Román no era el único contratista a quien se le adjudicaban las órdenes de compra, según la presentación

---

[70] *Íd.*, págs. 176-177.
[71] *Íd.*, pág. 177.
[72] *Íd.*, págs. 178-180.
[73] *Íd.*, págs. 181-182.
[74] *Íd.*, págs. 182-183.
[75] *Íd.*, págs. 183-184.
[76] *Íd.*, págs. 196-197.
[77] *Íd.*, pág. 140.
[78] *Íd.*, pág. 188.
[79] *Íd.*, pág. 141.

anual de proyectos.[80] Asimismo, estableció que el señor Danois Román era el representante autorizado de RL.[81]

**Luis Fernando Giraldo Arroyave**

El testigo laboró con RL bajo la supervisión directa del señor Danois Román y, posteriormente, con Restaura.[82] Durante su testimonio, le mostraron varias cotizaciones de Constructora Lingua firmadas con su nombre en calidad de gerente de la compañía. No obstante, testificó que no los firmó, no era gerente, socio ni tenía relación alguna con Constructora Lingua.[83] En particular, se le mostró una propuesta de Constructora Lingua para el proyecto de la fuente en el Edificio Antiguo de Recursos Naturales (orden de compra 12250640), firmado con su nombre como Gerente de la Corporación.[84] Sin embargo, puntualizó que aunque la firma era parecida a la suya, no recordaba haber suscrito dicho documento, más que no tuvo relación alguna con el proyecto.[85] A su vez, se le mostró una propuesta de Constructora Lingua para el proyecto de la cafetería del Capitolio (orden de compra 12250641) firmada con su nombre, a pesar de que afirmó que no preparó dicho documento y reiteró que no tenía relación alguna con la corporación.[86] En el contrainterrogatorio, afirmó que el señor Danois Morales manejaba los asuntos de RL y nadie conocía al señor Liste Liñeira.[87] Manifestó que cuando estaba trabajando con RL, se percató que el apelante Danois Román estaba realizando otros trabajos de Restaura, por lo que le peticionó que no le pagara con cheques emitidos por RL, sino a nombre de Restaura.[88]

**Oscar Mendoza Martínez**

---

[80] TPO del 10 de diciembre de 2018, págs. 52, 56-57.
[81] *Íd.,* pág. 60.
[82] *Íd.,* pág. 85.
[83] *Íd.,* págs. 86-91.
[84] *Íd.,* pág. 87.
[85] *Íd.,* págs. 89-90.
[86] *Íd.,* págs. 90-91.
[87] *Íd.,* págs. 107-108.
[88] *Íd.,* pág. 119.

El señor Mendoza Martínez trabajó como Supervisor del Almacén de Propiedad en la Superintendencia del Capitolio, pero desde el año 2002 hasta el 2017, laboró como receptor de propiedad.[89] Estableció que, como receptor, era el encargado de certificar que la mercancía coincidiera con la orden.[90] Manifestó que, al no ser ingeniero ni arquitecto, delegó la certificación de la mercancía relacionada con las órdenes de proyecto a la Oficina de Gerencia de Proyectos.[91] Identificó que, durante los años 2010 al 2012, las certificaciones de proyectos se firmaron por el apelante Martínez Morales, la señora Acobis Ross, el señor Rodríguez Cortés y el señor Javish Muñiz.[92] Señaló que una vez verificada la certificación, firmaba el *Informe de Recibo e Inspección*, conocido como "la viuda", documento necesario para que el Departamento de Finanza emitiera los pagos.[93] No obstante, admitió que, contrario al Reglamento del Capitolio, llegó a firmar el *Informe de Recibo e Inspección* en una fecha previa a que se le entregara la certificación, reconociendo que desconocía si las obras se llegaron a realizar.[94] Puntualizó que le comentó a la señora Rivera Domínguez que todas las órdenes de compras se estaban adjudicando a favor de Restaura, por lo que desde ese momento le dejaron de pasar las requisiciones.

**Armando Álvarez Suárez**

Fungió como Comprador en la Superintendencia del Capitolio desde el año 2001.[95] Estableció que para los años 2010 al 2012, una vez la señora Rivera Domínguez le enviaba una requisición, se comunicaba con los suplidores para que cotizaran, evaluaba las cotizaciones, llenaba el registro de cotizaciones y se lo entregaba al

---

[89] TPO del 12 de diciembre de 2018, págs. 6-7.
[90] *Íd.*, págs. 7-8.
[91] *Íd.*, págs. 7-9.
[92] *Íd.*, págs. 13-14.
[93] *Íd.*, pág. 10; TPO del 15 de julio de 2019, págs. 96-97.
[94] TPO del 15 de julio de 2019, págs. 104-115.
[95] TPO del 18 de julio de 2019, pág. 19.

Director.[96] Expresó que la señora Rivera Domínguez le enviaba las requisiciones de compras conjunto con cotizaciones, sin que el testigo realizara su labor de solicitar dichas cotizaciones.[97] Asimismo, identificó que a pesar de certificar que recibió las cotizaciones indicadas y que las mismas aparecían en el documento, la señora Rivera Domínguez les entregó las cotizaciones y le instruyó que las montara en el Récord de Cotizaciones. Indicó que dichas órdenes de compra se adjudicaron a favor de este suplidor de Restaura y Fasan, por lo que le planteó la preocupación a la señora Rivera Domínguez, quien no le pasó más cotizaciones.[98] Testificó que por dicho patrón de adjudicación, solicitó a la señora Rivera Domínguez no trabajar más obras de construcción.[99]

**Vanessa Acobis Ross**

Desde enero hasta mayo de 2012, laboró como Coordinadora de Proyectos en la Superintendencia del Capitolio y a partir de dicha fecha hasta noviembre de 2017, trabajó como Directora Interina de la Oficina de Gerencia de Proyectos.[100] Indicó que se asignaban coordinadores para que realizaran las tareas diarias de supervisión, en las que se aseguraran que el trabajo se realizara. Estableció que a pesar de que el Departamento de Compras debía gestionar las cotizaciones, por instrucciones de sus superiores, peticionó cotizaciones a varias compañías como Restaura, Techno Mármol, Capital Project, entre otras.[101] Aseveró que firmó cotizaciones conjunto con el señor Martínez Morales, mientras que el señor Rodríguez Cortés firmó las certificaciones de los proyectos,[102] que

---

[96] *Íd.*, págs. 20-23.
[97] *Íd.*, págs. 28-35, 38-43, 67.
[98] *Íd.*
[99] *Íd.*, pág. 62.
[100] *Íd.*, págs. 171-173.
[101] *Íd.*, pág. 289-291; TPO del 19 de julio de 2019, págs. 44-51.
[102] TPO del 18 de julio de 2019, págs. 295-312.

declaraban que la obra inspeccionada se realizó conforme con la descripción de la propuesta.[103]

**Manuel Liste Liñeira**

Desde el año 1987 era el Presidente de RL, dedicada a construcción y la restauración de edificios antiguos y modernos.[104] Aseveró que desde el año 2002, el señor Danois Román trabajó para RL y llegó a ser *Property Manager*, posición descrita como de confianza total debido a que tenía el poder de firmar contratos para la compañía.[105] Estableció que el señor Danois Román estaba autorizado a firmar contratos con su propio nombre, pero nunca con el nombre de Liste Liñeira.[106] Por otro lado, manifestó que de la Superintendencia del Capitolio le mostraron sobre veintiocho (28) órdenes de compra a nombre de RL y firmadas con su nombre, pero sin ser firmadas por su persona, sin ser autorizadas ni cotizadas por RL.[107] Sobre el particular, señaló que no reconoció la firma expuesta sobre su nombre.[108] Asimismo, se le mostraron varias propuestas a nombre de RL y firmadas encima su nombre, pero aseguró que nunca las preparó, firmó ni autorizó a persona alguna a realizar dichas cotizaciones ni a plasmar su firma.[109] A saber:

| Exhibit | Propuesta de RL | Testimonio del señor Liste Liñeira |
|---------|-----------------|-------------------------------------|
| 28 | Mejoras en el segundo nivel del Edificio Antiguo de Recursos Naturales (orden de compra 11251100). | Las partes estipularon que el señor Liste Liñeira no firmó la propuesta; no la preparó, ni autorizó su preparación. |
| 63 | Restauración de la fuente interior del Edificio Medicina Tropical (orden de compra 12250640). | Sostuvo que aparecía firmada por Manuel Liste Liñeira, firma que no reconocía por no ser la suya; no preparó la propuesta ni autorizó a alguien a prepararla.[110] |
| 65 | Mejoras en la cafetería del Capitolio (orden de compra 12250641). | Testificó que aparecía firmada por Manuel Liste Liñeira, firma que no reconocía por no ser la suya; no preparó la propuesta ni autorizó a alguien a prepararla.[111] |

---

[103] TPO del 19 de julio de 2019, págs. 20-26, 238.
[104] TPO del 26 de julio de 2019, págs. 15-16.
[105] *Íd.*, págs. 18-19.
[106] *Íd.*, pág. 19.
[107] *Íd.*, pág. 26.
[108] *Íd.*
[109] *Íd.*, págs. 27-58, 63-68.
[110] *Íd.*, pág. 63.
[111] *Íd.*, págs. 63-65.

| 70 | Restauración de la escalera del Edificio Medicina Tropical por (orden de compra 12250783). | Alegó que el nombre Manuel Liste aparecía debajo de una firma que no reconocía por no ser la suya; no preparó la propuesta, ni autorizó a alguien a prepararlo.[112] |
|---|---|---|
| 72 | Suplido y la instalación de mosaicos de fuentes en el Edificio Medicina Tropical (orden de compra 12250822). | Concretó que el nombre Manuel Liste aparecía debajo de una firma que no reconocía por no ser la suya; no preparó la propuesta, ni autorizó a alguien a prepararlo.[113] |
| 73 | Trabajo de plomería de la Cámara de Representantes (orden de compra 12250893). | Las partes estipularon que el señor Liste Liñeira no firmó la propuesta; no la preparó, ni autorizó su preparación. |
| 74 | Mejoras de las puertas del Edificio Covadonga (orden de compra 12250898). | Las partes estipularon que el señor Liste Liñeira no firmó la propuesta; no la preparó, ni autorizó su preparación. |
| 78 | Mejoras en el pasillo del Edificio Medicina Tropical para conectar los lados Este y Oeste (orden de compra 12250968). | Las partes estipularon que el señor Liste Liñeira no firmó la propuesta; no la preparó, ni autorizó su preparación. |
| 82 | Fabricación e instalación de los muebles para el Salón de Audiencia Baltasar Corrada del Río (orden de compra 12250974). | Las partes estipularon que el señor Liste Liñeira no firmó la propuesta; no la preparó, ni autorizó su preparación. |
| 84 | Restauración de la Plaza de los Policías (orden de compra 12250975). | Las partes estipularon que el señor Liste Liñeira no firmó la propuesta; no la preparó, ni autorizó su preparación. |
| 86 | Remodelación de las paredes del Este del Edificio Medicina Tropical (orden de compra 12251047). | Las partes estipularon que el señor Liste Liñeira no firmó la propuesta; no la preparó, ni autorizó su preparación. |
| 88 | Remodelación del sistema de plomería del Edificio Medicina Tropical (orden de compra 12251048). | Las partes estipularon que el señor Liste Liñeira no firmó la propuesta; no la preparó, ni autorizó su preparación. |
| 97 | Restauración de techos de aceros en el área de transportación del Senado (orden de compra 12251074). | Las partes estipularon que el señor Liste Liñeira no firmó la propuesta; no la preparó, ni autorizó su preparación. |
| 104 | Restauración del área de reproducción de la Cámara de Representante (orden de compra 12251127). | Las partes estipularon que el señor Liste Liñeira no firmó la propuesta; no la preparó, ni autorizó su preparación. |
| 105 | Mejoras de la Plaza Manuel Gandía (orden de compra 12251128). | Las partes estipularon que el señor Liste Liñeira no firmó la propuesta; no la preparó, ni autorizó su preparación. |
| 136 | Mantenimiento de la Plaza de los Presidentes, Recordación y San Juan Bautista (orden de compra 13250202). | Afirmó que el nombre Manuel Liste aparecía debajo de una firma que no reconocía por no ser la suya; no preparó la propuesta, ni autorizó a alguien a prepararlo.[114] |
| 138 | Instalación de dos puertas de aluminio en Medical Arts (orden de compra 13250226). | Apuntó que el nombre Manuel Liste aparecía debajo de una firma que no reconocía; no preparó la propuesta, ni autorizó a alguien a prepararlo.[115] |
| 142 | Fabricación e instalación de puertas PVC del tercer piso del Edificio Antiguo de Recursos | Alegó que el nombre Manuel Liste Liñeira aparecía debajo de una firma que no reconocía por no ser la suya; |

[112] *Íd.*, pág. 68.
[113] *Íd.*, págs. 66-67.
[114] *Íd.*, págs. 27-28.
[115] *Íd.*, pág. 46.

| | | |
|---|---|---|
| | Naturales (orden de compra 13250262). | no preparó la propuesta, ni autorizó a alguien a prepararlo.[116] |
| 143 | Fabricación e instalación de ventanas PVC del tercer piso del Edificio Antiguo de Recursos Naturales, escrito a manuscrito (orden de compra 13250263). | Adujo que el nombre Manuel Liste Liñeira aparecía debajo de una firma que no reconocía por no ser la suya; no preparó la propuesta, ni autorizó a alguien a prepararlo.[117] |
| 147 | Arreglo la puerta de madera del Capitolio (orden de compra 13250305). | Las partes estipularon que el señor Liste Liñeira no firmó la propuesta; no la preparó, ni autorizó que otro la preparara. |
| 154 | Elaboración *low-wall* de la Plaza del Jíbarito (orden de compra 13250323). | Aseguró que el nombre Manuel Liste aparecía debajo de una firma que no reconocía; no preparó la propuesta, ni autorizó a alguien a prepararlo.[118] |
| 155 | Remodelación del pasillo del tercer nivel del Edificio 3 (orden de compra 13250332). | Arguyó que el nombre Manuel Liste aparecía debajo de una firma que no reconocía; no preparó la propuesta, ni autorizó a alguien a prepararlo.[119] |
| 156 | Instalación de ATH en el Edificio Medicina Tropical (orden de compra 13250334). | Afirmó que el nombre Manuel Liste aparecía debajo de una firma que no reconocía; no preparó la propuesta, ni autorizó a alguien a prepararlo.[120] |
| 159 | *Cyclone fences* para la Plaza de los Veteranos (orden de compra 13250392). | Manifestó que el nombre Manuel Liste aparecía debajo de una firma que no reconocía; no preparó la propuesta, ni autorizó a alguien a prepararlo.[121] |
| 160 | Trabajos de agua potable para la Plaza San Juan Bautista (orden de compra 13250393), | Alegó que el nombre Manuel Liste aparecía debajo de una firma que no reconocía; no preparó la propuesta, ni autorizó a alguien a prepararlo.[122] |
| 164 | Remodelación del vestíbulo del Capitolio (Antigua Cafetería) (orden de compra 13250467). | Subrayó que el nombre Manuel Liste Liñeira aparece debajo de una firma que no reconocía por no ser la suya; no preparó la propuesta, ni autorizó a alguien a prepararlo.[123] |
| 165 | Fabricación de acera del Senado (orden de compra 13250466). | Alegó que el nombre Manuel Liste Liñeira aparecía debajo de una firma que no reconocía por no ser la suya; no preparó la propuesta, ni autorizó a alguien a prepararlo.[124] |
| 167 | Restauración de la oficina en el anexo del Senado (orden de compra 13250479) | Afianzó que el nombre Manuel Liste Liñeira aparecía debajo de una firma que no reconocía por no ser la suya; no preparó la propuesta, ni autorizó a alguien a prepararlo.[125] |

Por otra parte, el señor Liste Liñeira expresó que era el Presidente de Constructora Lingua.[126] Expuso que el señor Giraldo Arroyave subcontrataba trabajos a Constructora Lingua, pero nunca tuvo una posición gerencial ni se le autorizó a presentar propuestas

---

[116] *Íd.*, pág. 47.
[117] *Íd.*, págs. 48-49.
[118] *Íd.*, págs. 49-50.
[119] *Íd.*, págs. 50-51.
[120] *Íd.*, págs. 51-52.
[121] *Íd.*, pág. 53.
[122] *Íd.*, págs. 53-54.
[123] *Íd.*, págs. 54-55.
[124] *Íd.*, págs. 57-58.
[125] *Íd.*, pág. 58.
[126] *Íd.*, págs. 60-61.

por Constructora Lingua.[127] En particular, el señor Liste Liñeira manifestó que nunca autorizó al señor Giraldo Arroyave a preparar ni firmar una propuesta a nombre de Constructora Lingua para el proyecto de la fuente del Edificio Medicina Tropical (orden de compra 12250640)[128] ni para el proyecto de remodelación de la cafetería del Capitolio (orden de compra 12250641).[129]

**<u>Manuel José Liste Reyes</u>**

Declaró que ocupó varias posiciones en RL hasta el 2014, incluyendo Vicepresidente.[130] Relató que conjunto con la señora Acobis Ross, el señor Javish Muñiz, el personal de la Oficina del Contralor y el señor José Collazo, recorrió las obras supervisadas por el señor Danois Román, en las que RL sufragó los materiales y la mano de obra.[131] El señor Liste Reyes atestó que firmó que los cheques de salarios para los empleados de RL, incluyendo por los servicios del señor Danois Román, para las obras de construcción pagadas por la Superintendencia del Capitolio a favor de Restaura.[132] En concreto, el testigo puntualizó que el señor José Collazo, quien era empleado de RL, trabajó en la orden de compra 10250730 para el reemplazo del techo del puente de los Edificios 3 y 4 del Edificio Antiguo de Recursos Naturales que fue pagada a favor de Restaura.[133] Sobre el particular, afirmó que RL emitió un cheque a favor del señor José Collazo por dicho trabajo que el testigo personalmente inspeccionó.[134] Asimismo, al testigo le causó risa que para la orden de compra 10250730 apareciera una cotización de Constructora Lingua, cuando dicha corporación de su padre no estaba en función para ese momento.[135] Por otro lado, el testigo subrayó que el señor

---

[127] *Íd.*, págs. 62, 63-64.
[128] *Íd.*, pág. 62.
[129] *Íd.*, págs. 63-65.
[130] *Íd.*, pág. 281.
[131] *Íd.*, pág. 293-294.
[132] *Íd.*, págs. 304-314, TPO del 22 de agosto de 2019, las págs.138-142.
[133] TPO del 26 de julio de 2019, págs. 305-307.
[134] *Íd.*, pág. 306.
[135] *Íd.*; TPO del 5 de agosto de 2019, págs. 18-19.

José Collazo y otros empleados de RL trabajaron para la orden de compra 10250836 de una placita en el lado sur del Edificio 5, la cual se pagó el 13 de mayo de 2010 a favor de Restaura, fecha en la que el señor Danois Román aún trabajaba para RL.[136] Con relación a la orden de compra 11250179 sobre la conexión de una tubería de plomería en la Lomita de los Vientos, el señor Liste Reyes expresó que acudió a dicho lugar, donde estuvieron trabajando el señor José Collazo conjunto con el señor Felipe Blanco, un plomero pagado por RL.[137] No obstante, manifestó que la Superintendencia del Capitolio pagó dicha obra a favor de Restaura.[138] Las partes estipularon que el señor Liste Reyes declararía que los trabajos de las siguientes órdenes de compra se realizaron con el equipo y personal de RL, sin que la Superintendencia del Capitolio le pagara:[139]

| Exhibit | Orden de compra |
|---|---|
| 15 | 11250180 – Restauración del Salón Protocolar |
| 16 | 11250181 – Restauración del Salón Protocolar |
| 21 | 11250547 – Reparación de tuberías y restauración de la oficina de la Senadora Lorna Soto Villanueva |
| 30 | 11251143 – Compra e instalación de mueble para televisar en el Salón de Conferencias |
| 33 | 11251144 – Compra e instalación de luminarias en algunas oficinas del pasillo y calentador para el baño del Comisionado Residente |
| 37 | 12250161 – Remodelación de dos (2) baños en la Secretaría del Senado |
| 40 | 12250162 – Remodelación del baño en el Mezanine del Edificio Baltasar Corrada del Río |
| 41 | 12250163 – Remodelación de dos (2) baños en el segundo piso del Capitolio |
| 43 | 12250164 – Demolición de covacha en el túnel del Edificio Medicina Tropical |
| 50 | 12250275 – Remodelación de los baños del tercer piso del Edificio Medicina Tropical |
| 63 | 12250640 – Restauración de la fuente interior del Edificio Medicina Tropical |
| 70 | 12250783 – Remodelación de la escalera del Edificio Medicina Tropical |
| 76 | 12250961 – Suplido para la puerta del baño del primer piso del Capitolio |
| 78 | 12250968 – Restauración del primer piso en el ala Sur del Edificio Medicina Tropical |
| 86 | 12251047 – Reparación de la fachada del Edificio Medicina Tropical |
| 100 | 12251123 – Mejoras en la antigua Oficina de Auditoría de la Cámara de Representantes |

**Sandra Rodríguez Rodríguez**

---

[136] TPO del 26 de julio de 2019, págs. 308-311.
[137] *Íd.*, págs. 313-314.
[138] *Íd.*, pág. 314.
[139] TPO del 5 de agosto de 2019, págs. 12-13.

Desde el 2012, trabaja como Asesora de Seguros en la CFSE.[140] Mencionó que cuando un patrono tiene un contrato con agencias gubernamentales, dichas agencias deben requerir evidencia de la adquisición del seguro de la CFSE.[141] Relató que recibió una citación del Departamento de Justicia para que corroborase si el señor Danois Román y la señora Cuervo Sierra adquirieron la póliza de la CFSE para los proyectos en el Capitolio.[142] Explicó que según la certificación emitida el 13 de abril de 2015 por la CFSE, tras realizar una búsqueda sobre el seguro social patronal, Fasan, Restaura, el señor Danois Román y la señora Cuervo Sierra, carecían de una póliza para los años 2010, 2011, 2012 y 2013.[143] Igualmente, relató que para los proyectos adjudicados a los patronos antes mencionados en el Capitolio, no se emitieron pólizas de la CFSE.[144] Estableció que encontró que para el año 2010, obtuvieron contratos por $379,871.26 y una imposición de prima no pagada de $7,770.36; para el año 2011, adquirieron contratos por $547,711.97 y una imposición de prima no pagada de $12,244.97 y para el año 2012, tuvieron contratos por $1,174,715.50 y una imposición de prima no pagada de $113,059.04.[145] Declaró que, para el año 2013, Fasan adquirió una póliza permanente que no cubría los proyectos, dado que no estaban relacionadas a las órdenes de compra.[146] En el contrainterrogatorio, afirmó que, entre los mecanismos que posee la CFSE para cobrar la póliza a los patronos se encuentran las cartas de cobro, pero para Fasan y Restaura no se agotó dicho recurso administrativo.[147]

**Warren Figueroa Cruz**

---

[140] TPO del 26 de agosto de 2019, pág. 7.
[141] *Íd.*, pág. 8.
[142] *Íd.*, págs. 16-17.
[143] *Íd.*, págs. 37-38.
[144] *Íd.*, págs. 38-39.
[145] *Íd.*, pág. 47, 70-72.
[146] *Íd.*, pág. 74.
[147] *Íd.*, págs. 116-117.

Declaró como perito y aseveró que el hecho de que una actividad se refleje en una cuenta de un funcionario no necesariamente significa que dicho funcionario la realizó, dado que pueden existir eventualidades en las que una tercera persona acceda a la cuenta.[148]

**José Candelas Vázquez**

Este perito relató que el 11 de julio de 2013, incautó seis (6) computadoras de la Superintendencia del Capitolio, las cuales se transportaron al laboratorio forense digital de la División de Análisis de Datos Forense Digital y Desarrollo Tecnológico.[149] Relató que basado en un análisis forense digital, desarrolló un informe conjunto con la señora Sonymar Torres Rivera, el señor Iván Denizard González, la señora Loida Pazó Díaz y el licenciado Rolando Emmanuelli.[150] En las computadoras asignadas a la compradora Jamilette Ramírez Sánchez y a la asistente administrativo del Departamento de Proyectos de Construcción, Gladys Alberti Torres, encontraron órdenes de compras adjudicadas a Restaura y Fasan.[151] Además, descubrieron varios correos electrónicos en los que la señora Ramírez Sánchez le peticionó a la señora Alberto Torres catorce (14) requisiciones para solicitar obras de construcción de las que once (11) se adjudicaron a Restaura y Fasan por la suma de $329,800.00.[152] Dos (2) de dichos correos electrónicos se enviaron con copia a edanois@yahoo.com.[153] En el disco duro de la computadora que la señora Alberti Torres utilizó, se hallaron propuestas de Restaura, con unos documentos creados por RL.[154] Particularizó que encontró distintas cantidades para una misma propuesta en diferentes

---

[148] *Íd.*, págs. 160-161.
[149] TPO del 19 de septiembre de 2019, págs. 6-11.
[150] *Íd.*, págs. 6-22, 38-49, 83-134.
[151] *Íd.*, pág. 20.
[152] *Íd.*, págs. 134-147.
[153] *Íd.*, pág. 134.
[154] *Íd.*, págs. 158-161.

formatos.[155] A saber, en la versión electrónica para la propuesta de la restauración del vestíbulo del Capitolio indica que se cotizó por $25,175.00, mientras en la versión física en el expediente de compras demuestra que se cotizó por $10.500.00.[156]

**Sonymar Torres Rivera**

Desde el año 2012, la perito laboraba en la División de Análisis de Datos Forenses Digital y Desarrollo Tecnológico en la Oficina del Contralor.[157] Entre agosto y septiembre de 2013, participó en el análisis forense de la computadora asignada a la señora Ramírez Sánchez y en la redacción de un informe.[158] Repasó algunos correos electrónicos en los que se solicitaron requisiciones, enviados por el usuario jramirez hacia galberti con copia a edanois, en las que resultaba agraciado el señor Danois Román.[159] Identificó un correo electrónico en el que el usuario jramirez le envió a edanois un modelo de cotización realizada por R&R Roofing para realizar drenajes en el techo del Capitolio.[160] En la computadora asignada a la señora Ramírez Sánchez, encontró varios documentos realizados en el 2004 por RL, modificado en el 2012 por jramirez y edanois como cotizaciones de obras de construcción de distintas compañías.[161]

**Giovanni Narváez Oliver**

Desde el 2013 al 2016, el señor Narváez Oliver obtuvo un contrato de asesoría legal en la Superintendencia del Capitolio.[162] Le tomó una declaración jurada al señor Rodríguez Cortés, quien estableció que, durante la administración del 2008 al 2012, se falsificó su firma en unas certificaciones de obras.[163]

**Héctor J. Figueroa Ramos**

---

[155] *Íd.*, pág. 203.
[156] Íd.
[157] TPO del 23 de septiembre de 2019, pág. 13.
[158] *Íd.*, págs. 22-25.
[159] *Íd.*, págs. 90-131.
[160] *Íd.*, págs. 164-231.
[161] *Íd.*, págs. 213-231.
[162] TPO del 10 de octubre de 2019, págs. 7-11.
[163] *Íd.*, pág. 13-31.

Desde el 2002 se dedica a ser Examinador de Documentos Dudosos en el Negociado de Ciencias Forenses (NCF).[164] Testificó que produjo un informe basado en la examinación de las firmas de las siguientes diez (10) personas: el señor Acosta Ramírez, el señor Pablo Miguel Sastre Fernández, la señora Alberti Torres, la señora Ramírez Sánchez, el señor Liste Liñeira, el señor Rodríguez Cortés, el señor Danois Román, la señora Cuervo Sierra, el señor Muñiz Reyes y el señor Martínez Morales.[165] El señor Figueroa Ramos apuntó que del análisis pericial del NCF se encontró que el señor Danois Román firmó por el señor Liste Liñeira en los documentos identificados Q-1 al Q-29.[166] A saber:

| Identificación NCF | Orden de compra | Documento firmado por el señor Danois Román a nombre del señor Liste Liñeira |
|---|---|---|
| Q-1 | 13250202 | Propuesta de RL para el mantenimiento de las plazas San Juan Bautista, La Recordación y Paseo de los Presidentes por $60,400.00. |
| Q-2 | 13250226 | Propuesta de RL para la instalación de dos puertas de aluminio en Medical Arts por $9,600.00. |
| Q-3 | 13250262 | Propuesta de RL para Propuesta para la fabricación e instalación de puertas de PVC del tercer piso del Edificio Antiguo de Recursos Naturales por $63,500.00. |
| Q-4 | 13250263-M | Propuesta de RL para la fabricación e instalación de ventanas de PVC del tercer piso del Edificio Antiguo de Recursos Naturales por la suma de $63,500.00. |
| Q-5 | 13250305 | Propuesta de RL para el arreglo de la puerta de madera del Capitolio por $6,600.00. |
| Q-6 | 13250323 | Propuesta de RL para la elaboración *low-wall* de la Plaza del Jíbarito por $4,885.00. |
| Q-7 | 13250332 | Propuesta de RL para la remodelación del área del pasillo del tercer nivel del Edificio 3 por $73,800.00. |
| Q-8 | 13250334-M | Propuesta de RL para la instalación de ATH en el Edificio Medicina Tropical por $29,600.00. |
| Q-9 | 13250335 | Propuesta de RL para el arreglo de tubería sanitaria de la oficina del Representante Jorge Colbert Toro por $2,800.00. |
| Q-10 | 13250392 | Propuesta de RL para la instalación de *cyclone fences* en la Plaza de los Veteranos por $7,800.00. |
| Q-11 | 13250393 | Propuesta de emergencia de RL para trabajos de agua potable para la Plaza San Juan Bautista por $2,800.00. |
| Q-12 | 13250466 | Propuesta de RL para para la fabricación de acero del Senado por $11,000.00. |
| Q-13 | 13250467 | Propuesta de RL para la remodelación del vestíbulo del Capitolio en el sótano por la suma de $18,000.00. |

[164] *Íd.*, págs. 290-292.
[165] *Íd.*, págs. 320-346.
[166] TPO del 13 de febrero de 2020, págs. 14-16, 84-88.

| Q-14 | 13250479 | Propuesta de RL para restauración de oficina en el anexo del Senado por la suma de $87,500.00. |
|------|----------|-----|
| Q-15 | 12250640 | Propuesta de RL para la restauración de la fuente histórica por la suma de $65,000.00. |
| Q-16 | 12250641 | Propuesta de RL para la desmantelación de la cafetería del Capitolio por la suma de $54,456.89. |
| Q-17 | 12250782 | Propuesta de RL para las mejoras de las aceras del Edificio Mellado por $7,000.00. |
| Q-18 | 12250822 | Propuesta de RL para el suplido y la instalación de mosaicos de las fuentes en el Edificio Medicina Tropical por $10,600.00. |
| Q-19 | 12250783 | Propuesta de RL para la restauración de la escalera del Edificio Medicina Tropical por $17,900.00. |
| Q-20 | 12250893 | Propuesta de RL para los trabajos de plomería en la Cámara por $7,900.00. |
| Q-21 | 12250898 | Propuesta de RL para las mejoras de las puertas del antiguo Edificio Covadonga por la suma de $2,900.00. |
| Q-22 | 12250968 | Propuesta de RL para las mejoras del pasillo del Edificio Medicina Tropical para conectar los lados Este y Oeste por $48,900.00. |
| Q-23 | 12250974 | Propuesta de RL para la fabricación e instalación de muebles en el Salón de Audiencias Baltasar Corrada del Río por $37,900.00. |
| Q-24 | 12250975 | Propuesta de RL para la restauración de la Plaza de los Policías por $11,900.00. |
| Q-25 | 12251047 | Propuesta de RL para la remodelación de paredes del lado Este del Edificio Medicina Tropical por $49,000.00. |
| Q-26 | 12251048 | Propuesta de RL para la remodelación del sistema de plomería del Edificio Medicina Tropical por $6,000.00. |
| Q-27 | 12251074 | Propuesta de RL para la restauración de techos de aceros en los talleres por $17,900.00. |
| Q-28 | 12251127 | Propuesta de RL para la restauración del área de reproducción de la Cámara de Representantes por $54,600.00. |
| Q-29 | 12251128 | Propuesta de RL para las mejoras en la Plaza Manuel Gandía por $48,000.00. |

Asimismo, el testigo concretó que la señora Cuervo Sierra, el señor Muñiz Reyes, el señor Acosta Ramírez, la señora Alberti Torres ni la señora Rivera Ortiz fueron autores de las firmas de los señores Liste Liñeira y Rodríguez Cortés.[167] No obstante, encontró que varios documentos que contenían la firma del señor Martínez Morales, identificados como Q-50 al Q-54, fueron suscritos precisamente por dicho apelante.[168] A saber:

| Identificación NCF | Orden de compra | Documento firmado por el señor Martínez Morales |
|--------------------|-----------------|-----|
| Q-50 | 11250180 | El 24 de febrero de 2011, el señor Martínez Morales suscribió una *Certificación* en la que certificó que los servicios de restauración del |

---

[167] *Íd.*, págs. 20-32, 76, 99-100.
[168] *Íd.*, págs. 53-72.

| | | |
|---|---|---|
| | | Salón Protocolar se realizaron según la orden de compra 11250180. |
| Q-51 | 11250181 | El 3 de febrero de 2011, el señor Martínez Morales suscribió una *Certificación* en la que certificó que los servicios de restauración del Salón Protocolar se realizaron según la orden de compra 11250181. |
| Q-52 | 12250172-M | El 17 de noviembre de 2011, el señor Martínez Morales suscribió una Certificación en la que certificó que los servicios de demolición y restauración del puente y la fachada del Edificio Antiguo de Recursos Naturales se realizaron según las especificaciones de la orden de compra 12250172-M. |
| Q-53 | 12250172 | El 29 de agosto de 2011, el señor Martínez Morales suscribió una Certificación en la que certificó que Restaura realizó los trabajos de restauración de la fachada en las oficinas de administración satisfactoriamente, según la orden de compra 12250172, por lo que recomendó el pago de $49,292.33. |
| Q-54 | No se identifica la orden de compra | El 27 de junio de 2010, el señor Martínez Morales suscribió una carta en la que certificó que Restaura realizó satisfactoriamente los trabajos en el Área de Finanzas y Compras en el segundo piso del Edificio 3, en el Edificio Antiguo de Recursos Naturales, razón por la que recomendó el pago de $30,000.00. |

**Zuleika González Sánchez**

Desde el 2015 al 2016, laboró como Subdirectora y Directora de Recursos Humanos en la Superintendencia del Capitolio.[169] Era la persona encargada de los expedientes del personal activo e inactivo.[170] Identificó las fechas de nombramiento y culminación de empleo en la Superintendencia del Capitolio de los señores Rodríguez Cortés, Acosta Ramírez, Martínez Morales, entre otros, y sus respectivas funciones.[171] Puntualizó que el 29 de marzo de 2012, el señor Acosta Ramírez firmó un documento que contenía la descripción de sus deberes como Gerente de Servicios Administrativos.[172] Según leyó la testigos, dichos deberes del señor Acosta Ramírez consistían en lo siguiente:

> Planificar, dirigir, supervisar y coordinar la gran mayoría de procesos y actividades de la administración de diferentes fases operacionales y de servicios de apoyo correspondientes a los servicios administrativos de la adquisición de bienes, contratación de servicios, seguros institucionales, servicios de contabilidad a la Superintendencia.

---

[169] TPO del 20 de julio de 2020, págs. 17-18.
[170] *Íd.*, pág. 24.
[171] *Íd.*, págs. 83-100.
[172] *Íd.*, págs. 90-91.

Desarrollar, implantar, supervisar los trabajos que asignen en cumplimiento y la realización de las metas y objetivos organizacionales para los diferentes servicios administrativos y de apoyo corporativo.

Supervisar el cumplimiento y la aplicación efectiva de las leyes, reglamentos, normas de los asuntos administrativos de las actividades adquiridas de bienes.

La contratación de servicios, la contabilidad y otras actividades procesales relacionadas con los asuntos fiscales y financieros de las corporaciones de la Superintendencia.

Asesorar y orientar a la gerencia y otros funcionarios de la Superintendencia en todos los asuntos relacionados con los servicios de apoyo administrativo.

Asignar y supervisar las labores del personal asignado al departamento.

Colaborar con el supervisor en la implantación de los sistemas, procedimientos y órdenes administrativas que apruebe la gerencia.

Controlar, dar seguimiento, revisar, analizar los informes periódicamente, especiales y de progreso de diferentes asuntos operacionales.

Redactar y desarrollar cartas, memorandos, informes negativos y otros documentos relacionados con los asuntos que desarrolle.

Analizar, estudiar, interpretar gran variedad de leyes, reglamentos, circulares y otros escritos relacionados a los servicios y actividades del departamento.

Trasladarse a diversas localidades que desarrollen actividades relacionadas a sus funciones.

Colaborar con el supervisor en el desempeño de actividades, encomiendas especiales y/o procesales, gerenciales, administrativas y especiales que se le asignen o se lo delegue el Superintendente.

Representar a la Superintendencia en gestiones, actividades y asuntos oficiales que se le asignen.

Aprobar toda orden de compra antes de salir del departamento.

Revisar las cuentas para garantizar el cumplimiento.

Ser responsable de realizar un presupuesto y asegurarse de que cumpla con el mismo.

Notificar al Superintendente de cambios en presupuesto de las áreas de partidas.

Responsable de transferencias, balances, entradas y salidas de las cuentas bancarias.

Realizar reconciliaciones bancarias, responsable de presentar planillas trimestrales del Departamento de Hacienda, IRS y

realizar cualquier otra tarea relacionada a su puesto asignado por su supervisor.[173]

Posteriormente, la testigo afirmó que el señor Martínez Morales era el supervisor de la señora Alberti Torres.[174] Con relación al señor Martínez Morales, la testigo relató que el apelante firmó un documento que contenía la descripción de los siguientes deberes como Gerente de Proyectos de Construcción:

Dirigir, supervisar y coordinar las actividades, los trabajos, el personal administrativo del Departamento y el especializado en ingeniería, agrimensura y diseño de la Superintendencia.

Dirigir y supervisar la planificación, los estudios, desarrollo, diseño e ingeniería para los proyectos de construcción, remodelación, restauración y el recibo de las facilidades para los proyectos de la Superintendencia.

Coordinar los procesos para el desarrollo de los proyectos de construcción con diseñadores y profesionales consultivos de los campos de la arquitectura, ingeniería, agrimensura, diseño y otras que intervengan en el proceso de los proyectos de construcción de las facilidades.

Supervisar, inspeccionar y evaluar los proyectos de construcción de facilidades de la Superintendencia en sus diferentes etapas con el propósito de comprobar que los mismos cumplan con los procedimientos previos, especificaciones y con las normas de seguridad ocupacional, la reglamentación local, federal aplicable.

Analizar situaciones y asuntos especializados y operacionales correspondientes a las actividades de ingeniería y de agrimensura para el plan de desarrollo de recomendaciones.

Asesorar a la alta gerencia y a funcionarios de la Superintendencia en aspectos técnicos relacionados con todos los procesos técnicos de construcción, ingeniería, agrimensura y de los proyectos de construcción de facilidades institucionales.

Desarrollar y redactar los informes como obligaciones escritas y documentación relacionada con actividades y los trabajos de los proyectos bajo su responsabilidad.

Autorizar y certificar documentos y transacciones producidas de los procesos y actividades administrativas y especializadas de ingeniería, agrimensura, diseño y cumplimiento que se desarrollen en el área a su cargo.

Colaborar con diversos diseños, comités.

Proveer diversas comunicaciones institucionales de la Superintendencia.

Ofrecer sus recomendaciones al departamento encargado de la redacción y de los contratos relacionados a los proyectos de construcción.

---

[173] *Íd.*, págs. 91-93.
[174] *Íd.*, pág. 94.

Diseñar y desarrollar las especificaciones y planos de proyectos de construcción e instalaciones de facilidades.

Desarrollar los sistemas y parámetros de diseño con información necesaria para que los consultores externos desarrollen los proyectos de construcción e instalaciones de las facilidades.

Calcular información hidráulica, hidrológica y de otra naturaleza mediante la aplicación de fórmulas matemáticas y principios de ingeniería.

Evaluar los dibujos, diseños y especificaciones desarrolladas por otro personal de la Superintendencia u otros recursos externos con el propósito de comprobar y verificar el cumplimiento con las especificaciones y la información correspondiente del proyecto.

Coordinar y gestionar con las agencias auditables gran variedad de transacciones, permisos, autorizaciones y otros asuntos relacionados con la localización y construcción de las distintas instalaciones y facilidades administrativas por la Superintendencia.

Colaborar en el desarrollo de información relacionada con propuestas de proyectos y estimados de tiempo y costos de los proyectos de construcción.

Ofrecer orientación a los proponentes de subastas sobre la otorgación de proyectos.

Participar en el proceso de evaluación y selección de las propuestas sometidas por diferentes proveedores de servicios para la otorgación del proyecto.

Se traslada a diversas localidades en la Isla y al exterior para la gestión y desarrollo de las actividades y los trabajos relacionados a los proyectos de construcción que se le asignen.

Representar al Superintendente en gestiones y actividades oficiales que se le recomiende cuando sea requerido.[175]

## Jesús Cruz Velázquez

Desde el 2002, el señor Cruz Velázquez ocupó distintas posiciones en la Oficina del Controlador desde Auditor Asistente Ingreso, Auditor Asistente, Auditor, Auditor Senior hasta ser Gerente de Auditoría.[176] El testigo atestó que en 2011 estuvo encargado de una auditoría de unas obras de construcción en la Superintendencia del Capitolio.[177] Detalló que en febrero de 2011 comenzó el proceso de auditoría investigando el organigrama de la Superintendencia del

---

[175] *Íd.*, págs. 94-100.
[176] TPO del 13 de agosto de 2020, Tomo I, pág. 20.
[177] *Íd.*, págs. 27-29.

Capitolio y entrevistando a los funcionarios de mayor jerarquía.[178] Indicó que posteriormente definió sus cuatro (4) objetivos, los cuales eran: el área de construcción, el área de nóminas, el área de contrato de servicios profesionales y consultivos y el área de compras.[179] El testigo declaró que subsiguientemente solicitó el universo de alrededor de tres mil (3,000) órdenes compras para los años 2009 al 2012.[180] Testificó que llamó a todos los licitadores de una orden de compra para confirmar si presentaron las propuestas.[181] Puntualizó que en mayo de 2023 procedió a celebrar una reunión con el señor Liste Liñeira, quien negó haber realizado cierta propuesta, ya que no utilizaba el formato ni el logo expuesto.[182] Asimismo, sostuvo que el señor Liste Liñeira afirmó que la firma contenida en la propuesta no era la suya y que su otra corporación que aparecía como licitante, Constructora Lingua, nunca estuvo en operaciones ni llegó a realizar trabajos ni contratos.[183] Particularizó que el señor Liste Liñeira identificó que el documento a nombre de Constructora Lingua estaba firmado a nombre de Julio Collazo Herrera, lo cual era un nombre inexistente porque tenía un empleado llamado Julio, otro empleado llamado José Collazo y otro de apellido Herrera.[184] De ese ejercicio, encontró que la mayoría de las órdenes de compras relacionadas a obras de construcción para ese período se otorgaron a favor de Restaura y Fasan, específicamente ciento cuarenta y tres (143).[185]

El señor Cruz Velázquez indicó que el proceso de compra en la Superintendencia del Capitolio comenzaba con una requisición de materiales mediante el documento Solicitud de Compra en Materiales y Arrendamiento, en el que describía la necesidad que se tenía que

---

[178] *Íd.*, págs. 58-59.
[179] *Íd.*, pág. 59.
[180] *Íd.*, págs. 61-63.
[181] *Íd.*, pág. 83.
[182] *Íd.*, págs. 83-84.
[183] *Íd.*, pág. 84; TPO del 13 de agosto de 2020, Tomo II, pág. 21.
[184] TPO del 13 de agosto de 2020, Tomo II, pág. 21.
[185] TPO del 13 de agosto de 2020, Tomo I, pág. 87.

comprar.[186] Testificó que posteriormente dicho documento se trasladaba al área de materiales, en el que se determinaba si esos materiales que se necesitaban estaban disponibles.[187] De no estar los materiales, se certificaba para que se procediera con el proceso de la orden de compra.[188] Posteriormente, en el área de compras, la Directora Interina, Rivera Domínguez, autorizaba la orden de compra y le trasladaba el documento a un comprador que, en la orden de compra analizada era la señora Ramírez Sánchez.[189] Concretó que posteriormente el comprador solicitaba tres (3) cotizaciones a distintos proveedores para entonces preparar el Récord de Cotizaciones.[190] Una vez se realizaba el desglose de propuestas, el comprador determinaba a quien se le iba a adjudicar la orden de compra.[191] De ahí, el comprador certificaba que recibió las cotizaciones indicadas y que estas eran las que aparecían en el documento.[192] Posteriormente, la Directora Interina de Compras, la señora Rivera Domínguez, certificaba que verificó el informe, que lo encontró correcto y que autorizó obtener el servicio o materiales del licitador agraciado.[193] Según el testigo, subsiguientemente el Departamento de Servicios Generales identificaba la cifra y el número de cuenta por el cual se iba a pagar la orden.[194] Posteriormente, indicó que el señor Acosta Ramírez obligaba los fondos y certificaba que existían los fondos para pagar la orden de compra.[195] Manifestó que el suplidor presentaba una factura y posteriormente se realizaba un comprobante de pago que se preparaba en el área de finanzas para el cual se realizaba el proceso de pre-intervención para comparar la

---

[186] TPO del 13 de agosto de 2020, Tomo II, págs. 12-15.
[187] *Íd.*, pág. 16.
[188] *Íd.*
[189] *Íd.*, pág. 17.
[190] *Íd.*, págs. 17-18.
[191] *Íd.*, págs. 18-19.
[192] *Íd.*, pág. 19.
[193] *Íd.*
[194] *Íd.*
[195] *Íd.*, págs. 21-23.

factura con la orden de compra.[196] Ulteriormente, la oficial pagadora de la Superintendencia del Capitolio, emitía el número de cheque, lo firmaba y le se le fijaba el sello "*Paid*" para que el trabajo no se pagara doblemente.[197] Eventualmente, la Superintendencia del Capitolio, con su independencia fiscal, preparaba el cheque y se le entrega al suplidor.[198] El testigo explicó que "la viuda" era el formulario denominado Informe de Recibo de Inspección, en el cual el receptor realizaba un proceso de contar lo que recibió y lo enviaba al área de finanzas para que formara parte del proceso de pre-intervención.[199] Igualmente identificó un documento de certificación del Gerente o el Departamento de Gerencia de Proyecto, donde se certificaba que los trabajos se realizaron según la orden de compra.[200] El testigo subrayó que sin dicho certificado no se procedía a realizar el pago.[201]

El testigo puntualizó que tras analizar las ciento cuarenta y tres (143) órdenes de compras a favor de Restaura y Fasan encontró que hubo fraccionamiento de compra, en las que en un período de tiempo relativamente corto se emitieron más de una orden de compra para un lugar en particular para evitar el proceso de subasta en las órdenes de compra cuyo importe fuera $50,000.00 o más.[202] A saber, el testigo expuso que hubo un fraccionamiento de compra con las órdenes de compra 11250180 y 11250181, las cuales se realizaron en el mismo Salón Protocolar con un mes de diferencia, entre agosto de 2010 y septiembre de 2010, que se solicitaron el mismo día y se preparó el récord de cotizaciones en igual fecha.[203] El testigo expresó que ambas órdenes de compra sumaban $98,191.24.[204] Declaró que ambas órdenes de compra fueron solicitadas por la señora Alberti

---

[196] *Íd.*, págs. 25-27.
[197] *Íd.*, págs. 30-31.
[198] *Íd.*, pág. 31.
[199] *Íd.*, págs. 39-41.
[200] *Íd.*, pág. 42.
[201] *Íd.*
[202] *Íd.*, págs. 46-47.
[203] *Íd.*, págs. 47-48.
[204] *Íd.*, pág. 49.

Torres, quien era supervisada por el señor Martínez Morales.[205] Sobre la orden de compra 11250180, el testigo encontró incongruencia entre las cantidades dispuestas en las propuestas de Restaura y RL con el Récord de Cotizaciones.[206] Pues, en la propuesta de RL se cotizó por $58,900.00, mientras que el Récord de Cotizaciones indica que eran $65,653.86.[207] A su vez, el testigo advirtió que tanto las propuestas de Restaura como de RL carecían de detalles.[208] Asimismo, aseveró que las propuestas para la orden de compra 11250180 eran de igual fecha que las propuestas para la orden de compra 11250181.[209] Expresó que el 24 de febrero de 2011 y el 3 de febrero de 2011, respectivamente, el señor Martínez Morales certificó que las órdenes de compra 11250180 y 11250181 fueron completadas, no obstante estas se facturaron anteriormente, el 12 de enero de 2011 y el 13 de septiembre de 2010.[210] Sin embargo, según fotografías del 25 de abril de 2011, dicha reparación del Salón Protocolar aún no había sido culminada, ya que el edificios se encontraba en andamios.[211] Al examinar una fotografía del Salón Protocolar del 1 de junio de 2011, el testigo indicó que aún se encontraba en remodelación.[212] El señor Cruz Velázquez dispuso que dichos trabajos de remodelación del Salón Protocolar fueron efectivamente realizados entre los años 2013 y 2014 por la compañía Fe-Ri Construction.[213]

El testigo reveló que encontró otro fraccionamiento de compra en el segundo puso del área de finanzas en el Edificio Medicina Tropical mediante las siguientes seis (6) órdenes de compra

---

[205] *Íd.*, págs. 49-50.
[206] *Íd.*, pág. 50.
[207] *Íd.*, págs. 50-52.
[208] *Íd.*, pág. 52.
[209] *Íd.*
[210] *Íd.*, pág. 62.
[211] *Íd.*, págs. 68-69.
[212] *Íd.*, pág. 74.
[213] *Íd.*, pág. 70.

11251100, 11250128, 11250170, 12250171 y 12250172.[214] Sobre estas órdenes de compra, le llamó la atención observar las cotizaciones de MEG para las obras de construcción, cuando dicha compañía y los servicios de la ingeniera Rivera Ortiz eran contratados para la inspección de proyectos.[215] Igualmente, al verificar las propuestas de Ekho, encontró que dicha entidad nunca fue incorporada en el Departamento de Estado y al cotejar en varias ocasiones los números telefónicos, pertenecía a la Zapatería Aldo de Plaza Carolina, establecimiento que confirmó que llevaba muchos años con el mismo número telefónico y el otro le pertenecía al Dr. Miguel De Jesús, quien era médico.[216] Igual sospecha se levantó con las propuestas de MEG, dado que no coincidían con otras presentadas anteriormente por la señora Rivera Ortiz.[217] Igualmente, se percató que se utilizó la firma de un empleado, Miguel Torres, para realizar las peticiones al área de finanzas, pero verificó que dicha persona no firmó los documentos.[218] El señor Cruz Velázquez atestiguó que para las órdenes de compra 11250171 y 12250172 se utilizaron las mismas tres (3) propuestas de Restaura, Ekho y MEG.[219] Por otro lado, el testigo puntualizó que el señor Martínez Morales certificó que todas las órdenes de compra se completaron, conforme lo solicitado y el señor Acosta Ramírez realizó la obligación de pago.[220] Con respecto a la orden de compra 12250172, el señor Cruz Velázquez encontró que aunque dicha orden se modificó para cambiar el fondo y disminuir el costo, se pagaron tanto la orden original como la modificada, es decir, se pagaron en dos (2) ocasiones.[221] Se analizó que el señor Acosta Ramírez firmó los

---

[214] *Íd.*, pág. 53; 75.
[215] *Íd.*, pág. 79.
[216] *Íd.*, págs. 80-82.
[217] *Íd.*, pág. 86.
[218] *Íd.*, págs. 91-92.
[219] *Íd.*, pág. 96.
[220] *Íd.*, págs. 94-97.
[221] *Íd.*, pág. 101.

cheques de $45,841.86 a favor de Restaura para la orden de compra 12250128, $43,535.62 a favor de Restaura para la orden de compra 12250171 y de $37,200.00 a favor de Restaura para la orden de compra 12250172, siendo la misma persona, quien también firmó la obligación para las referidas órdenes de compra.[222] Asimismo, puntualizó que los trabajos de la orden de compra 12250128 eran iguales a los trabajos de las órdenes de compra 12250172 y 12250172-M.[223] Identificó lo siguiente:

> [...] Si vemos ambas propuestas, son exactamente las mismas. Tienen la misma fecha, tienen la misma descripción y vemos que los trabajos que se están detallando son exactamente lo mismo. Aquí entonces conlleva un tercer pago, básicamente cuando se modifica la orden de compra 172, que entonces, nuevamente, son exactamente los mismos trabajos. La 128 con la 172, ambos se pagan, se reduce o se modifica la orden de compra para cambiar el fondo y reducir costos, y entonces esa tercera orden de compra, que sería la orden de compra [...] 0172-M, se reduce por $40,000.00, pero [son] exactamente los mismos trabajos y nuevamente se paga. O sea, esa orden de compra se pagó en tres ocasiones.

En las tres (3) ocasiones, una de las personas que firmó los cheques fue el señor Acosta Ramírez.[224] Por otro lado, precisó que los trabajos para las órdenes de compra 11250170, 12250171, 12250172 y 12250172-M se solicitaron el mismo día, el 10 de junio de 2011.[225] Además, especificó que dichas órdenes de compra para las mismas áreas fueron certificadas por el señor Martínez Morales el mismo día, 21 de agosto de 2011.[226] Sobre estos trabajos le llamó la atención que solamente transcurrieron entre trece (13) a doce (12) desde que se trabajaron las órdenes de compra, se realizaron los trabajos de construcción, se certificaron y se emitieron los cheques.[227] Declaró que, en algunos casos, todo el proceso se realizó en un solo día.[228]

---

[222] *Íd.*, págs. 108-111.
[223] *Íd.*, págs. 111-112.
[224] *Íd.*, págs. 112-113.
[225] *Íd.*, pág. 113.
[226] *Íd.*, pág. 114.
[227] *Íd.*, pág. 116.
[228] *Íd.*

Por otra parte, el señor Cruz Velázquez mencionó que igualmente existió fraccionamiento de compra en las órdenes de compra 12251049 y 12251123.[229] En torno a la orden de compra 12251049 adjudicada a favor de Fasan por la remodelación de las antiguas oficinas de auditoría de la Cámara de Representantes, se percató que licitaron tanto Restaura como Fasan, compañías que pertenecían al señor Danois Román.[230] En lo que respecta a la orden de compra 12251123, estaba relacionada con la misma remodelación de las antiguas oficinas de auditoría de la Cámara de Representantes de la orden de compra 12251049, pero que se emitió con alrededor de doce (12) a trece (13) días de diferencia, 10 de abril de 2012 y 23 de abril de 2012.[231] Igualmente, identificó que licitaron ambas compañías pertenecientes al señor Danois Román, Restaura y Fasan.[232]

Igualmente, el señor Cruz Velázquez identificó un fraccionamiento de compra en las órdenes de compra 12251072 y 11251126 para remodelar el antiguo almacén de la Oficina de Servicios Legislativos.[233] Señaló que las propuestas carecían de fecha, ponche y firma de los suplidores.[234] También, identificó un fraccionamiento de compra en las órdenes de compra 12251248, 12251296, 13250058, 13250059 y 13250332 en el lado Sur del tercero piso en el Edificio Antiguo de Recursos Naturales, también conocido como Edificio Medicina Tropical, para un total de $182,382.96.[235] Sobre estas órdenes de compra, el testigo identificó que algunas de las propuestas carecían de fecha, descripción y firma

---

[229] *Íd.*, págs. 116-117.
[230] *Íd.*, pág. 121.
[231] *Íd.*, págs. 131-132.
[232] *Íd.*, pág. 133.
[233] *Íd.*, pág. 137.
[234] *Íd.*, pág. 139.
[235] *Íd.*, págs. 145-156.

de los licitantes.[236] En la orden de compra 13250058 encontró inconsistencia en las descripciones de las propuestas.[237]

El señor Cruz Velázquez declaró que las órdenes de compra 13250066 y 13250154 versaron sobre la misma obra de construcción de un *playground* y sistema de riego en el parque de niños en el lado Sur del Edificio Medicina Tropical, por lo que el trabajo de ambas órdenes totalizó $66,144.00.[238]

Por último, encontró fraccionamiento de compra en las órdenes de 13250184 y 13250191 para los trabajos en el tercer piso del Edificio Antonio R. Barceló para un total de $94,700.00.[239] Por cada una de las antes mencionadas órdenes de compra, el testigo expresó que el señor Acosta Ramírez emitió unos cheques a favor de Fasan, los cuales fueron endosados por el señor Danois Román.[240]

Por otro lado, no encontró evidencia de pago de los seguros como de la CFSE, aun cuando en las propuestas de Restaura y Fasan se cobraba una partida para seguros.[241] Con relación a la línea de crédito de 15 millones que la Superintendencia del Capitolio solicitó al BGF para pagar las órdenes de compra, el testigo indicó que la dependencia legislativa no guardaba información ni tenía un registro.[242] Por ello, particularizó que como único se podía identificar cuál orden de compra se pagó con la línea de crédito en el BGF o con los propios fondos de la Superintendencia del Capitolio era a través del Sistema de contabilidad interno *Micro Information Products* (MIP).[243] Declaró que solamente el señor Acosta Ramírez y la señora Camille Rivera Parrilla tenían acceso al referido sistema MIP.[244]

---

[236] *Íd.*, pág. 155-160.
[237] *Íd.*, pág. 157.
[238] *Íd.*, págs. 161-168.
[239] *Íd.*, págs. 169-170.
[240] *Íd.*, págs. 172-174.
[241] *Íd.*, págs. 148-154; TPO del 11 de enero de 2021, págs. 35-36; TPI del 15 de enero de 2021, págs. 130-259.
[242] TPO del 13 de agosto de 2020, Tomo II, pág. 126.
[243] *Íd.*, págs. 126-131.
[244] *Íd.*

El testigo particularizó que el señor Danois Román incorporó las corporaciones Fasan y Restaura en el Departamento de Estado en mayo de 2012, no obstante, ambas corporaciones participaron en las órdenes de compra antes de dicha fecha.[245] Asimismo, detalló que ambas corporaciones aparecían ubicadas en la misma dirección en Carolina, correspondiente a la residencia del señor Danois Román.[246] Además, destacó que el correo electrónico que aparecía para ambas corporaciones en el Certificado de Incorporación era el mismo perteneciente al señor Danois Román al que se enviaron cotizaciones desde la Superintendencia del Capitolio.[247] A su vez, estableció que las personas que estaban autorizadas en la Superintendencia del Capitolio para hacer transacciones con respecto a las cuentas de banco de Restaura y Fasan eran el señor Danois Román y la señora Cuervo Sierra.[248]

El señor Cruz Velázquez identificó treinta y siete (37) órdenes de compra en las que Restaura y Fasan, las compañías pertenecientes al señor Danois Román, compitieron entre ellas, lo que no permitió que otros licitadores compitieron en buena lid.[249] Sobre el particular, encontró que los documentos relacionados a Fasan estaban firmados por E. Cuervo.[250] Igualmente, hizo la observación que las compañías que competían con Restaura o Fasan eran RL o MEG, ya que sus propuestas eran falsas por no ser presentadas por los suplidores.[251] Por otro lado, se repasaron varias órdenes de compras adjudicadas tanto a Fasan como a Restaura que los cheques fueron endosados por el señor Danois Román.[252]

---

[245] TPO del 11 de enero de 2021, pág. 13.
[246] *Íd.*, pág. 14.
[247] *Íd.*, pág. 16.
[248] *Íd.*, pág. 23.
[249] *Íd.*, págs. 11-13.
[250] *Íd.*, pág. 12.
[251] *Íd.*, pág. 20.
[252] *Íd.*, págs. 20-177.

El testigo afirmó que principalmente el señor Martínez Morales certificó los pagos dobles y triples por un mismo trabajo, mientras que el señor Acosta Ramírez autorizó los pagos.[253]

A su vez, identificó órdenes adjudicadas a Restaura que fueron realizadas por los empleados y equipos de RL, seis (6) órdenes de compra valoradas en $188,938.01 para el año 2010, nueve (9) órdenes valoradas en $358,164.81 para el año 2011 y nueve (9) órdenes valoradas en $260,240.13 para el año 2012.[254]

En el contrainterrogatorio, afirmó que, previo a que se emita un pago de fondos públicos, se tiene que pasar por una pre-intervención en la División de Finanzas de la Superintendencia del Capitolio.[255] Además, testificó que el señor Danois Román no ha sido la única persona que haya recibido un pago doble y la forma de manejar esas eventualidades es restituyendo uno de los pagos.[256] Admitió que no verificó las cuentas bancarias de Fasan y Restaura para conocer si se realizaron pagos a los empleados.[257]

**Pablo Sastre Fernández**

Del 2004 al 2012 fungió como Superintendente Auxiliar y dirigía las áreas de ornato, ambiente, proyectos, servicios técnicos y conservación de facilidades.[258] Entre sus funciones, era el representante autorizado del Superintendente para verificar las requisiciones que posteriormente reciben los pre-interventores para emitirse el pago.[259] Al identificar el documento de tres proyectos, estableció que no se pagaron triple ni doble. A preguntas de la defensa, el testigo estableció que si el señor Mendoza Martínez no certificaba que el servicio se realizó y si no se le proporcionaban

---

[253] *Íd.*, págs. 178-230; TPI del 15 de enero de 2021, págs. 8-129.
[254] TPO del 13 de agosto de 2020, Tomo II, págs. 13-34, 39; TPO del 11 de enero de 2021, págs. 10-49, 55-96, 106-224; TPO del 15 de enero de 2021, págs. 8-121, 125-259.
[255] TPO del 4 de febrero de 2021, págs. 78-79.
[256] *Íd.*, págs. 227-228.
[257] *Íd.*, pág. 246.
[258] TPO del 12 de febrero de 2021, págs. 20-22.
[259] *Íd.*, págs. 23-31.

fotografías de la obra de construcción, no firmaba "la viuda".[260] Por ello, no firmaba "la viuda" si el señor Martínez Morales era quien certificaba que el servicio se realizó. A preguntas del Ministerio Público, identificó una obra en la cual se pagó la factura a Restaura en la misma fecha de la cotización de RL.[261] Es decir, que para la fecha en que se adjudicó los servicios, la cotización de RL no existía.[262] Admitió que la Superintendencia del Capitolio le pagó a Restaura la suma relacionada al seguro de la CFSE.[263] Identificó eventualidades en las que "la viuda" se firmó posterior a emitirse el cheque por la obra, firmado por el señor Acosta Ramírez, siendo contrario al orden establecido por el Reglamento.[264] Identificó que en una obra se cotizaron las dos compañías del señor Danois Román, eventualidad que no era permitida.[265] Por otro lado, aclaró que bajo un mismo número de orden modificada se pagaron dos (2) servicios dado que, por las malas condiciones del Edificio Antiguo de Recursos Naturales, una obra original se tenía que modificar debido a que se encontraban otros problemas de deterioro o filtraciones.[266]

Luego de celebrarse el juicio en su fondo, el Foro Primario encontró culpable a los apelantes por todos los delitos imputados, con excepción del señor Martínez Morales. A continuación, exponemos las sentencias impuestas:

**Señor Acosta Ramírez**

El TPI encontró culpable al señor Acosta Ramírez por todos los cargos imputados. El 20 de agosto de 2021, el Foro Primario sentenció al apelante a cumplir una pena de dos (2) años de reclusión mediante el beneficio de sentencia suspendida por cada cargo por infracción al Artículo 265 del Código Penal de 2004, *supra*, sec. 4893.

---

[260] *Íd.*, págs. 75-96.
[261] TPO del 11 de marzo de 2021, págs. 178-179.
[262] *Íd.*, págs. 179-180.
[263] TPO del 12 de marzo de 2021, pág. 114.
[264] *Íd.*, págs. 131-149.
[265] *Íd.*, pág. 158.
[266] TPO del 15 de marzo de 2021, págs. 82-106.

Le impuso una pena especial de un comprobante de Rentas Internas de $300.00 en cada uno de los cargos, así como una pena de restitución de $5,000.00 a favor del Estado. A su vez, ordenó su inclusión en el Registro de Personas Convictas por Corrupción.

**Señor Martínez Morales**

El TPI no encontró culpable al señor Martínez Morales por infracción al Artículo 193 del Código Penal de 2004, *supra,* sec. 4821, pero culpable por los demás cargos imputados. El 17 de septiembre de 2021, el TPI condenó al apelante a cumplir una pena de dos (2) años de reclusión mediante el beneficio de sentencia suspendida. Como pena especial, le impuso el pago de comprobantes de Rentas Internas de $300.00 en cada cargo por violación al Artículo 265 del Código Penal de 2004 (4to grado), *supra,* sec. 4893 y otro de $100.00 en el cargo por infracción al Artículo 265 del Código Penal de 2004, *Íd.* Además, le impuso la restitución de $10,000.00 a favor del Estado en un término de veinticuatro (24) meses y ordenó que debía incluirse en el Registro de Personas Convictas por Corrupción.

**Señora Cuervo Sierra**

El TPI encontró culpable a la señora Cuervo Sierra por el cargo imputado. El 22 de octubre de 2021, el TPI sentenció a la apelante a cumplir una pena de dos (2) años de reclusión mediante el beneficio de sentencia suspendida. Le impuso como pena especial el pago de un comprobante de Rentas Internas de $300.00 y dictaminó que debía ser incluida en el Registro de Personas Convictas por Corrupción.

**Señor Danois Román**

El TPI encontró culpable al señor Danois Román por todos los cargos imputados. El 22 de octubre de 2021, el TPI le impuso al apelante una pena de seis (6) años de reclusión mediante restricción domiciliaria. Como pena especial, le ordenó al pago de comprobantes

de Rentas Internas de $300.00 en cada cargo, para un total de $9,300.00, a ser pagados en un término de seis (6) años. En igual término, debía pagar $500,000.00, de los cuales $50,000.00 eran a favor del señor Manuel Liste Liñeira y $450,000.00 a favor del Estado. Además, dispuso que debía ser incluido en el Registro de Personas Convictas por Corrupción.

Inconformes, los apelantes acudieron ante este Tribunal mediante la presentación de distintos recursos de apelación que fueron consolidados. Plantearon que el TPI cometió los siguientes errores:

> **ERRÓ EL HONORABLE TRIBUNAL DE INSTANCIA AL CELEBRAR UN JUICIO EN QUE SE COARTÓ EL DERECHO CONSTITUCIONAL DEL APELANTE A UN DESCUBRIMIENTO DE PRUEBA POR NO HAB[É]RSELE SUMINISTRADO EVIDENCIA PERTINENTE Y ADEMÁS HABÉRSELE OCULTADO LA MISMA SEGÚN INFORME EMITIDO POR EL PROCURADOR GENERAL DE PUERTO RICO.**

> **ERRÓ EL HONORABLE TRIBUNAL DE INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD EN EL CASO DE EPÍGRAFE A PESAR DE QUE NO SE PROBÓ LA CULPABILIDAD DEL ACUSADO MÁS ALLÁ DE DUDA RAZONABLE.**

> **ERRÓ EL HONORABLE TRIBUNAL DE INSTANCIA AL ENCONTRAR CULPABLE AL APELANTE A PESAR DE QUE LA PRUEBA DESFILADA NO VINCULA AL APELANTE CON LOS HECHOS ALEGADAMENTE COMETIDOS.**

El señor Danois Román, añadió un cuarto error:

> **ERRÓ Y ABUS[Ó] DE SU DISCRECIÓN EL HONORABLE TRIBUNAL DE INSTANCIA AL EMITIR EN LA SENTENCIA UNA PENA DE RESTITUCIÓN DE $500,000.00 SIN EVALUAR LA CAPACIDAD DE PAGO DEL APELANTE CONVIRTIENDO DICHA IMPOSICIÓN EN UNA POSIBLE PENA DE CÁRCEL POR FALTA DE CAPACIDAD DE PAGO MONETARIO.**

En atención a los errores planteados, procedemos a exponer la normativa jurídica atinente a este recurso.

**III.**

**A. <u>Apelación criminal</u>**

En nuestro ordenamiento jurídico, toda persona acusada tiene derecho a apelar cualquier sentencia penal que recaiga en su contra. *Pueblo v. Torres Medina*, 211 DPR 950, 959 (2023); *Pueblo v. Serbiá*, 78 DPR 788, 791-792 (1955). La apelación es un privilegio estatutario que adquirió un carácter cuasi-constitucional y forma parte del debido proceso de ley. *Pueblo v. Serbiá, supra*, pág. 792; *Pueblo v. Rivera Ortiz*, 209 DPR 402, 419 (2022); *Pueblo v. Esquilín Díaz*, 146 DPR 808, 815-816 (1998); *Pueblo v. Prieto Maysonet*, 103 DPR 102, 104 (1974). Una vez este Tribunal de Apelaciones adquirió jurisdicción, tenemos el deber de resolver el recurso de apelación en sus méritos. *Pueblo v. Colón Canales*, 152 DPR 284, 291 (2000). En tal sentido, los tribunales apelativos poseemos la facultad de examinar cualquier error de derecho cometido por el tribunal de instancia, así como cualquier asunto de hecho y derecho. *Pueblo v. Rivera Ortiz, supra*, págs. 421-422; *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002). Pues, como cuestión de derecho, la determinación de probar la culpabilidad de una persona más allá de duda razonable es revisable, dado que la apreciación de la prueba es un asunto tanto de hecho como de derecho. *Pueblo v. Irizarry, supra*; *Pueblo v. Torres Medina, supra*; *Pueblo v. Rivero Lugo y Almodóvar*, 121 DPR 454, 473 (1988); *Pueblo v. Pagán Díaz*, 111 DPR 608, 621 (1981).

Al evaluar si se probó la culpabilidad de un acusado más allá de duda razonable, es norma trillada que el juzgador de los hechos está en mejor posición para apreciar y aquilatar la prueba presentada. *Pueblo v. Casillas, Torres*, 190 DPR 398, 416 (2014). Por ello, la apreciación de la prueba del juzgador de los hechos merece gran respeto y deferencia por parte de un foro apelativo. *Íd.* Así las cosas, los tribunales apelativos solamente intervendremos con la apreciación de la prueba cuando se demuestre existencia de pasión, prejuicio, parcialidad o error manifiesto. *Íd.* pág. 417; *Pueblo v. Rivera*

*Ortiz, supra,* pág. 422; *Pueblo v. Irizarry, supra,* págs. 788-789. Además, intervendremos cuando surjan serias dudas, razonables y fundadas sobre la culpabilidad de la persona acusada. *Pueblo v. Casillas, Torres, supra; Pueblo v. Irizarry, supra,* pág. 789. Sin embargo, "si de un análisis ponderado de la prueba desfilada ante el foro primario surge duda razonable y fundada sobre si la culpabilidad del acusado fue establecida más allá de duda razonable, este Tribunal tiene el deber de dejar sin efecto el fallo o veredicto condenatorio". *Pueblo v. Casillas, Torres, supra.*

Cuando un acusado presenta un recurso de apelación en el que plantea como error insuficiencia de la prueba, así como errores de derecho, los foros apelativos realizaremos un escrutinio de dos (2) partes. *Pueblo v. Ortiz Colón,* 207 DPR 100, 125 (2021). En primer lugar, evaluaremos la alegación de insuficiencia de prueba que, de ser meritoria, procede absolver al acusado. *Íd.* Ahora bien, si el reclamo de insuficiencia de la prueba resulta inmeritorio, procede atender los errores de derecho. *Íd.*

### B. Derecho a descubrir prueba

La Constitución de Puerto Rico garantiza el derecho de toda persona acusada a preparar adecuadamente su defensa. Art. II, Sec. 11, Const. PR, Véase también *Pueblo v. Soto, Pérez,* 203 DPR 280, 289 (2019); *Pueblo v. Rodríguez González,* 202 DPR 258, (2019); *Pueblo v. Sanders Cordero,* 199 DPR 827, 835 (2018); *Pueblo v. Custodio Colón,* 192 DPR 567, 579 (2015); *Soc. Asist. Leg. v. Ciencias Forenses,* 179 DPR 849, 857 (2010); *Pueblo v. Santa Cruz,* 149 DPR 223, 231 (1999); *Pueblo v. Arocho Soto,* 137 DPR 762, 766 (1994). Para ejercer dicho derecho, se le debe permitir procurar evidencia en cuanto a los elementos esenciales del delito imputado. *Pueblo v. Ríos Alonso,* 156 DPR 428, 445 (2002). Por ello, consustancial al derecho a una defensa adecuada, la persona acusada goza del derecho a

descubrir prueba. *Soc. Asist. Leg. v. Ciencias Forenses, supra*; *Pueblo v. Soto, Pérez, supra*, pág. 290; *Pueblo v. Arzuaga*, 160 DPR 520, 530 (2003); *Pueblo v. Santa Cruz, supra*; *Pueblo v. Arocho Soto, supra*. No obstante, dicho derecho no es absoluto ni ilimitado, ya que el mismo se encuentra delimitado por las Reglas de Procedimiento Criminal. *Íd.*; *Pueblo v. Rodríguez Aponte*, 116 DPR 653, 660 (1985); *Pueblo v. Dones Arrocho*, 106 DPR 303, 314 (1977).

La Regla 95 de Procedimiento Criminal, 34 LPRA Ap. II, rige lo concerniente al descubrimiento de prueba a favor de la persona acusada. A saber:

(a) El acusado presentará moción al amparo de esta Regla dentro en un término de cumplimiento estricto de veinte (20) días contados a partir de:

i) la celebración del acto de lectura de acusación en los casos que se impute la comisión de un delito grave; o

ii) la primera comparecencia del acusado al proceso asistido por el abogado que habrá de representarlo en el juicio, en los casos en que se impute la comisión de un delito menos grave. En el caso que la persona acusada manifieste que se representará por derecho propio, el tribunal deberá advertirle desde cuándo comienza a discurrir el término establecido en esta Regla, así como las consecuencias de su incumplimiento. Sometida la moción de la defensa conforme a lo dispuesto en esta Regla, el tribunal ordenará al Ministerio Fiscal o a cualquier agencia o instrumentalidad pública que permita al acusado inspeccionar, copiar o fotocopiar el siguiente material o información que está en posesión, custodia o control del Ministerio Fiscal o a cualquier agencia o instrumentalidad pública:

(1) Cualquier declaración jurada que el Ministerio Fiscal tenga del acusado.

(2) Cualquier declaración jurada de los testigos de cargo que hayan declarado en la vista para determinación de causa probable para el arresto o citación, en la vista preliminar, en el juicio o que fueron renunciados por el Ministerio Fiscal y los récords de convicciones criminales previas de éstos.

(3) Cualquier resultado o informe de exámenes físicos o mentales y de experimentos o pruebas científicas que sea relevante para preparar adecuadamente la defensa del acusado o que vaya a ser utilizado en el juicio por el Ministerio Fiscal.

(4) Cualquier libro, papel, documento, fotografía, objeto tangible, estructura o lugar que sea relevante para preparar adecuadamente la defensa del acusado, que el Ministerio Fiscal se propone utilizar en el juicio o que fue obtenido del acusado o perteneciera al acusado.

(5) El récord de convicciones criminales previas del acusado.

(6) Cualquier informe preparado por agentes de la Policía en relación con las causas seguidas contra el acusado que sea relevante para preparar

adecuadamente la defensa del acusado. El descubrimiento de esta prueba estará sujeto a las siguientes condiciones:

(A) Que los objetos, libros, documentos y papeles que el acusado interesa examinar se relacionan o describen con suficiente especificación;

(B) que no afecte la seguridad del Estado ni las labores investigativas de sus agentes policiacos, y

(C) la correspondiente moción del acusado sea presentada con suficiente antelación a la fecha señalada para la celebración del juicio, de manera que no haya innecesarias dilaciones en los procedimientos ni se produzcan molestias indebidas a los funcionarios del Estado.

(b) El Ministerio Fiscal revelará toda aquella evidencia exculpatoria del acusado que tenga en su poder.

(c) La defensa deberá incluir, junto con la solicitud de Descubrimiento de Prueba, las órdenes necesarias para solicitar el material o la información que prevee que el Ministerio Público no tendrá bajo su custodia, dirigidas a las personas o entidades que la poseen, custodian o controlan. El Ministerio Público deberá entregar la información y/o material solicitado que tenga bajo su custodia o control e informar al tribunal si existe algún material o información que le fue solicitada, pero que no se encuentra bajo su posesión, custodia o control, en cuyo caso el tribunal ordenará a la persona o entidad que la posea, custodie o controle, que la ponga a la disposición del acusado. [...]

Por otra parte, la Regla 95B de Procedimiento Criminal, *supra*, R. 95B, atinente a las órdenes protectoras, establece que "[m]ediante moción de cualquiera de las partes que esté debidamente fundamentada, el tribunal podrá ordenar que el descubrimiento o inspección sea dirigido, restringido, aplazado o condicionado, así como emitir cualquier orden que estime necesaria". Al emitir una orden protectora, el tribunal descansará en su sana discreción al realizar un balance entre los derechos de la persona acusada y el interés del Estado para establecer la forma en que se realizará el descubrimiento de prueba y regular los términos y las condiciones que considere justos y necesarios. *Pueblo v. Sanders Cordero, supra*, pág. 839; *Pueblo v. Custodio Colón, supra*, pág. 586. Para ello, el foro judicial está llamado a considerar las circunstancias particulares del caso, la prueba solicitada por la persona acusada y las posibles alternativas que están disponibles para proveer el descubrimiento de prueba. *Pueblo v. Sanders Cordero, supra*, pág. 841. Ahora bien,

cuando no existe controversia sobre el interés apremiante del Estado en restringir, limitar o condicionar el descubrimiento de prueba, el tribunal debe evaluar con mayor rigor la forma en que se concederá el descubrimiento de prueba. *Íd.* En tal eventualidad, la orden del tribunal no debe limitarse a la entrega de la prueba solicitada, sino que, conjuntamente, se debe disponer de las medidas y de las condiciones que salvaguarden tanto los derechos de los acusados como los intereses del Estado. Pues, los tribunales tienen el deber de "garantizar un procedimiento que conduzca a la presentación de la evidencia adecuada que sea pertinente a la controversia de hechos, evitando hasta donde sea posible que la sorpresa y ocultación--resultado inevitable del sistema adversativo--oscurezcan e impidan la búsqueda de la verdad". *Pueblo v. Tribunal Superior*, 92 DPR 116, 124-125 (1965). A pesar de que el derecho al descubrimiento de prueba está delimitado por las Reglas de Procedimiento Criminal, existen instancias en la que tiene una base más amplia, al amparo de la cláusula del debido proceso de ley.

A tenor con el debido proceso de ley, el Ministerio Público tiene el deber de revelar a la defensa la evidencia exculpatoria. En *Brady v. Maryland*, 373 US 83 (1963), el Tribunal Supremo de Estados Unidos resolvió que ocultar evidencia favorable solicitada por la persona acusada viola su debido proceso de ley cuando dicha prueba es material para su culpabilidad o pena, independientemente de la buena o mala fe del Ministerio Público. Véase *Kyles v. Whitley*, 514 US 419 (1995); *Arizona v. Youngblood*, 488 US 51. 55 (1988). *Moore v. Illinois*, 408 US 786 (1972). Pues, el Estado tiene el deber afirmativo de revelar la prueba a la defensa. *Brady v. Maryland, supra.*

Ahora, no se requiere revelar todo el archivo del Ministerio Público, sino aquella evidencia favorable para la persona acusada sea exculpatoria o para impugnar a un testigo. *United States v. Bagley*,

473 US 667, 675-676 (1985). La normativa de *Brady v. Maryland*, *supra*, es aplicable en tres (3) situaciones: cuando el Ministerio Público presenta un testimonio que sabía o que debió saber que existía perjurio; cuando la defensa realiza una solicitud específica de prueba exculpatoria, y cuando existe ausencia de dicha solicitud o sólo realiza una solicitud general y el Ministerio Público no revela la prueba exculpatoria. *United States v. Agurs*, 427 US 97, 103-107 (1976).

El Tribunal Supremo federal resolvió que aunque la defensa no haya peticionado una prueba, el Ministerio Público tiene el deber revelarla si la misma es evidencia exculpatoria. *Íd.* Se enfatizó que la obligación constitucional de revelar la evidencia exculpatoria no depende de la culpabilidad moral o la voluntad del Ministerio Público, sino de la materialidad de la prueba para la culpabilidad o el castigo de la persona acusada. *Íd.*, pág. 110. Dicha obligación del Estado de revelar evidencia favorable para la persona acusada está determinada por el efecto acumulativo de toda la evidencia suprimida por el Ministerio Público. Véase *Kyles v. Whitley*, 514 US 419 (1995).

Por ello, el derecho de la persona acusada a descubrir evidencia exculpatoria no incluye la autoridad no supervisada para buscar en los archivos del Estado, toda vez que no puede tomar por sí sólo la determinación sobre la materialidad de la información. *Pennsylvania v. Ritchie*, 480 US 39, 59 (1987). Es decir, la persona acusada no tiene derecho a una expedición de pesca en los archivos del Ministerio Público. *Pueblo v. Romero Rodríguez*, 112 DPR 437, 440 (1982); *Pueblo v. Rodríguez Sánchez*, 109 DPR 243 (1979). Pues, el Estado es quien decide qué información debe divulgarse, excepto que la defensa plantee la retención de la prueba favorable para la persona acusada. *Íd.* La persona acusada debe realizar una demostración *prima facie* convincente de la materialidad de la evidencia. *Pueblo v. Romero*

*Rodríguez, supra*; *Pueblo v. Rodríguez Sánchez, supra*. La evidencia es material si existe una probabilidad razonable de que, si se hubiera revelado a la defensa, el resultado del proceso hubiera sido distinto. *United States v. Bagley, supra*; *Cone v. Bell*, 556 US 449 (2009); *Strickland v. Washington*, 466 US 668 (1984). Como consecuencia, el tribunal debe evaluar a la luz de todo el expediente si existe una probabilidad razonable de que si la evidencia se hubiese revelado, el resultado del procedimiento hubiera sido distinto. *Turner v. United States*, 582 US 313, 324-325 (2017). La convicción debe revocarse solamente si la evidencia oculta es material en el sentido de que su ocultación socavó la confianza en el resultado del juicio. *United States v. Bagley, supra*. No obstante, si la ocultación de la evidencia resulta en un error constitucional, se debe al carácter de la evidencia, no al carácter del fiscal. *United States v. Agurs, supra*, pág. 110, véase también *Pueblo v. Romero Rodríguez, supra*.

### C. <u>Omisión en el cumplimiento del deber</u>

El Artículo 265 del Código Penal de 2004, *supra*, sec. 4893, tipificaba como delito la omisión en el cumplimiento del deber. El aludido artículo disponía que cometía tal delito menos grave, todo funcionario o empleado público que, a sabiendas, omitiera cumplir un deber que le impuso una ley o reglamento, y como consecuencia de tal omisión ocasionara la pérdida de fondos públicos o daño a la propiedad pública. *Íd.* Ahora bien, si el valor de la pérdida de fondos públicos o el daño a la propiedad pública sobrepasaba de $10,000.00, la persona imputada incurría en delito grave de cuarto grado. *Íd.* El mismo establecía que el tribunal también podía imponer la pena de restitución. Art. 265 del Código Penal de 2004, *supra*, sec. 4893. El elemento mental del delito era la intención y el a sabiendas. D. Nevárez Muñiz, <u>*Nuevo Código Penal de Puerto Rico*</u>, San Juan, Ed. Instituto para el Desarrollo del Derecho, Inc., Edición 2004-2005,

pág. 338. El término a sabiendas "implica conocimiento personal, no requiere el conocimiento de la ilegalidad del acto u omisión". Art. 14 del Código Penal de 2004, *supra*, sec. 4642.

La omisión en el cumplimiento del deber es un delito de comisión por omisión que requiere que, como consecuencia de la omisión del sujeto, se ocasione un daño a la propiedad o los fondos públicos. D. Nevárez Muñiz, *Nuevo Código Penal de Puerto Rico*, 2da ed., San Juan, Ed. Instituto para el Desarrollo del Derecho, Inc., 2008, pág. 351. Como delito de comisión por omisión u omisión impropia, se configura cuando el sujeto omitente no impide la producción de un resultado. *Pueblo v. Sustache Sustache*, 176 DPR 250, 281 (2009). Es decir, que con su no actuar, se infringió una norma prohibitiva y permitió que se lesionara un bien jurídico. *Íd.* Este tipo de delito requiere que no se evite el resultado. *Íd.* Ahora bien, para que se configure un delito de comisión por omisión debe demostrar: "(1) la existencia de un deber de garante; (2) la capacidad del omitente para cumplir con ese deber; (3) la producción de un resultado; y (4) la equivalencia entre la omisión y la producción activa del resultado que no se evitó". *Íd.* El deber de garante se puede originar cuando entre el sujeto omitente y la persona perjudicada existe una relación estrecha que permita imponer la obligación. *Íd.*, pág. 282. Dicha relación estrecha se manifiesta cuando (1) el omitente está encargado de la protección o custodia del bien jurídico lesionado o amenazado de lesión o (2) se trata del encauzamiento y la custodia del peligro que emana de una fuente determinada en relación con todo bien jurídico que pudiera afectarse por ella. *Íd.* Dicho deber de garante puede surgir de la ley, los principios jurídicos, la jurisprudencia y las costumbres. *Íd.*, pág. 283. Asimismo, "el deber de garante sólo surge de un contrato si uno de los sujetos asume expresamente la función de protección o custodia del bien jurídico,

de forma que se origine, entre ambas partes, una situación de dependencia efectiva". *Íd.* A saber, genera responsabilidad penal cualquier incumplimiento del deber de actuar en una situación de peligro, de cuyo manejo está encargado el garante. *Íd.*, págs. 283-284.

### D. Deberes respecto a la adquisición de bienes y servicios en la Superintendencia del Capitolio

Por virtud de la Ley de la Superintendencia del Capitolio Estatal de la Asamblea Legislativa de Puerto Rico, Ley Núm. 4 de 21 de julio de 1977, según enmendada, 2 LPRA sec. 651 (Ley de la Superintendencia del Capitolio), se creó la Superintendencia del Capitolio Estatal de la Asamblea Legislativa de Puerto Rico, que es la "entidad con capacidad jurídica para adquirir por título bienes inmuebles y encargada de la conservación, mantenimiento, ampliación, construcción, remodelación y actividades análogas requeridas para mantener en óptimas condiciones la planta física y los alrededores del Capitolio Estatal". Véase Artículos 1 y 2 de la Ley de la Superintendencia del Capitolio, *supra*, secs. 651-652. Mediante la referida ley, se facultó a los Presidentes del Senado y de la Cámara de Representantes de Puerto Rico a nombrar la persona que fungirá como Superintendente del Capitolio, así como el personal necesario para llevar a cabo los propósitos de la ley. Véase Artículo 2 y 4 de la Ley de la Superintendencia del Capitolio, *supra*, secs. 652 y 654.

La política operacional de la Superintendencia del Capitolio era la de promover y preservar la integridad de esta dependencia legislativa y la de sus funcionarios y empleados; prevenir y combatir todo posible acto de corrupción y lograr una administración gubernamental ágil, eficaz y eficiente mediante la fiscalización de las transacciones entre las empresas privadas y la dependencia legislativa. Véase Artículo 3 del Reglamento de Compras, *supra*. Por ello, se promulgó el Reglamento de Compras, *supra*, con el objetivo

de establecer un sistema uniforme para la compra y el pago por los bienes, servicios no profesionales o el arrendamiento de equipo necesario, así como para establecer las pautas y los procedimientos en atención a la sana administración pública. El Artículo 7 del Reglamento de Compras, *supra*, establecía las siguientes normas generales:

> a. Los funcionarios en quienes el Superintendente delegue la facultad para adquirir bienes y servicios no profesionales o arrendar equipo será responsables de dichas gestiones, a tenor con las disposiciones de este Reglamento y cualquier otra reglamentación o legislación aplicable.
>
> b. **Toda compra de bienes y servicios no profesionales o arrendamiento de equipo o reemplazo de los mismos, que esté dentro de los parámetros de aplicabilidad de este Reglamento, se regirá por sus disposiciones, además de cualesquiera otras normas, disposiciones legales o reglamentarias que resulten aplicables. Disponiéndose, que la Superintendencia no incurrirá en gastos excesivos, extravagantes o innecesarios para adquirir bienes y servicios no profesionales o arrendar equipo, en el cumplimiento de sus funciones.**
>
> c. **Se prohíbe fraccionar compras con el fin de emitir más de una Obligación y Orden de Compra o Arrendamiento de Equipo u Orden de Servicios[267] a uno o varios suplidores en un período de tiempo razonablemente corto.**
>
> d. **Cuando se soliciten bienes y servicios no profesionales por una cantidad total de hasta diez mil ($10,000) dólares, inclusive, se utilizará el procedimiento de Registro de Cotizaciones, mediante el cual el Técnico de Compra, el Delegado Comprador[268] o el representante autorizado de éste, deberá obtener por lo menos tres (3) cotizaciones por teléfono, facsímil o correo electrónico.**
>
> e. **El procedimiento se Subasta Informal se utilizará para la adquisición de todo bien y servicio no profesional o arrendamiento de equipo con un valor que exceda la cantidad de diez mil (10,000) dólares hasta la cantidad de cincuenta mil (50,000) dólares, inclusive. Dicho procedimiento requerirá que se utilice la Solicitud de Precio para peticionar y dejar constancia de haber conseguido por lo menos tres (3) cotizaciones por escrito de suplidores cualificados.**
>
> […]
>
> g. Las unidades solicitantes iniciarán toda gestión de solicitudes de bienes, arrendamiento de equipo y servicios no

---

[267] La Obligación y Orden de Compra o Arrendamiento de Equipo es el formulario para ordenar al suplidor seleccionado que provea los bienes solicitados, según las especificaciones, precios y demás condiciones de la compra o arrendamiento. Se considera un contrato para todos los efectos. Véase Artículo 6 (q) del Reglamento de Compras, *supra*.

[268] El Delegado Comprador es el funcionario o empleado facultado por el Superintendente para efectuar las compras en la Superintendencia del Capitolio. Véase Artículo 6 (f) del Reglamento de Compras, *supra*.

profesionales mediante la preparación y presentación a la Oficina de Compras de la Superintendencia de una Solicitud de Compras, Arrendamiento de Equipo o Servicios No Profesionales, con los nombres impresos y firmas de los funcionarios o empleados autorizados.

h. Toda unidad solicitante deberá someter la Solicitud de Compras, Arrendamiento de Equipo o Servicios No Profesionales con suficiente anticipación, considerando que el procedimiento de adjudicación o arrendamiento variará, dependiendo de si es un suplidor local o extranjero, el valor de la transacción y el requisito o procedimiento normativo que aplique para obtener cotizaciones.

i. Toda unidad solicitante deberá ofrecer especificaciones claras, precisas, no restrictivas y que promuevan la competencia, sobre los bienes y servicios no profesionales que necesiten, a fin de no menoscabar o impedir el buen funcionamiento de la Superintendencia para adquirir el bien o servicio no profesional o arrendar el equipo necesario. Además, tramitará con diligencia los documentos e información pertinente y requerida para completar eficaz y prontamente el proceso de compra o arrendamiento; y facilitará cualquier información adicional que simplifique y acelere dicho proceso.

[…]

k. No se recibirán bienes ni servicios no profesionales sin que previamente se haya completado y autorizado la correspondiente Solicitud de Compras, Arrendamiento de Equipo o Servicios No Profesionales y reservado fondos suficientes para pagarlos de la partida correcta.

l. El Delegado Comprador será responsable de preparar los documentos fiscales necesarios para la compra de los bienes y servicios no profesionales o el arrendamiento de equipo para la Superintendencia.

[…]

**q. Las cotizaciones de precios para bienes o servicios no profesionales sólo serán procesadas por los funcionarios y empleados autorizados de la Oficina de Compras de la Superintendencia.** […] (Énfasis nuestro).

Según el Artículo 13 del Reglamento de Compras, *supra,* la Superintendencia del Capitolio debía perseguir el siguiente proceso para la compra de bienes y servicios no profesionales o arrendamiento de equipo hasta $10,000.

a. La Oficina de Compras de la Superintendencia recibirá la Solicitud de Compras, Arrendamiento de Equipo o Servicios No Profesionales y obtendrá todas las certificaciones requeridas antes de emitir la correspondiente Obligación y Orden de Compra o Arrendamiento de Equipo u Orden de Servicios.

b. La Solicitud de Compras, Arrendamiento de Equipo o Servicios No Profesionales será certificada por el Encargado de la Propiedad de la Superintendencia, en los casos de equipo, o por el Director de la Oficina de Servicios Generales

de la Superintendencia o su representante autorizado, en los casos de materiales. Estos funcionarios verificarán si de sus respectivos inventarios pueden suplirse los equipos o materiales solicitados y que no tengan uso inmediato en alguna de las otras unidades solicitantes.

c. Previo a gestionar la adquisición de cualquier material o equipo de computadoras, la Oficina de Compras de la Superintendencia consultará al Director correspondiente del Centro de Sistemas de Información sobre la necesidad y conveniencia de adquirir el mismo.

d. Si se considera meritoria la Solicitud de Compras, Arrendamiento de Equipo o Servicios No Profesionales, el Técnico de Compra, el Delegado Comprador o el representante autorizado de éste, obtendrá, como mínimo, tres (3) cotizaciones por teléfono, facsímile o correo electrónico de los suplidores incluidos en el Registro de Suplidores de la Superintendencia y desglosará dicha información en el Registro de Cotizaciones. Disponiéndose, que en casos excepcionales, cuando sea más conveniente para la operación eficaz de la Superintendencia o los intereses de ésta y del Pueblo de Puerto Rico, se podrán obtener cotizaciones de otras personas naturales o jurídicas no incluidas en el Registro de Suplidores de la Superintendencia, que puedan proveer los bienes o servicios no profesionales a la satisfacción de ésta. De ello acontecer, el Delegado Comprador preparará un informe explícito y detallado que justifique tal determinación. Además, gestionará que dicho suplidor se incorpore al Registro de Suplidores de la Superintendencia.

e. El Delegado Comprador remitirá la Solicitud de Compras, Arrendamiento de Equipo o Servicios No Profesionales a la Oficina de Finanzas de la Superintendencia, con la información recopilada y su análisis escrito para determinar la procedencia de la compra o arrendamiento. Luego, el Oficial asignado en el área de finanzas de la Superintendencia, analizará dicha Solicitud, a fin de certificar la disponibilidad de fondos para este propósito y el pago de los bienes o servicios no profesionales solicitados. Si la certificación expedida fuere positiva, el referido Oficial enviará la solicitud, con la información que la acompaña, a la Oficina de Compra de la Superintendencia para el trámite de compra o arrendamiento correspondiente. Si por el contrario, la certificación expedida fuere negativa, el mismo la devolverá a la Oficina de Compras de la Superintendencia para que el Delegado Comprador notifique la denegación de la Solicitud a la unidad solicitante.

f. Cuando el Delegado Comprador seleccione el suplidor, firmará la Solicitud de Compras, Arrendamiento de Equipo o Servicios No Profesionales. Disponiéndose, que cuando en alguna compra o arrendamiento hubiere un único suplidor, este hecho deberá constar por escrito en la misma. Luego de haber firmado la Solicitud, el Delegado Comprador la remitirá, junto con la información relativa a ésta, para la aprobación del Superintendente. Si el Superintendente la aprobare, así lo indicará en la Solicitud con su firma y devolverá toda la documentación pertinente a la Oficina de Compras de la Superintendencia para que se procese la Obligación y Orden de Compra o Arrendamiento de Equipo u Orden de Servicios. Por el contrario, si el Superintendente la denegare, así lo señalará en la propia Solicitud y remitirá nuevamente tal Solicitud denegada, con los documentos que la acompañan, a la Oficina de Compras de la Superintendencia para que el

Delegado Comprador notifique a la unidad solicitante sobre dicho particular.

g. Si luego de procesar una Obligación y Orden de Compra o Arrendamiento de Equipo u Orden de Servicios se determinara que es necesario cancelarla total o parcialmente previo a haberla remitido al suplidor, se notificará la justa causa por escrito al empleado o funcionario de la Superintendencia encargado de llevar el Registro de Compras, a la Oficina de Finanzas, al Superintendente o su representante autorizado y al Director de Servicios Generales o Encargado de la Propiedad de la Superintendencia y a la unidad solicitante.

Por otro lado, conforme con el Artículo 14 del Reglamento de Compras, *supra*, cuando la compra de bienes y servicios no profesionales o arrendamiento de equipo excedía de $10,000 hasta un máximo de $50,000, se debía seguir el siguiente proceso de subasta informal[269]:

a. La Oficina de Compras de la Superintendencia recibirá la Solicitud de Compras, Arrendamiento de Equipo o Servicios No Profesionales y obtendrá todas las certificaciones requeridas antes de emitir la correspondiente Obligación y Orden de Compra o Arrendamiento de Equipo u Orden de Servicios.

b. La Solicitud de Compras, Arrendamiento de Equipo o Servicios No Profesionales será certificada por el Encargado de la Propiedad de la Superintendencia, en los casos de equipo, o por el Director de la Oficina de Servicios Generales de la Superintendencia o su representante autorizado, en los casos de materiales. Estos funcionarios verificarán si de sus respectivos inventarios pueden suplirse los equipos o materiales solicitados y que no tengan uso inmediato en alguna de las otras unidades solicitadas.

c. Previo a gestionar la adquisición de cualquier material o equipo de computadoras, la Oficina de Compras de la Superintendencia consultará al Director correspondiente del Centro de Sistemas de Información sobre la necesidad y conveniencia de adquirir el mismo.

d. Si se considerare meritoria la compra solicitada, el Técnico de Compra, el Delegado Comprador o el representante autorizado de éste, obtendrá, como mínimo, tres (3) cotizaciones por escrito de los proveedores incluidos en el Registro de Suplidores de la Superintendencia, para las cuales utilizará el formulario SC-PDC-015, denominado "Solicitud de Precios". Dichas cotizaciones deberán ser originales e incluir lo siguiente: nombre, dirección, seguro social patronal del suplidor, precio y términos de la compra o arrendamiento y el nombre y firma del representante autorizado que produjo la misma. Si la cotización se recibe mediante facsímile u otro medio electrónico, el Técnico de Compra certificará que la misma es correcta. El Delegado Comprador o su

---

[269] La subasta informal es el procedimiento de compra que se originará mediante una Solicitud de Precio para la adquisición de bienes y servicios no profesionales o el arrendamiento de equipo cuyo valor exceda de diez mil (10,000) dólares hasta la cantidad de cincuenta mil (50,000) dólares, inclusive.

representante autorizado, tendrá el deber de aprobar la Solicitud de Precios preparada y seleccionará los suplidores que, de acuerdo a su historial, sean los más idóneos, tomando como guías los precios, calidad y experiencia previa, entre otros factores.

e. El Delegado Comprador estará alerta de posibles conflictos de interés y de cualquier práctica indebida que pueda surgir entre los suplidores o que pueda restringir o eliminar la competencia.

De la obra resultar mayor a $50,000.00, la Superintendencia del Capitolio debía realizar un proceso de subasta formal. El propósito de este mecanismo es que exista una competencia equitativa en las proposiciones para la contratación pública, se adjudique al postor más bajo posible y se evite el favoritismo, la corrupción, la extravagancia y el descuido al otorgar contratos. *ECA Gen. Contract v. Mun. de Mayagüez*, 200 DPR 665, 672-673 (2018); *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 DPR 864, 872 (1990); *Justiniano v. ELA*, 100 DPR 334, 336 (1971). De esta forma, se promueve la inversión adecuada, responsable y eficiente con los recursos del Estado y se brinda protección al erario. *Super Asphalt v. AFI y otro*, 206 DPR 803, 820-821 (2021).

Ahora bien, el Reglamento de Compras, *supra*, establecía un procedimiento a seguir de ocurrir una emergencia o urgencia, se define a continuación:

> Toda necesidad pública inesperada e imprevista causada por situaciones fuera del alcance humano, en las que se requiere acción inmediata por estar en peligro la vida, salud o seguridad del Pueblo de Puerto Rico o de suspenderse, dañarse o afectarse adversamente el servicio público o la propiedad del Gobierno. Además dicho término incluirá aquella situación en donde, sin mediar negligencia, olvido o dilación administrativa, la vigencia de fondos disponibles está a punto de caducar y toda oportunidad para arrendar equipo o adquirir los materiales, equipo o servicios no profesionales pueda perderse, afectando adversamente el interés público. Disponiéndose, que también comprenderá todo aquel suceso o combinación ocasional de circunstancias, que exija actuación inmediata para resolver situaciones imprevistas que pudieran ocasionar un impacto perjudicial y significativo al servicio que brinda la Superintendencia. Artículo 6 (g) del Reglamento de Compras, *supra.*

En tal eventualidad de ocurrir emergencia o urgencia, el
Artículo 12 del Reglamento de Compras, *supra*, permitía la siguiente
excepción:

> [E]l Superintendente o su representante autorizado podrá
> autorizar la compra o arrendamiento de bienes, equipo o
> servicios no profesionales mediante el uso de fondos de la Caja
> Menuda hasta un límite de setenta y cinco (75) dólares o la
> cantidad que establezca el Departamento de Hacienda. Para
> ello, se utilizará el procedimiento de mercado abierto y se
> cumplimentará el formulario SC-PDC-016, denominado
> Solicitud de Compra para Caja Menuda. El Delegado
> Comprador o su representante autorizado verificará que dicho
> formulario esté debidamente cumplimentado y que lo
> solicitado no esté disponible en la Superintendencia.

Asimismo, mediante el Artículo 15 del Reglamento de Compras,
*supra,* se dispuso un proceso de aviso de cambio en la Obligación y
Orden de Compra o Arrendamiento de Equipo u Orden de Servicios.
Esto es:

> El Delegado Comprador hará una anotación correspondiente
> de "M" bajo el renglón referente a "Acción" en la Obligación y
> Orden de Compra o Arrendamiento de Equipo u Orden de
> Servicios cuando sea necesario efectuar un cambio en la
> misma. Algunas de las situaciones que constituyen causas
> justificadas para emitir un Aviso de Cambio serán las
> siguientes:
> a. Cancelaciones totales o parciales de los bienes, equipo o
> servicios no profesionales solicitados.
> b. Cambio en precio y cantidad.
> c. Cambio en las especificaciones.
> d. Incumplimiento de oferta u otras circunstancias.

Por último, el reglamento implementó el siguiente proceso para
la entrega de la compra, arrendamiento de equipo u servicio:

> a. Previo a aceptar los bienes o la prestación de los servicios
> no profesionales, el Receptor[270] verificará que éstos y su
> entrega estén acorde con los términos especificados en la
> Obligación y Orden de Compra o Arrendamiento de Equipo u
> Orden de Servicios, en cuyo caso prepararán un Informe de
> Recibo e Inspección.[271] De lo contrario, no los recibirá y
> escribirá una nota en el conduce explicando la razón de su
> devolución o no aceptación al suplidor. También remitirá al
> Delegado Comprador el Informe de Recibo e Inspección con la
> justificación para denegarlos, quien, a su vez, cumplimentará
> el formulario Cancelación de Partida y enviará copia de éste al
> oficial asignado en el área de finanzas de la Superintendencia,

---

[270] El Receptor es el empleado nombrado por el Superintendente, responsable de
certificar la corrección e integridad de los bienes recibidos o la prestación de los
servicios no profesionales ordenados por la Superintendencia. Véase Artículo 6 (t)
del Reglamento de Compras, *supra.*

[271] El Informe de Recibo e Inspección es el documento para certificar el recibo de
bienes correcta e íntegramente despachados, conforme a la Obligación y Orden de
Compra o Arrendamiento de Equipo, o la prestación de servicios no profesionales
rendidos acorde a la Orden de Servicios, con el propósito final de sustentar su pago.
Véase Artículo 6 (n) del Reglamento de Compras, *supra.*

al Superintendente o su representante autorizado, al Encargado de Propiedad o al Director de Servicios Generales y a la unidad solicitante.

b. El Delegado Comprador enviará la Obligación y Orden de Compra o Arrendamiento de Equipo u Orden de Servicios al Oficial asignado en el área de finanzas de la Superintendencia, a fin de que cumpla con el procedimiento interno en vigor para realizar el pago de los bienes recibidos o servicios no profesionales prestados.

c. El receptor enviará copia del Informe de Recibo e Inspección al (a la) Director(a) de la Oficina de Compras de la Superintendencia cuando se entreguen los bienes recibidos o presten los servicios no profesionales a la unidad solicitante y enviará otra copia de dicho Informe al Encargado de la Propiedad o Director de Servicios Generales de la Superintendencia, según corregida, para que cumpla con las normas pertinentes de control de propiedad. Además, remitirá el original del referido Informe, junto con los conduces de entrega, al Oficial asignado en el área de finanzas de la Superintendencia.

### E. Fraude

El inciso (b) del Artículo 210 del Código Penal de Puerto Rico de 2004, *supra*, sec. 4838, disponía que cometía el delito grave de cuarto grado de fraude, toda persona que realizara actos u omisiones que privaran a otra persona o afectaran los derechos o intereses patrimoniales sobre bienes inmuebles o muebles para perjuicio de esta, del Estado o de un tercero. El artículo establecía que el tribunal podía imponer la pena de restitución. Art. 210 del Código Penal de Puerto Rico de 2004, *supra*, sec. 4838. El elemento mental de dicho delito era la intención de defraudar o actuar fraudulentamente. D. Nevárez Muñiz, *Nuevo Código Penal de Puerto Rico*, 2008, *op. cit.*, pág. 285. En lo que nos concierne, "[e]n la modalidad (b) la conducta fraudulenta consiste en realizar actos u omisiones que tienen el efecto de privar o afectar los derechos o intereses patrimoniales de otra persona para su perjuicio". D. Nevárez Muñiz, *Nuevo Código Penal de Puerto Rico*, Edición 2004-2005, *op. cit.*, pág. 285.

### F. Apropiación ilegal agravada

El Artículo 192 del Código Penal de 2004, *supra*, sec. 4820, tipificaba como delito menos grave de apropiación ilegal cuyo acto prohibido era apropiarse de un bien mueble ajeno sin violencia ni

intimidación. *Íd.*, pág. 243. El referido artículo disponía que cometía dicho delito toda persona que ilegalmente se apropiara sin violencia ni intimidación de bienes muebles pertenecientes a otra persona.

El elemento indispensable de la apropiación ilegal era que la persona imputada se apropiara o adviniera en posesión ilegal de bienes muebles pertenecientes a otra persona. *Pueblo v. Uriel Álvarez*, 112 DPR 312, 317-318 (1982). El delito se consumaba al momento de llevarse a cabo la apropiación ilegal en cualquiera de sus modalidades. D. Nevárez Muñiz, *Nuevo Código Penal de Puerto Rico*, Edición 2004-2005, *op. cit.*, pág. 244. Concierne puntualizar que "el Código Penal contempla[ba] todas las formas clásicas de desposesión, despojo o interrupción de la custodia, posesión propia o propiedad – aquello que conlleva[ba] el aprehender una cosa y trasladarla – pero también abarcadoramente comprend[ía] todos los otros modos de lograr la posesión, transitoria o no, de un bien o cosa". *Pueblo v. Uriel Álvarez*, *supra*, pág. 317. La naturaleza de dicha apropiación de un bien mueble debía ser ilegal, en contravención de alguna ley, reglamento u orden. D. Nevárez Muñiz, *Nuevo Código Penal de Puerto Rico*, Edición 2004-2005, *op. cit.* Ahora bien, el elemento mental del delito era la intención de apropiarse de los bienes. *Íd.* Por ello, no se configuraba el delito si la persona acusada se apropiaba de un bien mueble por error, bajo la creencia de que era propio; tenía la autorización por parte del dueño para utilizarlo o sustraerlo, o actuó negligentemente. *Íd.* Por otro lado, era necesario que hubiese una transferencia o desplazamiento de la propiedad mueble de un patrimonio a otro. *Íd.*, pág. 245.

El delito de apropiación ilegal alcanzaba su tipo agravado cuando la persona se apropiaba de una propiedad, fondos públicos o de bienes cuyo valor sea de $1,000.00 o más. Art. 193 del Código Penal de 2004, *supra*, sec. 4821. Por otro lado, si el bien apropiado

ilegalmente era menor de $1,000.00 dólares, pero mayor de $500.00, se incurría en delito de cuarto grado. Adicionalmente, el tribunal estaba facultado para imponer la pena de restitución. *Íd.* Este artículo mantuvo la aplicabilidad de la apropiación ilegal de fondos públicos cuando un ciudadano privado se apropió de fondos públicos sin ser funcionario, empleado o alguna persona encargada de la administración de dichos fondos. D. Nevárez Muñiz, *Nuevo Código Penal de Puerto Rico*, 2008, *op. cit.*, pág. 257.

### G. Falsificación de documentos

El Artículo 218 del Código Penal de 2004, *supra*, sec. 4846, tipificaba el delito de falsificación de documentos. El referido artículo establecía que incurría en el delito grave de cuarto grado de falsificación de documentos, toda persona que con la intención de defraudar realizara, en todo o en parte, un documento, instrumento o escrito falso, mediante el cual se haya creado, transferido, terminado o de otra forma afectado cualquier derecho, obligación o interés o que falsamente se haya alterado, limitado, suprimido o destruido, total o parcialmente uno verdadero. *Íd.* En su modalidad de hacer en todo o en parte un documento, instrumento o escrito falso, el delito se consumía tan pronto se realizara el documento falso con las características y la intención de defraudar y que se creara, transfiriera, terminara o afectara algún derecho, obligación o interés de otra persona. D. Nevárez Muñiz, *Nuevo Código Penal de Puerto Rico*, 2008, *op. cit.*, págs. 293-294. Por otro lado, en su modalidad de alterar, suprimir o destruir total o parcialmente un documento verdadero, existía una alteración material del documento verdadero. *Íd.* En *Pueblo v. Flores Betancourt*, 124 DPR 867, 874-875 (1989), el Tribunal Supremo resolvió que "la médula del delito consist[ía] en la intención de perjudicar, causar daño o defraudar a otra persona con pleno conocimiento de la falsedad del escrito". La persona defraudada

podría ser natural, jurídica o el propio Estado. D. Nevárez Muñiz, *Nuevo Código Penal de Puerto Rico*, 2008, *op. cit.*, pág. 295. Cabe señalar que el perjuicio no requería ser necesariamente patrimonial, dado que podía ser suficiente frustrar la administración de una ley o lesionar una función gubernamental. *Pueblo v. Flores Betancourt*, *supra*, pág. 878.

Mediante la aprobación del Código Penal de 2012, se estableció que comete el delito de falsificación de documentos:

> Toda persona que con el propósito de defraudar haga, en todo o en parte, un documento, instrumento o escrito falso, mediante el cual se cree, transfiera, termine o de otra forma afecte cualquier derecho, obligación o interés, o que falsamente altere, limite, suprima o destruya, total o parcialmente, uno verdadero será sancionada con pena de reclusión por un término fijo de tres (3) años. [...] Artículo 211 del Código Penal de 2012, *supra*, sec. 5281.

El elemento mental del aludido delito es el propósito de defraudar a personas naturales o jurídicas, como el Estado. D. Nevares Muñiz, *Código Penal de Puerto Rico*, 4ta ed., San Juan, Ed. Instituto para el Desarrollo del Derecho, Inc., 2019, pág. 334-336.

### H. Falsedad ideológica

El Artículo 219 del Código Penal de 2004, *supra*, sec. 4847, regía lo concerniente al delito de falsedad ideológica. El referido artículo disponía que toda persona que, con la intención de defraudar, hiciera en un documento público o privado, declaraciones falsas concerniente a un hecho del cual el documento da fe o tuviese efectos jurídicos en perjuicio de otra persona cuando se tratara de un documento privado, incurría en este delito grave de cuarto grado.

### I. Posesión y traspaso de documentos falsificados

El Artículo 224 del Código Penal de 2004, *supra*, sec. 4852, tipificaba el delito de posesión y traspaso de documentos falsificados, que disponía que toda persona que con intención de defraudar poseyera, usara, circulara, vendiera o pasara como genuino o verdadero cualquier documento, instrumento o escrito falsificado, a

sabiendas de que era falso, alterado, falsificado o imitado, cometía dicho delito grave de cuarto grado. Es decir, la intención del aludido delito era defraudar a otra persona, con conocimiento de que era falsificado, por lo que el delito no se configuraba con el simple hecho de poseer un documento falsificado. D. Nevárez Muñiz, *Nuevo Código Penal de Puerto Rico*, 2008, *supra*, pág. 299. Ahora bien, cuando se hacía uso del documento falso con conocimiento de tal hecho, se desprendía que se intentó defraudar a otra persona. D. Nevárez Muñiz, *Nuevo Código Penal de Puerto Rico*, Edición 2004-2005, *op. cit.*, pág. 286.

### J. Restitución

En otro extremo, de acuerdo con el Artículo 49 del Código Penal de 2004, *supra*, sec. 4677, la pena de restitución constituía una de las penas que se puede imponer a una persona natural para cumplir su sentencia. A tenor con el Artículo 61 del Código Penal de 2004, *supra*, sec. 4689, la pena de restitución consistía en la obligación impuesta por el tribunal para compensar a la víctima de los daños y las pérdidas ocasionadas a su persona o propiedad, como consecuencia del delito. El propósito de la pena de restitución es punitivo y de indemnización para la víctima. *Vázquez v. Caraballo*, 114 DPR 272, 278 (1983); D. Nevárez Muñiz, *Nuevo Código Penal de Puerto Rico*, Edición 2004-2005, *op. cit.*, pág. 87. El tribunal podía disponer que la pena de restitución se satisficiera en dinero, mediante la prestación de servicios, la entrega de los bienes ilegalmente apropiados o su equivalente, en caso de que no estén disponibles. *Íd.* Importante es que, a diferencia de la pena de multa, el Código Penal no proveía para la reclusión subsidiaria en defecto del pago de la restitución. D. Nevárez Muñiz, *Nuevo Código Penal de Puerto Rico*, Edición 2004-2005, *op. cit.*, pág. 87. De esta forma, se evitó discriminar a las personas indigentes. *Íd.*; *Vázquez v. Caraballo*,

*supra*, pág. 279, *Tate v. Short*, 401 US 395 (1971). Ahora bien, la validez de una pena de restitución depende de la capacidad económica de la persona sentenciada para cumplirla. *Vázquez v. Caraballo, supra*, pág. 278, *citando a* A. Campbell, *Law of Sentencing, New York, Lawyers Co-operative Pub. Co.*, 1978, Sec. 23, pág. 89. Pues, someter a una persona indigente a una penalidad mayor que la que generalmente afrontaría una persona que posea medios económicos es incompatible con la garantía constitucional de la igual protección de las leyes. *Íd.*, pág. 279. El Tribunal Supremo federal ha determinado que, si bien el Estado tiene un interés en castigar adecuadamente a las personas que violan las leyes penales, independientemente de su estatus económico, es injusto revocar automáticamente la libertad condicional si la persona realizó todos los esfuerzos razonables para pagar una multa o una restitución pero no hacerlo sin tener culpa. *Bearden v. Georgia*, 461 US 660 (1983). Se debe considerar si existen métodos alternativos adecuados para cumplir con la multa o la restitución. *Íd.*

En la eventualidad de que se impusiera la satisfacción de la restitución en dinero, el tribunal debía determinar el importe en consideración los siguientes factores: el total de los daños que debían restituirse; la participación prorrateada del sujeto si fueron varios partícipes; la capacidad del sujeto para pagar, y cualquier otro elemento que permitiese establecer una fijación adecuada a las circunstancias del caso y condiciones del sujeto. *Íd.* A pesar de que la pena de restitución era de satisfacción inmediata, el artículo establecía que, a solicitud del sujeto sentenciado y a discreción del tribunal, se podía pagar totalmente o en cuotas dentro de un término razonable a partir de advenir firme la sentencia.

Ahora bien, es norma reiterada que los foros apelativos no intervienen con el ejercicio discrecional del tribunal de instancias en

la imposición de la pena, salvo claro abuso de discreción. *Pueblo v. Rodríguez Santana*, 146 DPR 860, 888-889 (1998). Pues, al ejercer su sana discreción, el tribunal sentenciador está en mejor posición para evaluar las circunstancias de cada caso y la situación individual de cada persona acusada. *Íd.*, pág. 889.

A la luz de la normativa jurídica esbozada, procedemos a resolver las controversias ante nuestra consideración.

**IV.**

En el presente caso, los apelantes plantearon como primer señalamiento de error que el TPI incidió al celebrar el juicio, ya que se les coartó el derecho constitucional a descubrir la prueba, la cual era extensa, compleja y técnica. Los apelantes esgrimieron que el Ministerio Público no les suministró la evidencia documental que se utilizó como prueba ante su incapacidad para proveer copia física o digital de la voluminosa cantidad de documentos. Por ello, los apelantes indicaron que el Ministerio Público atropelló el descubrimiento de prueba al citarles a la Oficina del Contralor para revisar los documentos en presencia de un funcionario que los supervisaba y les permitía fotografiar solamente aquellos que fueran necesarios. Asimismo, manifestaron que, a pesar de haber realizado una oportuna objeción, el TPI admitió en evidencia unos documentos que el Ministerio Público no entregó a la defensa ante el fundamento de que no los iba a utilizar en el juicio. Ante ello, los apelantes esbozaron que el Foro Primario no podía iniciar el juicio hasta que la defensa descubriera la prueba y se preparara adecuadamente. A su vez, puntualizaron que el hecho de que el Estado no tuviese la capacidad de fotocopiar o digitalizar los documentos no podía ser óbice para violentar su debido proceso de ley. Por último, precisaron que el Estado ocultó evidencia exculpatoria del apelante Martínez

Morales, por lo que solicitaron la desestimación de los cargos contra dicho apelante.

En lo atinente al segundo y tercer señalamiento de error, el señor Acosta Ramírez reseñó el procedimiento de compras en la Superintendencia del Capitolio. A saber, sostuvo que una vez se recibía la solicitud de un servicio y la correspondiente requisición, el Departamento de Compras evaluaba por lo menos (3) cotizaciones y escogía el suplidor agraciado, la cotización se enviaba al Departamento de Finanzas, donde se obligaban los fondos de acuerdo con su disponibilidad y se autorizaba al Departamento de Compras para que el suplidor diera el servicio. El apelante apuntó que, en dicho proceso, su función se limitaba a obligar los fondos una vez recibía las cotizaciones, por lo que del desfile de prueba no surgió que llevó a cabo una función distinta. Además, precisó que no tenía el deber de garante, ya que entre sus funciones no existía el deber de certificar que una obra se realizó ni autorizar el pago por una obra realizada. Por ello, entendió que no se cometió el primer elemento del delito de comisión por omisión. A su vez, concretó que no se demostró el segundo elemento del delito de comisión por omisión de tener la capacidad de realizar la acción omitida, puesto que el Ministerio Público no demostró que tenía la capacidad de impedir el pago de los suplidores. El apelante señaló que no podía impedir voluntariamente la producción del desembolso de los fondos públicos, ya que dicha acción no era parte de sus funciones. Por otro lado, argumentó que no estaba vinculado con las órdenes de compra por las que se le acusó que autorizó el desembolso de los fondos, en vista de que el señor Mendoza Martínez era el funcionario encargado de certificar las obras y los pre-interventores autorizaban los pagos. Por último, explicó que previo a ocurrir los hechos imputados, en su contrato ni

en su expediente en el área de recursos humanos existía una descripción de sus deberes y funciones.

Por su parte, el señor Martínez Morales puntualizó que ningún testigo lo vinculó como el funcionario encargado de certificar las obras para su correspondiente pago, ni que conspiró con otras personas para apropiarse o beneficiar a un tercero en la obtención de fondos públicos. Además, arguyó que ninguno de los testigos lo vinculó como una persona que, a sabiendas y criminalmente, certificó unos documentos para perpetrar un delito. Arguyó que, por el contrario, la prueba presentada estuvo basada en meras conjeturas de documentación tachada, con líquido corrector y autenticada por funcionarios que no prepararon dicha documentación y no pudieron establecer una cadena de custodia adecuada.

Por otro lado, la señora Cuervo Sierra alegó que no se probó su culpabilidad más allá de duda razonable. Esto, dado que no se demostró que actuó en concierto y común acuerdo con el señor Danois Román para presentar cotizaciones con el propósito de obtener ventaja en la adjudicación de órdenes de compra en la Superintendencia del Capitolio. La apelante subrayó que ningún testigo expresó que la conocía o que la observó en las inmediaciones del Capitolio. A su vez, sostuvo que el Ministerio Público no demostró que firmó alguna cotización y que, aun cuando se alegó que firmó unas cotizaciones, no se probó que lo realizó de manera fraudulenta para obtener una ventaja indebida. Asimismo, esgrimió que no se le vinculó con el señor Danois Román, más allá de ser su excónyuge.

Por último, el señor Danois Román, adujo que la prueba desfilada no estableció con certeza que no efectuó los trabajos de las órdenes de compra que se le adjudicaron ni que tuvo un propósito criminal al recibir pagos dobles por los trabajos que realizó. Igualmente, el apelante alegó que la prueba circunstancial que se

presentó se cimentó en documentos que los testigos de cargo expresamente manifestaron que no intervinieron con estos y sobre los que la defensa objetó por las dudas sobre su manejo y cadena de custodia. A su vez, manifestó que el Ministerio Público no presentó el testimonio de las personas que intervinieron con los documentos presentados en su contra. El señor Danois Román esgrimió que no lo entrevistaron en la fase investigativa administrativa ni se le permitió proponer la devolución del dinero al no advertirle que recibió un pago doble. Respecto al cuarto señalamiento de error, arguyó que erró y abusó de su discreción el TPI al imponer una pena de restitución de $500,000.00, sin evaluar su capacidad de pago. El apelante sostuvo que el TPI debió celebrar una vista para auscultar su capacidad económica ya que, de lo contrario, la ejecución de la sentencia podía entrañar una pena de reclusión por deuda, lo cual es inconstitucionalmente prohibido. Pues, el apelante puntualizó que la validez constitucional de una pena de restitución depende de la capacidad económica para cumplirla.

Por su parte, la Oficina del Procurador General de Puerto Rico (OPG) en representación del Ministerio Público, concretó que los apelantes alegaron desacertadamente que no se demostró que eran culpables más allá de duda razonable por los delitos imputados. La OPG planteó que, mediante la acción de algunos de los apelantes y la omisión de otros, el Pueblo de Puerto Rico perdió miles de dólares en fondos públicos por la inobservancia de los reglamentos que velan por el uso correcto de estos. Puntualizó que los procesos de compras en la Superintendencia del Capitolio conllevaban diferentes etapas que involucraban a varias personas que, con excepción del suplidor, eran funcionarios públicos que estaban llamados a velar por el cumplimiento de ley y hacerlo constar al plasmar sus firmas. Esto, puesto que la falta de la firma de cualquiera de estos funcionarios

públicos impedía que se completara el proceso del pago de las órdenes de compra. La OPG alegó que los funcionarios públicos que figuran como apelantes validaron un proceso viciado y nulo con sus omisiones al no asegurarse del cumplimiento con las leyes y los reglamentos y firmar para seguir el curso de las órdenes de compra.

A saber, la OPG planteó que, al momento de ocurrir los hechos de este caso, los procesos de compras que no excedieran de $50,000.00 se regían por el Reglamento de Compras, *supra*, el cual se implementó para prevenir y combatir todo posible acto de corrupción contra la Superintendencia del Capitolio y detener cualquier conducta contraria a la sana administración pública de dicha dependencia legislativa. Según reseñó la OPG, el procedimiento para una compra que no excedía de $50,000.00, iniciaba en la oficina o dependencia que necesitaba un servicio o la adquisición de un bien mediante la requisición, titulada como Solicitud de Compras, Arrendamiento de Equipo o Servicios No Profesionales. La OPG detalló que el referido formulario de requisición se trasladaba al almacén, donde el encargado certificaba la inexistencia del artículo solicitado en el inventario. Asimismo, la OPG informó que, posteriormente, la requisición se dirigía al área de compras, donde la directora la inspeccionaba, le asignaba un número y la destinaba a un delegado comprador para solicitar un mínimo de tres (3) cotizaciones. La OPG indicó que el Artículo 7 (j) del Reglamento de Compras, *supra,* disponía que del delegado comprador entender necesario, podía solicitar información adicional para clarificar y ampliar las especificaciones en la requisición. Seguido, la OPG explicó que una vez recibidas las cotizaciones, el comprador vertía la información al récord de cotizaciones para hacer una recomendación sobre el suplidor que debía seleccionarse, basado en la disponibilidad del bien o servicio, sus especificaciones, el precio y la experiencia

previa con el suplidor. La OPG aclaró que una vez el comprador y el jefe de compras firmaban el récord de cotizaciones y certificaban que recibieron las cotizaciones indicadas, autorizaban la adquisición de productos o servicios del suplidor agraciado. Sobre el particular, particularizó que, el Artículo 14(e) del Reglamento de Compras, *supra,* establecía que el delegado comprador tenía la obligación de estar alerta de los posibles conflictos de intereses y de cualquier práctica indebida que podía surgir entre los suplidores o que podía restringir o eliminar la competencia. De ahí, expuso que se preparaba la orden de compra que incluía el número de requisición, el bien o servicio con las especificaciones y los datos del suplidor seleccionado. En el referido formulario, el delegado comprador o el director de compras certificaba que la orden se emitió de acuerdo con las leyes y los reglamentos aplicables, por lo que trasladaba al área de finanzas para la obligación de fondos. En dicha área, el director de finanzas certificaba que existían los fondos para el pago de la orden de compra solicitada. Una vez el bien llegó o el servicio se realizó, un receptor de la Superintendencia del Capitolio debía recibirlo y, utilizando el formulario conocido como "la viuda", verificaba que el bien o servicio se rindió de conformidad con las especificaciones que allí expuestas. Posteriormente, "la viuda" se enviaba a la oficina del Superintendente del Capitolio para que este o su representante autorizado la inspeccionara y aprobara. Para que se pagara por el bien o servicio, la factura y "la viuda" debía remitirse al área de finanzas, donde se realizaba una pre-intervención en la que se verificaban los documentos para preparar el comprobante. El pre-interventor certificaba que los documentos estaban conformes y que el pago no se efectuó previamente. Subsiguientemente, el comprobante se trasladaba para la firma del director de finanzas o su representante que certificaba con su firma que los artículos o servicios se obtuvieron

siguiendo los trámites establecidos por la ley y reglamentación; que de acuerdo con la ley para la organización o los fondos se podía incurrir en esa clase de gastos; que verificó la firma del supervisor o director de la oficina; que los cómputos eran correctos y que el comprobante no se autorizó previamente. En cambio, la OPG señaló que toda compra que excediera de dicha cantidad requería la celebración de una subasta, según se detalló en la prueba oral y documental.

La OPG expuso que de la prueba surgió que el señor Acosta Ramírez como Gerente de Servicios Administrativos, el señor Martínez Morales como Gerente del Área de Proyectos de Construcción, así como otros funcionarios públicos como la señora Alberti Torres quien fungió como Secretaria del señor Martínez Morales, la señora Ramírez Sánchez como Compradora y la señora Rivera Domínguez como Compradora y Directora de Compras, incumplieron con sus deberes de velar que los procesos de compras se realizaran conforme a derecho. Mediante lo anterior, planteó que dichos funcionarios permitieron que el señor Danois Román y la señora Cuervo Sierra como dueños y representantes de Restaura y Fasan cometieron actos intencionales y fraudulentos que resultaron en la pérdida de miles de dólares en fondos públicos. La OPG cuestionó la alegación de los señores Martínez Morales y Acosta Ramírez de desconocer sobre lo ocurrido, puesto que el señor Danois Román no cometió fraude en pocas instancias, sino en ciento cuarenta y tres (143) órdenes de compra que requirieron que el señor Acosta Ramírez autorizara su obligación y el pago de fondos, mientras que el señor Martínez Morales certificara directamente o a través de subalternos que los trabajos se realizaron. A su vez, sostuvo que el señor Acosta Ramírez omitió su obligación de preservar los documentos del trámite para el pago de las órdenes de compra.

En virtud de lo anterior, la OPG arguyó que de las ciento cuarenta y tres (143) órdenes de compra objeto de este caso, cuarenta y seis (46) emitidas a Restaura o Fasan se pagaron con fondos públicos provenientes de la línea de crédito de la Superintendencia del Capitolio en el BGF. Para ello, la OPG esgrimió que se requirió la certificación del señor Acosta Ramírez como Gerente de Servicios Administrativos de la Superintendencia del Capitolio o un representante suyo, lo que implicaba su anuencia. De las referidas órdenes, la OPG adujo que en varias ocasiones se pagaron múltiples órdenes de compras con un mismo cheque. A saber:

1. Cheque 302871 de 8 de marzo de 2012 emitido por el BGF a favor de Restaura por la suma de $116,232.40 para sufragar las órdenes de compra 11250334 de la restauración del Salón de Audiencias María Martínez en el Senado por $7,000.00; 11250547 de la reparación de tuberías y de la oficina de la Senadora Lorna Soto a causa de la rotura de la tubería principal por $31,070.80; 11250785 de la construcción de fascia en *gypsum board* del Salón Café del Senado por $6,493.50; 11250914-M de las mejoras a los cristales de la oficina de la Senadora Sila M. González por $14,090.40; 12250161 de la remodelación de dos (2) baños en la Oficina de Secretaria del Senado por $47,619.00, y 12250162 de la remodelación del baño en el Mezanine del Edificio Baltasar Corrada del Río por $9,956.70.

2. Cheque 303068 de 20 de marzo de 2012 emitido por el BGF a favor de Restaura por la suma de $172,362.15 para sufragar las órdenes de compra 12250163 de la remodelación de los baños en el segundo piso del Capitolio por $49,062.00; 12250164 de la demolición de la covacha para almacenar los equipos de jardinería en el Edificio Medicina Tropical por $32,523.00; 12250170 de restauración del área de cocina para las nuevas oficinas de servicios administrativos en el Edificio Antiguo de Recursos Naturales por $27,561.30; 12250760 de las mejoras en el Paseo de los Presidentes por $44,962.50; 12250782 de la instalación de ladrillo en la Plaza Ramón Mellado por $3,535.35, y 12250783 de la remodelación de la escalera del Edificio Medicina Tropical por $14,718.60.

3. Cheque 303667 de 26 de abril de 2012 emitido por el BGF a favor de Restaura por $90,136.35 para sufragar las órdenes de compra 12250741 del suplido de tapas de manholes del Edificio Medicina Tropical por $10,000.00; 12250822 de la instalación de escudos en fuente del Edificio Medicina Tropical por $4,868.50; 12250968 de la restauración del pasillo del Edificio Medicina Tropical por $38,656.53; 12251043 del paisajismo para la nueva plaza del Edificio Medicina Tropical por $4,000.00; 12250893 de las mejoras en la plomería del anexo de la Cámara de Representantes por $6,493.50, y 12250974 de la fabricación de muebles de estrados para el Edificio Covadonga por $31,746.00.

4. Cheque 303668 de 26 de abril de 2012 emitido por el BGF a favor de Fasan por la suma de $50,685.00 para sufragar las órdenes de compra 12250942 de la fabricación e instalación de canales de comisión por $27,000.00; 12250961 del suplido de puerta de baño del primer piso del Capitolio por $3,500.00, y 12250973 de

la restauración de la antigua oficina de recursos humanos por $24,000.00.

5. Cheque 304336 de 8 de junio de 2012 emitido por el BGF a favor de Restaura por la suma de $ 117,076.50 para sufragar las órdenes de compra 12250455 de la construcción de *canopy* en el anexo de la Cámara de Representantes por $13,382.50; 12251074 de las mejoras a las cubiertas metálicas de talleres en el Senado por $15,000.00; 12251135 de la restauración de la oficina de la Legisladora Liza Fernández Rodríguez en el Capitolio por $20,000.00; 12251127 de las mejoras a Oficina de Archivos y Reproducción de la Cámara de Representantes por $36,075.00, y 12251047 de la restauración del lado Este del Edificio Medicina Tropical por $36,075.00.

6. Cheque 304409 de 13 de junio de 2012 emitido por el BGF a favor de Fasan por la suma de $73,620.00 para sufragar las órdenes de compra 12251106 de la instalación de cable de seguridad para el techo del Capitolio por $17,000.00; 12251122 de la restauración del área de vigilancia de la Superintendencia del Capitolio por $17,000.00, y 12251126 de la restauración del antiguo almacén de la Oficina de Servicios Legislativos por $42,000.00.

7. Cheque 304728 de 28 de junio de 2012 emitido por el BGF a favor de Fasan por la suma de $106,485.00 para sufragar las órdenes de compra 12251049 de la remodelación de las antiguas oficinas de las Cámara de Representantes por $46,500.00, 12251050 de la restauración de fuentes de la Plaza de la Recordación por $23,000.00 y 12251161 de las mejoras en el Edificio Luis A. Ferrer por $45,000.00.

8. Cheque 305238 de 3 de agosto de 2012 emitido por el BGF a favor de Fasan por la suma de $21,669.00 para sufragar las órdenes de compra 12251052 de las mejoras en el pasillo del Edificio Medicina Tropical por $4,800.00, y 12251123 de las mejoras a la antigua oficina de auditoría de la Cámara en el Edificio de Medicina Tropical por $18,500.00.

9. Cheque 305289 de 9 de agosto de 2012 emitido por el BGF a favor de Restaura por la suma de $14,090,89 para sufragar las órdenes de compra 12251249 de la reparación de desagüe en el cuarto de comunicaciones por $2,741.70 y 12251296 de las mejoras en las ventanas del Edificio Medicina Tropical por $4,329.00.

10. Cheque 305557 de 24 de agosto de 2012 emitido por el BGF a favor de Restaura por la suma de $44,709.75 para sufragar las órdenes de compra 12251157 de la instalación del pavimento del Edificio Medicina Tropical por $36,075.00 y 13250146 de la remodelación en la oficina de la Senadora Evelyn Vázquez Nieves por $27,825.00.

Sin embargo, la OPG expuso que, a pesar de que los señores Martínez Morales y Acosta Ramírez omitieron su deber en multitud de ocasiones, las acusaciones presentadas y demostradas por el Ministerio Público se limitaron a las siguientes órdenes: las órdenes de compra 11250334 y 11250334-M para los trabajos en el Salón de Sesiones María Martínez; las órdenes de compra 11250172 y 12250172-M; 11250914 y 11250128 para los trabajos en el segundo piso de la Superintendencia del Capitolio, y las órdenes de compra 11250180 y 11250181 para los trabajos en el Salón Protocolar. Al

respecto, arguyó que se demostró que estas órdenes formaron parte de un patrón de requisiciones de obras de construcción carentes de especificaciones y de fraccionamiento de obras para que los costos no superaran los $50,000.00 y no tuviesen que pasar por el proceso de subastas. Igualmente, alegó que se demostró que unos trabajos se pagaron el mismo día o a los pocos días que se emitía la orden de compra. Asimismo, expresó que el señor Acosta Ramírez autorizó pagos duplicados con la cuenta de la Superintendencia del Capitolio y con la línea de crédito del BGF para órdenes de compras originales y modificadas que autorizó y el señor Martínez Morales certificó. La OPG explicó que muchos de estos se emitieron para sufragar órdenes modificadas, que en ocasiones obedecieron a cambios en las partidas presupuestarias que derivaron en múltiples órdenes pagadas con la línea de crédito en el BGF y/o con fondos públicos propios de la Superintendencia del Capitolio.

Por otro lado, el OPG puntualizó que de la prueba directa y circunstancial surgió que el señor Danois Román era artífice del esquema para apropiarse de fondos públicos de la Superintendencia del Capitolio, mientras que la señora Cuervo Sierra se benefició y participó del mismo. Esto, puesto que mediante comunicaciones por correo electrónico desde y hacia el correo electrónico edanois@yahoo.com con las señoras Ramírez Sánchez y Alberti Torres, el señor Danois Román logró la preparación de requisiciones y cotizaciones falsas de la compañía inexistente EKHO, RL, Constructora Lingua, MEG, entre otras. Además, destacó que el señor Danois Román y la señora Cuervo Sierra hicieron colusión en treinta y siete (37) órdenes de compra: 12250942, 12250961, 12250975, 12251047, 12251048, 12251049, 12251050, 12251052, 12251053, 12251072, 12251074, 12251106, 12251122, 12251123, 12251125, 12251126, 12251127, 12251128, 12251135, 12251153,

12251157, 12251160, 12251161, 12251176, 12251183, 13250051, 13250058, 13250059, 13250065, 13250144, 13250146, 13250154, 13250184, 13250191, 13250192 y 13250202 al presentar cotizaciones tanto de Restaura como Fasan para que una de las compañías resultara seleccionada. La OPG precisó que la colusión causada fue una acción fraudulenta que conllevó la adjudicación de órdenes de compras nulas. Asimismo, indicó que el cargo por el cual se le halló culpable a la señora Cuervo Sierra estaba relacionado con las cotizaciones que ella presentó y firmó en el patrón de colusión, por lo que no se basaron meramente en su relación como esposa del señor Danois Román.

Adicionalmente, la OPG manifestó que el señor Danois Román provocó fraudulentamente la concesión de órdenes de compra a favor de Restaura en los que se utilizaron los empleados y equipos de RL. Asimismo, señaló que para las órdenes de compra a favor de Restaura y Fasan se pagó una partida para seguros con fondos públicos, entre ellos de la CFSE. No obstante, subrayó que el señor Danois Román no suscribió ni pagó la póliza de la CFSE para los proyectos de construcción en las siguientes órdenes de compra: 10250722, 10250730, 10250836, 11250088, 11250109, 11250179, 11250180, 11250181, 11250334, 11250547, 11250785, 11250914, 11251100, 12250128, 12250142, 12250161, 12250162, 12250163, 12250164, 12250170, 12250171, 12250172, 12250275, 12250285, 12250299, 12250315, 12250381, 12250416, 12250420, 12250421, 12250545, 12250640, 12250641, 11251143, 11251144, 12250335, 12250455, 12250741, 12250760, 12250782, 12250783, 12250822, 12250893, 12250898, 12250942, 12250961, 12250968, 12250973, 12250974, 12250975, 12251043, 12251047, 12251048, 12251049, 12251050, 12251052, 12251053, 12251072, 12251074, 12251106, 12251106, 12251125, 12251126, 12251127, 12251128, 12251135, 12251153,

12251157, 12251160, 12251161, 12251176, 12251183, 12251248, 12251249, 12251296, 12251297, 12251338, 13250013, 13250058, 13250059, 13250065, 13250066, 13250144, 13250146, 13250154, 13250184, 13250190, 13250191, 13250192, 13250202, 13250220, 13250226, 13250227, 13250241, 13250242, 13250279, 13250280, 13250281, 13250205, 13250307, 13250310, 13250311, 13250312, 13250313, 13250314, 13250323, 13250332, 13250334, 13250335, 13250392, 13250393, 13250394, 13250424, 13250452, 13250466, 13250467, 13250478, 13250479, 13250480 y 13250508.

Referente al señalamiento de error relacionado al descubrimiento de prueba, la OPG alegó que el TPI no erró al celebrar el juicio, en vista de que no se les coartó su derecho a descubrir prueba ni el Ministerio Público ocultó evidencia exculpatoria alguna. La OPG expuso que durante la vista de lectura de acusación del 9 de septiembre de 2016, el Ministerio Público le comunicó al TPI que les entregó la prueba a los acusados de manera adelantada desde agosto de 2015. Ante ello, reseñó que el Foro Primario le instruyó a los coacusados que revisaran los documentos recibidos e informaran si algo faltaba. La OPG puntualizó que el 14 de septiembre de 2016, durante la lectura de acusación contra el señor Rodríguez Cortés, el TPI volvió a otorgar un término para que los apelantes se expresaran sobre una moción que el Ministerio Público presentó al amparo de la Regla 95-A de Procedimiento Criminal, *supra*, R. 95-A. Según la OPG, en dicha moción se notificó al TPI que el 21 de agosto y el 18 de septiembre de 2015, señor Martínez Morales recibió y acusó recibo del descubrimiento de prueba, al igual que el señor Danois Román lo recibió el 21 de agosto de 2015; la señora Cuevas Sierra en los días 21 de agosto y 23 de noviembre de 2015, y el señor Acosta Ramírez en los días 20 de agosto y 6 de noviembre de 2015. Por otra parte, indicó que en una vista sobre el estado de los procedimientos que se

celebró el 27 de octubre de 2016, el Ministerio Público anunció que los representantes legales de los apelantes acudirían al Departamento de Justicia para examinar la prueba. Empero, expresó que no acudieron. Así las cosas, el 29 de noviembre de 2016, el TPI otorgó un tercer término para que los apelantes se expresaran sobre el descubrimiento de prueba y se estableciera un calendario de reuniones. No obstante, adujeron que, dado que las partes no se reunieron, el 23 de febrero de 2017, el Foro a quo celebró una cuarta vista de estado de los procedimientos en la que el señor Danois Román y Acosta Ramírez anunciaron que pautaron reuniones con el Ministerio Público. La OPG señaló que el señor Martínez Morales indicó que iba a coordinar la reunión por correo electrónico. Sucesivamente, la OPG relató que el 19 de abril de 2017 se celebró una quinta vista sobre el estado de los procedimientos, en la que el Ministerio Público manifestó que entregó los documentos solicitados por el señor Martínez Morales.

Por otro lado, la OPG puntualizó que en la sexta vista de estado de los procedimientos, los señores Danois Román y Martínez Morales expresaron que no tenían certeza de haber recibido la totalidad del descubrimiento de prueba y se cuestionó la acción del Ministerio Público en exigir que se sacara copia de los documentos que fuesen necesarios. Por su parte, destacó que el Ministerio Público arguyó que se le colocó toda la documentación a la defensa de los apelantes en un salón de conferencia y que la defensa solicitó documentos que el Estado no se proponía utilizar. Asimismo, precisó que el TPI emitió unas órdenes a la Superintendencia del Capitolio y a la Oficina del Contralor para entregar los documentos y le otorgó un término a los apelantes para que solicitaran descubrimiento de prueba.

Acto seguido, la OPG indicó que en la séptima vista de seguimiento, el 22 de junio de 2017, el señor Danois Román

manifestó que recibió los documentos por parte de la Oficina del Contralor y que tenía pendientes unas peticiones realizadas hacia la Superintendencia del Capitolio y la CFSE. Por ello, la OPG indicó que el TPI les concedió a los apelantes un término de veinte (20) días para suplir el descubrimiento de prueba a favor del Ministerio Público.

En cuanto a la controversia relacionada con el documento de descripción de las funciones del señor Martínez Morales que su defensa alegó que no se descubrió, la OPG citó la siguiente expresión del TPI:

> Ya a los fines del tribunal eh ... honestamente la interpretación de esta carta sería una interpretación que va realmente al juzgador de los hechos. **El juzgador de los hechos tendría que determinar si esto constituye prueba exculpatoria o no.** Yo pienso que si la fiscal la tenía ... el [M]inisterio [P]úblico debió haberse producido. **Ciertamente el juicio no ha comenzado. Lo que hubiese pasado es que yo hubiese tenido que detenerlo para que usted se preparara y se enfrentara a esto. Pero yo no creo que como ... yo no creo que un ... ahora mismo hay un pre ... perjuicio a su representado a los fines de que no se le entregó en el momento que se le debió haber entregado. Y ciertamente el juicio no va a comenzar hoy y no va a comenzar dentro de un mes** [...] (Énfasis suplido).

Posterior a ello, la OPG mencionó que el TPI amonestó al Ministerio Público por no haber entregado una carta del 13 de marzo de 2017, dirigida al Fiscal Reyes con sus anejos a la defensa, sin desestimar las acusaciones. Esto, en vista de que el Foro Primario entendía que no existía perjuicio para el señor Martínez Morales, ya que su representación legal tenía la oportunidad de prepararse adecuadamente para el juicio que aún no comenzaba. A saber, recalcó la siguiente expresión del TPI:

> [Q]ueda muy claro el ru[l]ing del tribunal a los fines de que todo lo que tenga que ver con estos casos de estos señores y estas damas que el [M]inisterio [P]úblico tenga ... lo tenga tiene que proveerlo. O sea, no puede guardar nada. Y que si es ... si es valioso o no lo es, eso no es una determinación que la tiene que hacer el [M]inisterio [P]úblico. Eso lo determinarán ellos. Este ... así que no ... esto no debió haber sucedido y **el tribunal no desestima porque entiende que ahora mismo no hay ningún perjuicio que los compañeros y la compañera tienen la oportunidad de prepararse** eh ... y la interpretación verdad de lo de que es ese deber[.] (Énfasis suplido).

La OPG afirmó que el Tribunal *a quo* concluyó que la carta en controversia favorecía al apelante, pero que no constituyó una evidencia exculpatoria. A tal efecto, particularizó que el señor Martínez Morales no recurrió a las determinaciones del TPI en no desestimar las acusaciones en su contra y en resolver que la carta en controversia no era evidencia exculpatoria. Posteriormente, la OPG sostuvo que se le informó al TPI que la defensa del señor Martínez Morales no examinó los documentos el día pautado, ya que entendía que estaban desorganizados. La OPG manifestó que, eventualmente, las reuniones para la inspección de los documentos se celebraron el 29 de enero de 2018 con el representante legal del señor Acosta Ramírez; el 29 de enero y 1 de febrero de 2018 con la representante legal del señor Danois Román, y el 1 de febrero de 2018 con el representante legal del señor Martínez Morales. Subsiguientemente, la OPG relató que el 16 de enero de 2019, el señor Martínez Morales presentó una moción de descalificación al amparo del debido proceso de ley y una segunda moción de desestimación por violación al debido proceso de ley, las cuales, el 4 de febrero de 2019, el TPI declaró No Ha Lugar. Con relación a la desestimación por violación al debido proceso de ley, el Foro Primario mantuvo su determinación en que la falta de entrega de un documento a la defensa no reflejó mala fe por parte del Ministerio Público, y añadió que al Tribunal no se le presentó prueba alguna que indicara que esta omisión causó perjuicio. La OPG expuso que el señor Martínez Morales presentó un recurso de *certiorari* ante este Tribunal de Apelaciones mediante el caso KLCE201900291 que un Panel Hermano denegó. La OPG expuso que la determinación de este Foro apelativo advino final y firme, ya que el señor Martínez Morales no recurrió de esta. A su vez, aludió que el 5 de junio de 2019, el señor Martínez Morales solicitó la desestimación por violación al debido proceso de ley en una tercera

ocasión ante el fundamento de que la carta del 13 de marzo de 2017 constituyó prueba exculpatoria. Sin embargo, destacó que el TPI denegó la moción. Pese a lo anterior, la OPG arguyó que la referida carta no se presentó en evidencia durante el juicio ni los testigos la mencionaron.

La OPG puntualizó que el TPI actuó correctamente el 30 de noviembre de 2017, al ordenar al Ministerio Público que proporcionara todos los documentos recopilados a los apelantes y demás coacusados, independientemente de si se proponían a presentarlos en evidencia, a tenor con la Regla 95B (e) de Procedimiento Criminal, *supra*, R. 95B (e). Sobre el particular, enfatizó que posterior a dicha determinación, los apelantes tuvieron más de trece (13) meses para examinar la prueba y completar la preparación de su defensa. Por ello, esgrimió que no era correcta la alegación de los apelantes en que no se les suministraron copias, puesto que el Ministerio Público le entregó una gran cantidad de documentos desde el año 2015 y en pocas instancias recomendó sacar las copias mediante sus propios medios. La OPG manifestó que esta situación no constituyó una violación al debido proceso de ley, ya que la obligación del Ministerio Público bajo la Regla 95B de Procedimiento Criminal, *supra*, R. 95B, era permitir que los apelantes inspeccionaran, copiara o fotocopiaran material o información que estuviese en posesión, custodia o control del Ministerio Público, cualquier agencia o instrumentalidad pública.

Por otra parte, la OPG adujo que el TPI no incurrió en abuso de su discreción al imponer una pena de restitución al señor Danois Román, ya que éste no solicitó una discusión sobre el contenido del informe pre-sentencia ni lo impugnó en la lectura de sentencia. Asimismo, la OPG señaló que el señor Danois Román no expuso que estaba incapacitado para pagar la restitución, sino que expresó

reparo con la partida a favor del señor Liste Liñeira ante la posibilidad de que ocurriese duplicidad de pago por una acción civil. Por otro lado, planteó que el 29 de noviembre de 2021, apenas once (11) días después de presentar este recurso de apelación, el señor Danois Román presentó ante el TPI una moción de modificación de la *Sentencia*. Mediante esta, solicitó la modificación del horario de entrada y salida de su hogar y la cuantía de la partida de restitución para una cantidad menos onerosa y más razonable de conformidad con los ingresos expresados en el informe pre-sentencia. La OPG planteó que en una vista celebrada el 22 de febrero de 2022, el TPI hizo constar que carecía de jurisdicción para atender la moción presentada por el señor Danois Román hasta que esta Curia apelativa dispusiera el presente recurso. Sin embargo, esgrimió que el señor Danois Román no solicitó que el informe pre-sentencia se elevara en los autos, por lo que este Tribunal no estaba en condiciones para atender el planteamiento de error relacionado con la pena de restitución. No obstante lo anterior, la OPG manifestó que la imposición de restitución fue correcta en derecho, ya que el apelante contravino el Artículo 193 del Código Penal de 2004, *supra*, sec. 4821 al apropiarse de una cantidad superior a $500,000.00. Además, expuso que el Foro Primario le impuso al señor Danois Román una pena de sentencia suspendida que le permitía tener la oportunidad de trabajar y pagar la restitución a lo largo del término de la pena.

Tras evaluar minuciosamente las alegaciones de ambas partes así como la totalidad del expediente que se encuentra ante nuestra consideración, incluyendo los autos originales, nos encontramos en posición de resolver. Como cuestión de umbral, nos corresponde evaluar las alegaciones de insuficiencia de la prueba.

Con respecto al señor Acosta Ramírez, el Ministerio Público demostró mediante prueba testifical y documental que el apelante

autorizó con su firma la obligación de fondos y el pago de las órdenes de compras a favor de las corporaciones Restaura y Fasan, en contravención con el ordenamiento jurídico. En particular, se demostró que el señor Acosta Ramírez autorizó por tres (3) ocasiones la obligación y el pago para una misma obra de construcción en las nuevas oficinas de servicios administrativos en el área de finanzas y recursos humanos en el segundo nivel del Edificio Antiguo de Recursos Naturales por tres (3) ocasiones, sin cumplir con el proceso de subasta formal para las órdenes que sobrepasaban los $50,000.00. A saber:

A. El 12 de julio de 2011, se realizó la Solicitud de Compras, Materiales, Arrendamiento de Equipo o Servicios No Personales número 12-042-A para la construcción de baños y puente de fachada para nuevas oficinas de servicios administrativos en el área de finanzas y recursos humanos en el segundo nivel del Edificio Antiguo de Recursos Naturales. Esta requisición resultó en la orden de compra 12250128 que se adjudicó a favor de Restaura. El 8 de agosto de 2011, Restaura presentó una propuesta, en la que cotizó $49,292.33 para el suplido y la instalación de equipos y accesorios de baños, los enchapes de pisos y paredes de baños con mármol, la instalación de *gypsum board* en las paredes, la conexión de tuberías de primer piso y llevar al tercer piso, el suplido de tuberías de agua, el suplido de ventilación, el suplido de aguas sanitarias, y las mejoras al puente de fachada. El 18 de agosto de 2011, el señor Acosta Ramírez firmó la Obligación y Orden de Compra en la que certificó que existían los fondos para el pago de la orden de compra por $49,292.33 mediante el fondo 111 de la cuenta E-2990. El 23 de septiembre de 2011, el señor Acosta Ramírez firmó una segunda Obligación y Orden de Compra, en la que certificó que existían los fondos para el pago de la orden de compra de $49,292.33, pero esta vez se dividió en $41,956.07 del fondo 289 de la cuenta E-2990 y $7,336.26 del fondo 161 de la cuenta E-2990. El 23 de septiembre de 2011, el señor Danois Román emitió y firmó la factura 2011-ADM2 de $49,292.33 para la orden de compra de referencia. En igual fecha, el señor Acosta Ramírez firmó el cheque 003204 con fondos de la Superintendencia del Capitolio a favor de Restaura por la cantidad de $45,841.86 al deducir la retención del 7% de $49,292.33. Posterior a ello, el 21 de febrero de 2012, el señor Acosta Ramírez firmó una tercera Obligación y Orden de Compra, en la que certificó que existían los fondos para el pago de la orden de compra de $49,292.33, dividido en $41,956.07 del fondo 322 de la cuenta E-2990 y $7,336.26 del fondo 322 de la cuenta E-2990.

B. El 10 de junio de 2011, el señor Acosta Ramírez firmó la Solicitud de Compras, Materiales, Arrendamiento de Equipo o Servicios No Personales número 12-108-A para la construcción de baños y puente de fachada para nuevas oficinas de servicios administrativos en el área de finanzas y recursos humanos en

el segundo nivel del Edificio Antiguo de Recursos Naturales. Dicha requisición culminó en la orden de compra 12250172 que se adjudicó a Restaura. Igualmente, el 8 de agosto de 2011, Restaura envió una propuesta en la que cotizó $49,292.23, una diferencia de diez (10) centavos en comparación con la orden de compra 12250128 por el mismo suplido y la instalación de equipos y accesorios de baños, los enchapes de pisos y paredes de baños con mármol, la instalación de *gypsum board* en las paredes, la conexión de tuberías de primer piso y llevar al tercer piso, el suplido de tuberías de agua, el suplido de ventilación, el suplido de aguas sanitarias, y las mejoras al puente de fachada. El 18 de agosto de 2011, el señor Acosta Ramírez firmó una Obligación y Orden de Compra para la orden de compra 12250172 de $49,292.23, en la que certificó que existían los fondos para pagar la orden de compra a través del fondo 111 de la cuenta E-2990. En tal sólo siete (7) días de autorizarse la obligación de fondos, el señor Danois Román emitió y firmó la factura 2011-ADM1 de $49,292.23 para la orden de compra 12250172. El 28 de septiembre de 2011, se emitió el cheque 003258 con fondos de la Superintendencia del Capitolio a favor de Restaura por la suma de $45,841.77 al deducir la retención del 7% de $49,292.23.

C. El señor Danois Román emitió y firmó una propuesta sin fecha para los trabajos de demolición y restauración del área de puente y fachada para las nuevas oficinas de servicios administrativos en el área de segundo piso del Edificio Antiguo de Recursos Naturales inicialmente cotizada por la suma de $44,137.50, pero tachada con líquido corrector y escrita a mano la suma de $40,000.00. El 7 de noviembre de 2012, el señor Acosta Ramírez firmó una Obligación y Orden de Compra, en la que certificó que existían los fondos para el pago de la orden de compra 12250172-M de $40,000.00 a través del fondo 141 de la cuenta E-2990. En el referido documento se aclaró que se modificó la orden de compra 122501172 para bajar el costo total y corregir los fondos. El señor Danois Román emitió y firmó la factura 2011-DEP sin fecha por $40,000.00 para la orden de compra 12250172-M. El 18 de noviembre de 2011, el señor Acosta Ramírez firmó el cheque 003630 con fondos de la Superintendencia del Capitolio a favor de Restaura por la suma de $37,200.00 al deducir la retención del 7% de $40,000.00.

Asimismo, el señor Acosta Ramírez autorizó el desembolso de $14,000 de fondos de la Superintendencia del Capitolio y de la línea de crédito en el BGF para pagar por dos (2) ocasiones la cantidad de $7,000.00 a favor de Restaura por una sola obra de restauración del Salón de Audiencias María Martínez del Senado. A saber, el 28 de octubre de 2010, el señor Acosta Ramírez autorizó el cheque 001503 por la suma de $7,000.00 de los fondos de la Superintendencia del Capitolio para pagar a Restaura por la orden de compra 11250334. Aproximadamente dos (2) años más tarde, el 27 de febrero de 2012,

el señor Acosta Ramírez emitió una Certificación en la que solicitó al BGF el pago de la factura 2012-DSMM de Restaura por la suma de $7,000.00 por la misma orden de compra 11250334. Dicho pago doble se efectuó mediante el cheque 302871 que el BGF expidió el 7 de marzo de 2012 por la suma de $116,232.40 a favor de Restaura para sufragar varias órdenes de compra, entre las que se encontraba la orden de compra 11250334.

De igual manera, el señor Acosta Ramírez autorizó el pago de $28,180.80 para pagar dos (2) veces la cantidad de $14,090.40 a favor de Restaura por una sola obra de mejoras a los cristales de la Senadora Sila M. González Calderón. En específico, el 4 de abril de 2011, el señor Acosta Ramírez autorizó el cheque 002359 por la suma de $14,090.40 de los fondos de la Superintendencia del Capitolio para pagar a Restaura por la orden de compra 11250914. El 27 de febrero de 2012, el señor Acosta Ramírez emitió una Certificación en la que solicitó al BGF el pago de la factura 2012-MCSM de Restaura por la suma de $14,090.40 para nuevamente sufragar la orden de compra 11250914. En virtud de lo anterior, el 7 de marzo de 2012, el BGF emitió el cheque 302871 por la suma de $116,232.40 para sufragar, entre otras, la orden de compra 11250914.

Para dichas órdenes de compra 12250334 y 12250914, el señor Acosta Ramírez certificó lo siguiente hacia el BGF a nombre de la Superintendencia del Capitolio:

> 1. A la fecha en que se presenta esta Petición de Desembolso, no existe ni ha ocurrido un evento que constituya incumplimiento al Contrato de Préstamo.
>
> 2. Que el Prestatario [Superintendencia del Capitolio] es totalmente responsable de cumplir con todas las regulaciones y leyes fiscales o contributivas aplicables en relación con las retenciones que corresponda realizar a personas, entidades, corporaciones, con las que establezca una relación contractual o a quien le deba remitir pagos.
>
> 3. El Prestatario [Superintendencia del Capitolio] se compromete a mantener y preservar en lugar seguro todos los récords, documentos y expedientes utilizados para el procesamiento y aprobación de este pago por un periodo no

menor de 5 años o hasta que se haya efectuado el pago final bajo esta Línea de Crédito.

4. Bajo pena de perjuicio certifica que ningún servidor público del Banco Gubernamental de Fomento para Puerto Rico, sus subsidiarias y afiliadas, es parte o tiene algún interés en las ganancias o beneficios producto del contrato objeto de este pago, y de ser parte o tener interés en las ganancias o beneficios producto del contrato, ha mediado una dispensa previa.

**5. Certifica que los pagos solicitados son justos y correctos; que los productos o servicios o trabajo en general se han realizado, los productos han sido entregados, los servicios prestados y no han sido pagados.**

6. La cantidad del desembolso es suficiente y no excede la cantidad total de la Línea de Crédito bajo el Contrato de Préstamo. (Énfasis nuestro).

Para que el señor Acosta Ramírez presentara una Certificación hacia el BGF para solicitar el pago de servicios que se realizaron sin que se hayan sufragado y que dicho pago era justo y correcto, tenía un deber inequívoco de garantizar que los fondos públicos se desembolsaran de manera justa y correcta, en estricta conformidad con las normas aplicables a la adquisición de bienes y servicios no profesionales. De esta manera, el señor Acosta Ramírez poseía un deber de garante con la Superintendencia del Capitolio para prevenir el uso indebido de fondos públicos. Sin embargo, el apelante omitió su deber de velar por el cumplimiento reglamentario para prevenir todo posible acto de corrupción contra la administración pública de la Superintendencia del Capitolio y avaló la pérdida de fondos públicos, evidente en las transacciones de los pagos dobles y triples a favor de una empresa privada. En las órdenes de compra 12250334 y 11250914, el apelante autorizó el pago adicional de $7,000.00 y $14,090.40 a favor de Restaura por obras de construcción ya sufragadas. Además, solicitó la obligación de fondos para emitir un gran pago de $138,584.50 a favor de Restaura por una sola obra de construcción en el segundo nivel del Edificio Antiguo de Recursos Naturales por virtud de las órdenes de compra 12250128, 12250172 y 12250172-M y firmó el cheque de la orden 12250128, sin un

procedimiento de subasta formal. La obligación de fondos en tres (3) ocasiones en un corto período de tiempo para fraccionar una sola obra de construcción demostró claro incumplimiento por parte del señor Acosta Ramírez con el Artículo 7 (c) del Reglamento de Compras, *supra*, Art. 7 (c), el cual prohibía fraccionar las compras con el fin de emitir más de una Obligación y Orden de Compra o Arrendamiento de Equipo u Orden de Servicios a un suplidor en un periodo de tiempo razonablemente corto.

Contrario a lo aducido por el apelante, al obligar los fondos para pagar la adquisición de bienes y servicios en representación de la Superintendencia del Capitolio, tenía la responsabilidad y la capacidad de observar la reglamentación aplicable e impedir los múltiples desembolsos de dinero por una misma obra de construcción. De hecho, parte de las funciones del señor Acosta Ramírez como Gerente del Departamento de Servicios Administrativos era precisamente supervisar el cumplimiento y la aplicación efectiva de las leyes, reglamentos y normas que rigen los asuntos administrativos de las actividades de adquisición de bienes, la contratación de servicios, la contabilidad y otras actividades procesales relacionadas con los asuntos fiscales y financieros de las operaciones de la Superintendencia. Véase Plan de Clasificación de los Puestos del Servicio de Confianza de la Superintendencia del Capitolio, *supra*. Asimismo, como funcionario que se le delegó una facultad en el proceso de adquisición de bienes y servicios no profesionales, el Artículo 7 (a) del Reglamento de Compras, *supra*, Art. 7 (a), le imponía la responsabilidad de llevar a cabo sus funciones en cumplimiento con las disposiciones reglamentarias pertinentes. En definitiva, el señor Acosta Ramírez tenía que ejercer sus funciones de Gerente del Departamento de Servicios Administrativos con

eficacia y corrección para proteger los intereses de la Superintendencia del Capitolio, así como del Pueblo de Puerto Rico.

Independientemente de los roles que desempeñaron otros funcionarios públicos en el proceso de adquisición de bienes y servicios no profesionales en la Superintendencia del Capitolio, el señor Acosta Ramírez tenía la responsabilidad de corroborar que las obras de construcción se realizaron y no se sufragaron, previo a certificar dicho hecho ante el BGF para autorizar el pago de las órdenes de compra o firmar un cheque con fondos de la Superintendencia del Capitolio. De haber percibido las irregularidades de las órdenes de compra, los Artículos 13 y 17 del Reglamento de Compras, *supra*, proveían para proceder con la cancelación de las órdenes de compra en caso de violación a cualquier reglamentación de la Superintendencia del Capitolio o acción que perjudicara los mejores intereses de la dependencia legislativa o del Pueblo de Puerto Rico. Es decir, el señor Acosta Ramírez tenía el deber de impedir el pago de órdenes de compras que no eran legítimas. En cambio, el apelante provocó múltiples desembolsos de fondos públicos para sufragar una obra de construcción, reflejó un desprecio por la diligencia que debe ejercer un funcionario público y le ocasionó pérdidas tanto a la Superintendencia del Capitolio como al Pueblo de Puerto Rico. Cónsono con lo anterior, el Ministerio Público demostró más allá de duda razonable que el señor Acosta Ramírez omitió el cumplimiento de sus deberes como funcionario público impuestos en los reglamentos relacionados a la adquisición de bienes y servicios no profesionales. De esta forma, no impidió los intentos logrados para corromper la sana administración pública de la Superintendencia del Capitolio. Por ello, actuó correctamente el TPI al encontrar culpable al señor Acosta Ramírez por cada uno de los tres (3) cargos por omisión en el cumplimiento del deber, en

contravención con el Artículo 265 del Código Penal de 2004, *supra*, sec. 4893.

En lo que respecta al señor Martínez Morales, el Ministerio Público demostró que certificó en varias ocasiones que una obra de construcción se realizó a tenor con las especificaciones requeridas para proceder con el pago al suplidor, en claro incumplimiento con las normas reglamentarias. A saber, el 29 de agosto de 2011, el señor Martínez Morales emitió una carta al señor Acosta Ramírez en la que le certificó que Restaura realizó y finalizó satisfactoriamente los trabajos de restauración objeto de la orden de compra 12250172 sobre la construcción en el segundo nivel del Edificio Antiguo de Recursos Naturales, por lo que recomendó el pago de $49,292.33. Dicha obra se sufragó el 28 de septiembre de 2011 mediante el cheque 003258 con fondos de la Superintendencia del Capitolio por la suma de $45,841.77 a favor de Restaura, tras deducir la retención del 7% de $49,292.23. El 23 de septiembre de 2011, el señor Martínez Morales presentó una carta mediante la cual certificó que Restaura realizó satisfactoriamente los trabajos objeto de la orden de compra 12250128, los cuales versaban sobre la misma construcción en el segundo nivel del Edificio Antiguo de Recursos Naturales, por lo que recomendó el pago de $49,292.33. Por virtud de lo anterior, el 23 de septiembre de 2011 se emitió el cheque 003204 con fondos de la Superintendencia del Capitolio por la suma de $45,841.86 a favor de Restaura, tras deducir la retención del 7% de $49,292.33. Ulteriormente, el 31 de enero de 2012, el señor Martínez Morales certificó que los servicios de baños para las nuevas oficinas de servicios administrativos se realizaron según las especificaciones en la orden de compra 12250128. Por otro lado, el 17 de noviembre de 2011, el señor Martínez Morales presentó una Certificación, en la que certificó que los servicios en el Edificio Antiguo de Recursos Naturales

se realizaron según se especificó en la orden de compra 12250172-M, la cual se modificó para bajar el costo total y corregir el fondo. A causa de lo anterior, el 18 de noviembre de 2011 se emitió un cheque con fondos de la Superintendencia del Capitolio para el pago por tercera ocasión de la orden de compra 12250172-M por la suma de $37,200.00 a favor de Restaura, luego de deducir la retención del 7% de $40,000.00.

De igual manera, se demostró que el 17 de septiembre de 2010, el señor Martínez Morales autorizó la Solicitud de Compras, Materiales, Arrendamientos de Equipo o Servicios No Personales para la restauración del Salón de Audiencias María Martínez, objeto de la orden de compra 11250334. El 28 de octubre de 2010, se emitió un pago de $7,000.00 a favor de Restaura a través del cheque 001503 con fondos provenientes de la Superintendencia del Capitolio. Posteriormente, en el mes de enero de 2012, el señor Martínez Morales certificó que los servicios de demolición y mejoras al Salón de Audiencias María Martínez en el anexo del Senado se realizaron según las especificaciones de la orden de compra 11250334. Ante ello, el 7 de marzo de 2012, el BGF emitió el cheque 302871 por la suma de $116,232.40 a favor de Restaura para pagar, por segunda ocasión, la orden de compra 11250334, entre otras.

A su vez, el 13 de julio de 2010, el señor Martínez Morales autorizó la Solicitud de Compras, Materiales, Arrendamientos de Equipo o Servicios No Personales para la restauración del Salón Protocolar. Cabe destacar que la descripción del uso del referido documento estaba alterada con líquido corrector. El 25 de julio de 2010, el señor Danois Román emitió una propuesta en representación de Restaura, en la que cotizó la obra de restauración del Salón Protocolar en $48,232.04. Se evidenció que el 26 de julio de 2010 se presentó una propuesta a nombre de RL firmada por el señor

Liste Liñeira, en la que se cotizó la obra de restauración del Salón Protocolar por la suma de $58,900.00. No obstante, el 25 de agosto de 2010, las señoras Ramírez Sánchez y Rivera Domínguez firmaron el Récord de Cotizaciones para la orden de compra 11250180 para la restauración del Salón Protocolar, en el que certificaron que Restaura fue el licitador agraciado por presentar la cotización más baja de $49,232.04, comparado con la cantidad de $65,653.86 que el señor Liste Liñeira cotizó por RL y $52,000.00 que una persona llamada Antomio cotizó por CEE & L, compañía que se expuso a manuscrito que no envió cotización por tener el fax dañado. Es menester señalar que en el Récord de Cotizaciones, el uso para la orden de compra 11250180 estaba alterado con líquido corrector y las cantidades de las cotizaciones eran distintas a las propuestas presentadas por Restaura y RL. El 24 de febrero de 2011, el señor Martínez Morales certificó que los servicios de restauración del Salón Protocolar se realizaron según la orden de compra 11250180. Así las cosas, el 24 de febrero de 2011, el señor Acosta Ramírez autorizó el cheque 002173 para sufragar $48,232.04 de fondos de la Superintendencia del Capitolio a favor de Restaura.

Similarmente, el 13 de julio de 2010, el señor Martínez Morales autorizó la Solicitud de Compras, Materiales, Arrendamientos de Equipo o Servicios No Personales para la misma obra de restauración del Salón Protocolar. El 25 de julio de 2010, el señor Danois Román emitió una propuesta en representación de Restaura, en la que cotizó la obra de restauración del Salón Protocolar en $49,959.20. Asimismo, se presentó una propuesta a nombre de RL con la firma del señor Liste Liñeira, con fecha de 13 de septiembre de 2010, en la que se cotizó la obra de restauración del Salón Protocolar por la suma de $68,900.00. Días antes de recibir la propuesta de los demás suplidores, el 25 de agosto de 2010, las señoras Ramírez Sánchez y

Rivera Domínguez firmaron el Récord de Cotizaciones para la orden de compra 11250181, en el que certificaron que Restaura fue el licitador agraciado por presentar la cotización más baja de $49,959.20, comparado con los $68,900.00 que el señor Liste Liñeira cotizó por RL y los $52,800.00 que Antomio cotizó por CEE & L, compañía que, según los autos, no presentó propuesta alguna. El 3 de febrero de 2011, el señor Martínez Morales certificó que los servicios de restauración del Salón Protocolar se realizaron según la orden de compra 11250181. El 24 de febrero de 2011, se autorizó el cheque 002062 para sufragar $49,959.20 de fondos de la Superintendencia del Capitolio a favor de Restaura.

En atención a lo anterior, el Ministerio Público demostró que el señor Martínez Morales, actuó contrario a sus funciones y al deber de velar por el buen funcionamiento de la Superintendencia del Capitolio en la adquisición de bienes o servicios no profesionales, al certificar en dos (2) ocasiones que una misma obra de construcción bajo distintas órdenes de compra se realizó correctamente, lo que permitió su doble pago. Según se reseñó, el señor Martínez Morales permitió el desembolso de fondos públicos para el pago de $99,191.24 por las órdenes de compra 11250180 y 11250181 para un mismo trabajo de restauración del Salón Protocolar; $138,584.60 por las órdenes de compra 12250128, 12250172 y 12250172-M para una misma obra de mejoras en el Edificio Antiguo de Recursos Naturales, sin cumplir con el proceso de subasta formal. Además, el apelante permitió el pago doble para la orden de compra 11250334 por un trabajo de restauración del Salón Protocolar.

Contrario a lo que adujo el apelante, el análisis pericial del NSE reflejó claramente que el señor Martínez Morales fue la persona que firmó las certificaciones para proseguir con el pago de las órdenes de compra 11250180, 11250181, 11250172 y 11250172-M. No era

necesario demostrar que el apelante certificó los documentos para perpetrar un delito. Al contrario, se requería y efectivamente se demostró que el señor Martínez Morales omitió su deber de velar por la sana administración de la Superintendencia del Capitolio y la reglamentación aplicable a la adquisición de bienes y servicios no profesionales al certificar en más de una ocasión que un mismo trabajo de construcción se realizó satisfactoriamente y recomendar su pago. Más importante aún, el señor Martínez Morales omitió su deber de corroborar el estado de las obras de construcción previo a certificar que se realizaron satisfactoriamente a tal grado que realizó dicha función hasta con dos (2) años de anterioridad a que efectivamente la obra se realizara. A saber, el 24 de febrero de 2011 y el 3 de febrero de 2011, respectivamente, el señor Martínez Morales certificó que los trabajos de las órdenes de compra 11250180 y 11250181 para la remodelación del Salón Protocolar se realizaron satisfactoriamente, sin embargo, unas fotografías del 25 de abril de 2011 y 1 de junio de 2011 revelaron que dicho trabajo no se había culminado. En efecto, mediante el testimonio del señor Cruz Velázquez se demostró que la referida remodelación se culminó efectivamente entre los años 2013 al 2014 mediante la contratación de la compañía Fe-Ri Construction. La consecuencia de la omisión del apelante fue el ilegítimo pago doble y triple para una misma obra de construcción y la evidente pérdida de más de $10,000 de fondos públicos. Esto, indistintamente del rol de otros funcionarios públicos en el proceso de adquisición de bienes y servicios no profesionales en la Superintendencia del Capitolio.

Pues, a tenor con el Plan de Clasificación de los Puestos del Servicio de Confianza de la Superintendencia del Capitolio, el señor Martínez Morales como Gerente del Departamento de Proyectos de Construcción, poseía funciones de planificación, dirección,

supervisión y coordinación de los trabajos relacionados con los procesos de diseños y desarrollo de proyectos; desarrollo y evaluación de propuestas de construcción; administración de los contratos de construcción y remodelación de facilidades; desarrollo de los estimados de los costos de construcción; inspección y supervisión de los proyectos de construcción, entre otras. A su vez, debía supervisar, inspeccionar y evaluar los proyectos de construcción de facilidades de la Superintendencia en sus diferentes etapas con el propósito de comprobar que los mismos cumplieran con los procedimientos plenos, especificaciones, normas de seguridad ocupacional y con la reglamentación local y federal aplicable a los mismos. Por otro lado, como funcionario a quien se le delegó una facultad en el proceso de adquisición de bienes y servicios no profesionales, debía ejercer sus funciones de acuerdo con las disposiciones reglamentarias aplicables. Véase Artículo 7 (a) del Reglamento de Compras, *supra*, Art. 7 (a). A saber, el señor Martínez Morales tenía el deber de ejercer sus funciones como Gerente del Departamento de Proyectos de Construcción con eficacia y corrección para proteger la dependencia legislativa para la que laboraba.

Así las cosas, el Ministerio Público demostró más allá de duda razonable que el señor Martínez Morales como funcionario público, a sabiendas, omitió cumplir sus deberes impuestos reglamentariamente para la adquisición de bienes y servicios no profesionales, y como consecuencia de su omisión, ocasionó la pérdida de fondos públicos que, en dos ocasiones, sobrepasó los $10,000.00. Por consiguiente, no impidió la corrupción de la sana administración pública de la Superintendencia del Capitolio. En tal virtud, resolvemos que no se equivocó el TPI al encontrar al señor Martínez Morales culpable por los tres (3) cargos por omisión al

cumplimiento del deber por infracción al Artículo 265 del Código Penal de 2004, *supra*, sec. 4893.

Con respecto a la señora Cuervo Sierra, de los autos surgió que la apelante como representante de Fasan y su esposo, el señor Danois Román como representante de Restaura, realizaron actos constitutivos de colusión al presentar propuestas de ambas corporaciones en las mismas órdenes de compra para lograr la adjudicación de estas a su favor. Veamos:

| Orden de compra | Propuesta de Fasan firmada por la señora Cuervo Sierra | Propuesta de Restaura firmada por el señor Danois Román | Otras propuestas | Licitador agraciado |
|---|---|---|---|---|
| 1.  12250942 - Reemplazo del desagüe del Edificio CEEI | $27,000.00 | $35,750.00 | RL-$40,800.00<br><br>MEG (sin firma ni fecha) - $32,000.00 | Fasan<br><br>(El señor Danois Román endosó el cheque) |
| 2.  12250961 - Reparación de puerta de baño del primer piso del Capitolio | $3,500.00 | $4,040.40 | RL-$5,900.00 | Fasan<br><br>(El señor Danois Román endosó el cheque) |
| 3.  12250975 - Mantenimiento de la Plaza de los Policías | No cotizó, pero se le envió la requisición | $8,080.80 | RL-$11,900.00 (El análisis pericial del NCF reflejó que el señor Danois Román firmó la cotización). | Restaura<br><br>(El señor Danois Román endosó el cheque) |
| 4.  12251047 - Restaurar la fachada del Edificio Medicina Tropical | $38,000.00 | $36,075.00 | MEG (sin firma ni fecha) - $45,000.00<br><br>RL-$49,000.00 (El análisis pericial del NCF reflejó que el señor Danois Román firmó la cotización). | Restaura |
| 5.  12251048 - Mejoras de la plomería del Edificio Medicina Tropical | $6,500.00 | $3,896.10 | RL - $6,000.00 (El análisis pericial del NCF reflejó que el señor Danois Román | Restaura<br><br>(El señor Danois Román endosó el cheque) |

| | | | firmó la cotización). MEG (sin firma ni fecha) - $7,000.00 | |
|---|---|---|---|---|
| 6. 12251049 - Remodelación de las Antiguas Oficinas de Auditoría de la Cámara de Representantes | $46,500.00 | $53,391.00 | MEG (sin firma ni fecha) - $51,000.00 | Fasan (El señor Danois Román endosó el cheque) |
| 7. 12251050 - Restauración de las fuentes de la Plaza de la Recordación | $23,000.00 | $27,417.00 | RL - $39,00.00 MEG (sin firma ni fecha) - $35,000.00 | Fasan (El señor Danois Román endosó el cheque) |
| 8. 12251052 - Cambio de tuberías de data y eléctricas en el pasillo del Edificio Medicina Tropical. | $4,800.00 | $5,050.50 | MEG (sin firma ni fecha) - 6,000.00 | Fasan (El señor Danois Román endosó el cheque) |
| 9. 12251053 - Restaurar los baños del primer y segundo piso del Edificio Medicina Tropical | $39,000.00 | $40,404.00 | MEG (sin firma ni fecha) - $50,000.00 RL- $59,000.00 | Fasan (El señor Danois Román endosó el cheque) |
| 10. 12251072 - Restauración del antiguo almacén de la Oficina de Servicios Legislativos en el Edificio Medicina Tropical | $25,500.00 | $27,417.00 | MEG (sin firma ni fecha) - $30,000.00 | Fasan (El señor Danois Román endosó el cheque) |
| 11. 12251074 - Reparación de techo de aluminio y hierro en el área de transportación del Senado | $15,000.00 | $11,544.00 | RL- $17,900.00 (Las partes estipularon que el señor Liste Liñeira no firmó la propuesta; no la preparó, ni autorizó su preparación) Ortiz Ron Works - $27,000.00 | Restaura |
| 12. 12251106 - Instalación del cable de acero inoxidable para el techo del Capitolio | $17,000.00 | $23,088.00 | RL- $25,900.00 | Fasan |
| 13. 12251122 - Restaurar el Centro de la Cámara de la Seguridad de la Superintendencia del Capitolio | $17,000.00 | $19,760.00 | MEG (sin firma ni fecha) - $20,000.00 | Fasan |

| | | | | |
|---|---|---|---|---|
| 14. 12251123 - Mejoras en la antigua oficina de auditoría en la Cámara de Representantes | $18,500.00 | $23,088.00 | MEG (sin firma ni fecha) - $20,000.00 | Fasan |
| 15. 12251125 - Mejoras en el túnel del Edificio Medicina Tropical | $30,000.00 | $43,290.00 | RL- $30,900.00 | Fasan

(El señor Danois Román endosó el cheque) |
| 16. 12251126 - Restaurar antiguo almacén de la Oficina de Servicios Legislativos | $42,000.00 | $35,000.00 | RL- $54,000.00 | Fasan |
| 17. 12251127 - Mejoras de la oficina de archivo y reproducción de la Cámara de Representantes | $48,000.00 | $36,075.00 | RL- $54,600.00 (El análisis pericial del NCF reflejó que el señor Danois Román firmó la cotización). | Restaura |
| 18. 12251128 - Restauración de la Plaza Manuel Zeno Gandía | $46,000.00 | $42,900.00 | RL- $48,000.00 (El análisis pericial del NCF reflejó que el señor Danois Román firmó la cotización). | Restaura

(El señor Danois Román endosó el cheque) |
| 19. 12251135 - Restaurar oficina de la Legisladora Liza Fernández Rodríguez | $36,000.00 | $20,000.00 | RL- $35,000.00 | Restaura |
| 20. 12251153 - Suplido de puertas metálicas a prueba de fuego | $10,500.00 | $11,310.00 | RL- $12,000.00 | Fasan |
| 21. 12251157 - Suplido e instalación de pavimento en el Edificio Medicina Tropical | $39,000.00 | $36,075.00 | RL- $39,900.00 | Restaura

(El señor Danois Román endosó el cheque) |
| 22. 12251160 - Suplido e instalación de cristal en el ventanal del arco de bronce | $1,000.00 | $865.80 | RL- $2,000.00 | Restaura |
| 23. 12251161 - Mejoras en el primer nivel del Edificio Luis A. Ferrer | $45,000.00 | $57,720.00 | RL- $52,000.00 | Fasan

(El señor Danois Román endosó el cheque) |
| 24. 12251176 - Renta de dos (2) carros de golf | $1,300.00 | $1,443.00 | RL- $2,500.00 | Fasan |

| | | | | |
|---|---|---|---|---|
| 25. 12251183 - Restauración de los paneles eléctricos del túnel en la Cámara de Representantes | $2,200.00 | $2,400.00 | RL-$4,000.00 | Fasan<br><br>(El señor Danois Román endosó el cheque) |
| 26. 13250051 - Fabricar rampa de hormigón en el pasillo del Edificio Medicina Tropical | $25,000.00 | $16,536.00 | MEG (sin firma ni fecha) - $22,000.00 (La señora Rivera Ortiz testificó que no realizó la propuesta) | Restaura<br><br>(El señor Danois Román endosó el cheque) |
| 27. 13250058 - Restaurar tercer piso del Edificio Antiguo de Recursos Naturales | $55,000.00 | $46,375.00 | MEG (sin firma ni fecha) - $57,000.00 (La señora Rivera Ortiz testificó que la realizó esta propuesta) | Restaura<br><br>(El señor Danois Román endosó el cheque) |
| 28. 13250059 - Restaurar tercer piso del Edificio Antiguo de Recursos Naturales | $60,000.00 | $49,486.16 | MEG (sin firma ni fecha) - $67,000.00 (La señora Rivera Ortiz testificó que no realizó la propuesta) | Restaura |
| 29. 13250065 – Restauración del patio interior del Edificio Medicina Tropical | $35,000.00 | $28,296.00 | MEG (sin firma ni fecha) - $49,000.00 | Restaura<br><br>(El señor Danois Román endosó el cheque) |
| 30. 13250066 - Construcción de *playground* en la Plaza Santiago Iglesias Pantín Parte I | $48,230.00 | $25,000.00 en impreso, tachado con líquido corrector y añadido $52,000.00 en manuscrito | MEG (sin firma ni fecha) - $50,000.00 (La señora Rivera Ortiz testificó que no realizó la propuesta) | Restaura<br><br>(El señor Danois Román endosó el cheque) |
| 31. 13250144 – Adquisición e instalación de *adapter dressing* y tubo galvanizado 2 | No cotizó | $3,445.00 | MEG no cotizó | Restaura<br><br>(El señor Danois Román endosó el cheque) |
| 32. 13250146 - Restauración de las oficinas de la Senadora Evelyn Vázquez Nieves | $32,000.00 | $27,825.00 | MEG (sin firma ni fecha) - $26,000.00 en impreso, tachado con líquido corrector y añadido $29,000.00 en manuscrito (La señora Rivera Ortiz | Restaura<br><br>(El señor Danois Román endosó el cheque) |

| | | | | |
|---|---|---|---|---|
| | | | testificó que no realizó la propuesta) | |
| 33. 13250154 - Construcción de *playground* en la Plaza Santiago Iglesias Pantín Parte II | $19,000.00 (Sin evidencia de la propuesta) | $17,914.00 (Sin evidencia de la propuesta) | MEG - $23,000.00 (Sin evidencia de la propuesta) | Restaura (El señor Danois Román endosó el cheque) |
| 34. 13250184 - Trabajos eléctricos, mecánicos, data y fuego en la antigua oficina de compra del Edificio Medicina Tropical (repetido) | $46,800.00 | $53,391.00 | MEG (sin firma ni fecha) - $51,000.00 | Fasan |
| 35. 13250191 - Remodelación de la nueva oficina de la Administradora de la Cámara de Representantes | $47,900.00 | $56,277.00 | MEG (sin firma ni fecha) - $55,000.00 | Fasan (El señor Danois Román endosó el cheque) |
| 36. 13250192 - Suplido de puerta doble de madera en Edificio Medicina Tropical | $8,900.00 | $4,717.50 | MEG (sin firma ni fecha) - $8,000.00 (La señora Rivera Ortiz testificó que no realizó la propuesta) | Restaura (El señor Danois Román endosó el cheque) |
| 37. 13250202 - Mantenimiento de la Plaza Los Presidentes, Recordación y San Juan Bautista | $66,000.00 | $49,800.00 | RL- $60,400.00 (El análisis pericial del NCF reflejó que el señor Danois Román firmó la propuesta). | Restaura (El señor Danois Román endosó el cheque) |

A la luz de lo anterior surgió que tanto Fasan como Restaura compitieron en, por lo menos, las treinta y siete (37) órdenes de compra, en las que ambas corporaciones resultaron agraciadas. En las órdenes de compra que favorecieron a Fasan, se demostró que la señora Cuervo Sierra firmaba las propuestas mientras que, principalmente, el señor Danois Román firmaba los cheques para endosarlos en representación de Fasan. Cabe destacar que los certificados de incorporación tanto de Fasan como Restaura, de fecha de 4 de mayo de 2012, demostraron que el señor Danois Román actuó como Agente Residente e Incorporador de ambas corporaciones con oficina designada en el mismo apartamento del Condominio Bella

Mare de Carolina. Según el testimonio creído del auditor principal, el señor Cruz Velázquez, dicho apartamento era la residencia del señor Danois Román. Adicionalmente, los Informes Anuales de los años 2012 y 2013 de Fasan y Restaura reflejaron que el señor Danois Román era la persona autorizada en ambas corporaciones, al igual que ocupó los puestos de Presidente y Tesorero de manera indefinida.

Además, mediante la prueba admitida y creída del NCF, se demostró que el señor Danois Román firmó por el señor Liste Liñeira en las cotizaciones de RL en por lo menos siete (7) de las órdenes de compra antes reseñadas. Igualmente, cabe señalar que todas las cotizaciones presentadas por MEG carecían de la fecha y la firma de la señora Rivera Ortiz, quien sostuvo que no preparó ni autorizó documento alguno de MEG sin estos elementos. Más aún, es preciso resaltar que el Ministerio Público presentó en evidencia un *Subcontrato de Construcción* de fecha 31 de agosto de 2012 en el que el señor Danois Román como Presidente de Restaura, contrató a Fasan, a través de la señora Cuervo Sierra como Presidenta de Fasan, para realizar trabajos adjudicados a Restaura en las fuentes de los anexos del Capitolio, por la suma alzada de $96,000.00.

De todo lo anterior emanó que el señor Danois Román y la señora Cuervo Sierra, actuando como representantes de Fasan y Restaura, redujeron la competencia e influyeron en la adjudicación de órdenes de compras a su favor al coordinar las cotizaciones de ambas corporaciones para las obras de construcción. Esto, al presentar cotizaciones más bajas que las propuestas no autorizadas por los representantes de otros suplidores como RL y MEG para cumplir con el requisito de tres (3) cotizaciones, demostrativo de que Fasan y Restaura estaban compitiendo solos para la adjudicación de las órdenes de compra. Este esquema de la colusión que se le imputó a la señora Cuervo Sierra no se debió meramente por su relación de

cónyuge con el señor Danois Román. Sobre tal alegación, debemos resaltar que, "la dama de la justicia es ciega, no ingenua". *PIP v. ELA et al.*, 186 DPR 1, 14 (2012). Ciertamente se demostró a satisfacción que el señor Danois Román fue el artífice de la colusión, máxime que mediante la prueba testifical y el análisis forense se mostró que el señor Danois Román con el usuario edanois modificó documentos de RL para realizar cotizaciones de obras de construcción de distintas compañías como RL, EKHO, Constructora Lingua y MEG en conjunto con las señoras Ramírez Sánchez y Alberti Torres. No obstante, el Ministerio Público presentó prueba para no tener duda razonable sobre las acciones de la señora Cuervo Sierra en el esquema de colusión al firmar y presentar propuestas a nombre de Fasan y obtener una ventaja indebida de alrededor de $447,500.00 bruto mediante la adjudicación de dieciocho (18) órdenes de compra a favor de Fasan y suya por virtud del referido esquema constitutivo de fraude. De igual forma, la apelante permitió una ventaja indebida de alrededor de $464,906.36 bruto mediante la adjudicación de diecinueve (19) órdenes de compra a favor de Restaura.

En vista de lo anterior, el Ministerio Público demostró más allá de toda duda razonable que la señora Cuervo Sierra privó a la Superintendencia del Capitolio y al Pueblo de Puerto Rico de la competencia real y legítima en la contratación pública para la obtención de bienes y servicios no profesionales. Como resultado, la Superintendencia del Capitolio no obtuvo cotizaciones más beneficiosas en término de precios y servicios tal como hubiese ocurrido si los otros suplidores participaban de forma legítima, sin el control de la señora Cuervo Sierra y del señor Danois Román. Por ello, no erró el TPI al declarar culpable a la señora Cuervo Sierra por el delito de fraude, según tipificado Artículo 210 B del Código Penal de 2004, *supra*, sec. 4838.

Por lo antes detallado, el Ministerio Público demostró más allá de toda duda razonable que el señor Danois Román perpetró actos constitutivos de fraude, en infracción al Artículo 210 (B) del Código Penal de 2004, *supra*, sec. 4838, al privar a la Superintendencia del Capitolio de la capacidad de obtener bienes y servicios mediante una competencia real entre los suplidores que pudieran proveer un mejor precio y servicio en, por lo menos, treinta y siete (37) órdenes de compra adjudicadas a favor de Restaura y Fasan. Esto, al hacer colusión con la señora Cuervo Sierra en la presentación de cotizaciones de Restaura y Fasan en competencia con las propuestas no autorizadas por los representantes de los suplidores RL y MEG para cumplir con el requisito de tres (3) cotizaciones. Reiteramos que se demostró a satisfacción que el señor Danois Román endosó los cheques a favor de Fasan y firmó por el señor Liste Liñeira en las propuestas de RL. De esta manera, el apelante eliminó toda competencia legítima para la obtención de bienes y servicios no profesionales en la Superintendencia del Capitolio y socavó la integridad de los procesos de contratación pública para la obtención de bienes y servicios no profesionales en la Superintendencia del Capitolio.

Asimismo, el Ministerio Público demostró más allá de duda razonable que el señor Danois Román cometió el delito de fraude, en violación al Artículo 210 (B) del Código Penal de 2004, *supra*, sec. 4838, al utilizar el personal y el equipo de RL para realizar las órdenes de compra 11251143-M, 12250783, 12250961, 12250968, 12251123, 12251047, 12250161, 12250162, 12250163, 12250164, 12250171, 12250275, 12250640, 10250730, 10250836, 12250179, 12250180, 12250181 y 11250547, adjudicadas a Restaura. La prueba documental y testifical creída reflejó que los empleados de RL, cuyos servicios fueron sufragados por dicha compañía, trabajaron en

las antes mencionadas obras de construcción que fueron cobradas por Restaura con cheques endosados por el señor Danois Román.

En atención a lo anterior, se probó sin lugar a duda razonable que el señor Danois Román cometió tres (3) cargos imputados por apropiación ilegal agravada, en contravención al Artículo 193 del Código Penal de 2004, *supra*, sec. 4821, al privar a RL de al menos $658,785.08 por recibir los siguientes ingresos brutos, sin la retención del 7%, por los trabajos de construcción realizados con el personal y el equipo pagado por RL, sin que esta compañía recibiera el correspondiente pago de la Superintendencia del Capitolio. A saber: $49,375.00 (11251143-M), $14,718.60 (12250783), $3,500.00 (12250961), $38,656.53 (12250968), $18,500.00 (12251123), $36,075.00 (12251047), $47,619.00 (12250161), $9,956.70 (12250162), $49,062.00 (12250163), $32,523.00 (12250164), $46,812.50 (12250171), $25,412.50 (12250275), $49,786.88 (12250640), $19,065.22 (10250730), $40,036.50 (10250836), $48,421.61 (12250179), $48,232.04 (12250180), $49,959.20 (12250181) y $31,072.80 (11250547).

A su vez, con respecto a tres (3) cargos por apropiación ilegal agravada, tipificado en el Artículo 193 del Código Penal de 2004, *supra*, sec. 4821, el Ministerio Público presentó como evidencia unas Certificaciones Negativas emitidas el 13 de abril de 2015 por la CFSE, en las que se reflejó que tanto Restaura como el señor Danois Román no pagaron la póliza para los años fiscales 2010, 2011, 2012 y 2013, fechas en que se realizaron los trabajos de las órdenes de compra objeto de este caso. Se presentó en evidencia una Certificación emitida por la señora Santaella Rosa de la CFSE en la que certificó que durante el período fiscal 2010, 2011 y 2012, los patronos Fasan y Restaura obtuvieron contratos en los años 2010, 2011 y 2012 por las respectivas sumas de $379,871.26, $547,711.97 y

$1,174,715.50, con una imposición de prima no pagada de $7,770.36, $12,244.39 y $113,059.04, proporcionalmente. Asimismo, se demostró que el señor Danois Román recibió el pago de fondos públicos sin sufragar las siguientes primas impuestas por concepto de seguro del CFSE, las cuales no pagó:

| Orden de compra | Pago | Prima no pagada |
|---|---|---|
| 1. 10250836 | $40,036.50 | $935.25 |
| 2. 10250730 | $19,065.22 | $445.36 |
| 3. 11250334 | $7,000.00 | $107.10 |
| 4. 11250914 | $14,090.00 | $257.85 |
| 5. 11251100 | $49,080.00 | $1,146.51 |
| 6. 12250128 | $49,292.33 | $1,151.47 |
| 7. 12250142 | $1,200.00 | $99.00 |
| 8. 12250171 | $46,812.50 | $1,093.54 |
| 9. 12250299 | $2,294.37 | $99.00 |
| 10. 12250315 | $2,565.33 | $99.00 |
| 11. 12250381 | $12,842.70 | $145.12 |
| 12. 12250420 | $2,861.25 | $201.72 |
| 13. 11250547 | $31,0722.80 | $725.86 |
| 14. 11250785 | $6,493.50 | $118.83 |
| 15. 11251143 | $49,375.00 | $755.44 |
| 16. 11251144 | $1,200.00 | $99.00 |
| 17. 12250162 | $9,956.70 | $232.59 |
| 18. 12250163 | $49,062.00 | $1,146.09 |
| 19. 12250164 | $32,523.00 | $643.95 |
| 20. 12250170 | $27,561.30 | $643.83 |
| 21. 12250275 | $25,412.50 | $593.64 |
| 22. 12250285 | $1,200.00 | $99.00 |
| 23. 12250416 | $11,240.63 | $262.58 |
| 24. 12250545 | $2,273.75 | $160.30 |
| 25. 12250640 | $49,786.88 | $1,163.02 |
| 26. 12250335 | $26,750.00 | $409.28 |
| 27. 12250455 | $13,382.50 | $312.62 |
| 28. 12250741 | $10,000.00 | $152.62 |
| 29. 12250760 | $44,962.50 | $1,050.32 |
| 30. 12250782 | $3,535.35 | $99.00 |
| 31. 12250783 | $$14,718.60 | $343.83 |
| 32. 12250822 | $4,868.50 | $113.73 |
| 33. 12250893 | $6,493.50 | $102.27 |
| 34. 12250898 | $2,164.50 | $99.00 |
| 35. 12250942 | $27,000.00 | $425.25 |
| 36. 12250961 | $3,500.00 | $99.00 |
| 37. 12250968 | $38,656.53 | $903.02 |
| 38. 12250974 | $31,746.00 | $647.62 |
| 39. 12250975 | $8,080.00 | $224.62 |
| 40. 12251043 | $4,000.00 | $99.00 |
| 41. 12251047 | $36,075.00 | $842.71 |
| 42. 12251048 | $3,896.10 | $99.00 |
| 43. 12251050 | $23,000.00 | $362.25 |
| 44. 12251052 | $4,800.00 | $99.00 |
| 45. 12251053 | $39,000.00 | $911.04 |
| 46. 12251072 | $25,500.00 | $595.68 |
| 47. 12251074 | $11,544.00 | $269.67 |
| 48. 12251106 | $17,000.00 | $479.40 |

| | | |
|---|---|---|
| 49. 12251122 | $17,000.00 | $397.12 |
| 50. 12251123 | $18,500.00 | $432.16 |
| 51. 12251125 | $30,000.00 | $681.60 |
| 52. 12251127 | $38,075.00 | $1,002.14 |
| 53. 12251128 | $42,900.00 | $974.69 |
| 54. 12251135 | $20,000.00 | $454.50 |
| 55. 12251153 | $10,500.00 | $238.56 |
| 56. 12251157 | $36,075.00 | $99.00 |
| 57. 12251160 | $865.00 | $99.00 |
| 58. 12251248 | $36,562.80 | $869.28 |
| 59. 12251249 | $2,741.70 | $99.00 |
| 60. 12251296 | $4,239.00 | $101.13 |
| 61. 12251297 | $8,658.00 | $202.25 |
| 62. 12251338 | $5,300.00 | $123.81 |
| 63. 13250051 | $16,536.00 | $386.28 |
| 64. 13250058 | $46,375.00 | $1,083.32 |
| 65. 13250059 | $49,486.15 | $1,156.00 |
| 66. 13250065 | $28,296.00 | $786.69 |
| 67. 13250066 | $48,320.00 | $1,097.83 |
| 68. 13250144 | $3,445.00 | $99.00 |
| 69. 13250146 | $27,825.00 | $650.00 |
| 70. 13250184 | $46,800.00 | $592.02 |
| 71. 13250190 | $17,316.00 | $404.50 |
| 72. 13250191 | $47,900.00 | $1,118.95 |
| 73. 13250192 | $4,717.50 | $165.12 |
| 74. 13250226 | $3,975.00 | $99.00 |
| 75. 13250227 | $2,782.50 | $99.00 |
| 76. 13250242 | $2,609.45 | $99.00 |
| 77. 13250279 | $6,360.00 | $148.57 |
| 78. 13250280 | $6,625.00 | $231.88 |
| 79. 13250281 | $1,449.70 | $99.00 |
| 80. 13250305 | $6,360.00 | $222.60 |
| 81. 13250307 | $4,960.00 | $115.88 |
| 82. 13250310 | $2,741.70 | $99.00 |
| 83. 13250311 | $1,014.79 | $99.00 |
| 84. 13250312 | $2,308.80 | $99.00 |
| 85. 13250313 | $2,899.40 | $99.00 |
| 86. 13250314 | $4,637.50 | $108.33 |
| 87. 13250226 | $1,420.71 | $99.00 |
| 88. 13250332 | $45,630.00 | $1,065.92 |
| 89. 13250334 | $13,250.00 | $309.52 |
| 90. 13250335 | $2,192.50 | $99.00 |
| 91. 13250392 | $4,500.00 | $105.12 |
| 92. 13250393 | $1,154.40 | $99.00 |
| 93. 13250394 | $2,650.00 | $99.00 |
| 94. 13250424 | $1,590.00 | $99.00 |
| 95. 13250452 | $5,512.00 | $99.00 |
| 96. 13250466 | $2,480.00 | $99.00 |
| 97. 13250467 | $10,600.00 | $162.18 |
| 98. 13250478 | $5,300.00 | $99.00 |
| 99. 13250479 | $13,250.00 | $242.48 |
| 100. 13250480 | $49,025.00 | $897.16 |
| 101. 13250485 | $5,300.00 | $99.00 |

De esta forma, se demostró más allá de duda razonable que el

señor Danois Román se apropió sin violencia ni intimidación de

alrededor de $40,311.20 pertenecientes al Estado, en vista de que dicha partida estaba destinada para el pago de seguros de la CFSE. Importante es que se probó que el señor Danois Román tenía conocimiento de la referida partida de seguros, toda vez que la misma fue cotizada en las propuestas que envió para cada una de las obras de construcción.

A parte de lo anterior, el Ministerio Público demostró más allá de duda razonable que el señor Danois Román cometió los restantes cinco (5) cargos por apropiación ilegal agravada, en infracción al Artículo 193 del Código Penal de 2004, *supra*, sec. 4821, al apropiarse de $138,584.60 bruto de fondos públicos mediante el pago triple de una obra de construcción en las nuevas oficinas de servicios administrativos en el área de finanzas y recursos humanos en el segundo nivel del Edificio Antiguo de Recursos Naturales por virtud de las órdenes de compras fraccionadas 12250128 cobrada por $49,292.33, 12250172 por $49,292.23 y 12250172-M por $40,000.00. De igual modo, se probó que el señor Danois Román se apropió de $28,180.80 bruto en el doble pago de la orden de compra 11250914 mediante el cheque 002359 de la Superintendencia del Capitolio y el cheque 302871 emitido por el BGF; $14,000.00 por el doble pago del trabajo realizado en el Salón de Audiencias María Martínez mediante la orden de compra 11250334 mediante el cheque 001503 de la Superintendencia del Capitolio y el cheque 302871 emitido por el BGF, y $146,424.00 por una obra de restauración del Salón Protocolar mediante el pago del cheque 002062 para la orden de compra 11250180 y el cheque 002062 para la orden de compra 11250181, todos endosados por el señor Danois Román.

En lo concerniente al delito de falsificación de documentos, tipificado en el Artículo 218 del Código Penal de 2004, *supra*, sec. 4846, el Ministerio Público demostró más allá de duda razonable que

el señor Danois Román, con la intención de defraudar, realizó documentos falsos con pleno conocimiento de su falsedad para afectar los derechos del señor Liste Liñeira. Lo anterior, al falsificar la firma del señor Liste Liñeira y crear propuestas falsas a nombre de RL con la intención fraudulenta de controlar las cotizaciones recibidas por cada obra de construcción en la Superintendencia del Capitolio para ser el licitador que ofreciera el menor precio. A saber, según el análisis pericial del NSF, al cual se le concedió total credibilidad, el señor Danois Román firmó por el señor Liste Liñeira en las propuestas que se presentaron por RL en las órdenes de compra 13250202, 13250226, 13250262, 13250263-M, 13250305, 13250323, 13250332, 13250334-M, 13250335, 13250392, 13250393, 13250466, 13250467, 13250479, 12250640, 12250641, 12250782, 12250822, 12250783, 12250893, 12250898, 12250968, 12250974, 12250975, 12251047, 12251048, 12250174, 12251127 y 12251128. Estas propuestas firmadas a nombre del señor Liste Liñeira, quien sostuvo que no preparó los referidos documentos, contenía cotizaciones más altas que las presentadas por Restaura y Fasan. De esta manera, el señor Danois Román logró la adjudicación de las órdenes de compra y recibió un ingreso bruto aproximado de $494,853.37, afectando igualmente el derecho de la Superintendencia del Capitolio a la libre competencia y al mejor uso de los fondos públicos.

Como secuela de lo anterior, el Ministerio Público demostró más allá de toda duda razonable que el señor Danois Román incurrió en los tres (3) cargos por el delito de falsedad ideológica, tipificado en el Artículo 219 del Código Penal de 2004, *supra*, 4847, de que, con la intención de defraudar, realizó varios documentos privados a nombre del señor Liste Liñeira en representación de RL que tuvo el efecto

jurídico de perjudicar tanto al señor Liste Liñeira como a la Superintendencia del Capitolio.

Por último, en lo atinente a los cinco (5) cargos por posesión y traspaso de documentos falsificados, tipificado en el Artículo 224 del Código Penal de 2004, *supra*, sec. 4852 y el Artículo 217 del Código Penal de 2012, *supra*, sec. 5287, el Ministerio Público demostró más allá de toda duda razonable que el señor Danois Román, con el propósito de defraudar, poseyó cotizaciones falsas a nombre de RL para las cuales falsificó la firma del señor Liste Liñeira y la circuló a la Superintendencia del Capitolio, a sabiendas de que dichos documentos eran falsos con la intención de controlar la adjudicación de las órdenes de compra y ser el licitador agraciado. Esto, desde diciembre de 2011 para las órdenes de compra 13250202, 12250640, 12250641, 12250782, 12250783, 12250822, 122250893, 12251074, 12251127, 12251128, 12250968, 12250974, 12250975, 12251047, 12251048 y desde septiembre de 2012 para las órdenes de compra 13250226, 13250262, 13250263, 13250305, 13250323, 13250332, 13250334, 13250335, 13250392, 13250393, 13250466, 13250467 y 13250479. Reiteramos que, a tenor con el Informe Pericial del NCF, el cual mereció credibilidad, el señor Danois Román firmó por el señor Liste Liñeira en las mencionadas órdenes de compra. Pero, más aún, el apelante utilizó dichos documentos falsos, con conocimiento de tal hecho, para cumplir con el requisito de tres (3) cotizaciones para la adjudicación de las órdenes de compra en la Superintendencia del Capitolio y lograr ser el licitador agraciado por presentar cotizaciones más bajas que RL.

En definitiva, concluimos que el Ministerio Público descargó satisfactoriamente su responsabilidad de demostrar más allá de duda razonable que el señor Danois Román cometió los treinta y un (31)

cargos que se le imputaron. Por tal motivo, no erró el TPI al declararlo culpable por cada delito.

Por todo lo anterior y tras realizar un sosegado y exhaustivo examen del expediente, concluimos que el Ministerio Público cumplió satisfactoriamente con su responsabilidad de demostrar más allá de toda duda razonable los elementos constitutivos de los delitos imputados a cada uno de los apelantes. En vista de lo anterior, no erró el TPI al declararlos culpables. Ante ello, consideramos que las alegaciones de insuficiencia de la prueba carecen de mérito, por lo que procede que atendamos los errores de derechos planteados en este recurso.

Como primer señalamiento de error de derecho, los apelantes plantearon que se le coartó el derecho constitucional al descubrimiento de prueba por el Ministerio Público no haber suministrado evidencia pertinente, según un informe que emitió la OPG. Los apelantes arguyeron que el Ministerio Público atropelló el descubrimiento de prueba al citarlos en la Oficina del Contralor a revisar los documentos en presencia de otros funcionarios públicos por su incapacidad de fotocopiar o digitalizar la extensa documentación que formó parte de la evidencia y no entregar unos documentos que inicialmente anunciaron que no utilizaría como prueba. Asimismo, adujeron que el Ministerio Público ocultó evidencia exculpatoria del señor Martínez Morales. Sin embargo, al analizar los autos podemos determinar que no les asiste la razón a los apelantes.

Indudablemente, los apelantes poseían una garantía constitucional al descubrimiento de prueba. Empero, dicho derecho no es irrestricto, ya que está delimitado por las Reglas de Procedimiento Criminal, *supra*, y la jurisprudencia aplicable. Pues, a tenor con la Regla 95 de Procedimiento Criminal, *supra*, los acusados

tenían derecho a inspeccionar, copiar o fotocopiar la evidencia que estuviese en posesión, custodia o control del Ministerio Público, al igual que a toda aquella evidencia exculpatoria. Lo anterior no entraña que el Ministerio Público le suministrara copia de toda la documentación que estuviese en su posición o que los apelantes tuviesen derecho a una expedición de pesca en los archivos del Ministerio Público. Pues, existen circunstancias particulares, como las de este caso, en las que por la extensión de la documentación que se utilizó como evidencia, se permite que la inspección o el descubrimiento de la prueba sea dirigido, restringido, aplazado o condicionado. En tal eventualidad, el Foro Primario está llamado a considerar las circunstancias particulares de cada caso para auscultar las alternativas disponibles para proveer el descubrimiento de prueba, sin que se les coarten los derechos constitucionales de los acusados. En este caso, el Ministerio Público planteó que carecía de la capacidad para fotocopiar o digitalizar la evidencia, por lo que utilizó como alternativa la inspección de los documentos en la Oficina del Contralor. Como se reseñó anteriormente, el Ministerio Público le otorgó la evidencia a cada acusado desde el año 2015 y, durante el trayecto procesal de tres (3) años del caso en el TPI, se le otorgó una amplia oportunidad de que los representantes legales de cada apelante inspeccionaran la prueba y se prepararan para el juicio en su fondo que comenzó a celebrarse el 5 de marzo de 2018.

En lo que respecta a la alegación del señor Martínez Morales sobre una presunta prueba exculpatoria que el Ministerio Público no entregó, resulta menester puntualizar que el Foro Primario estableció que dicha carta del 13 de marzo de 2017 dirigida hacia un fiscal podía resultar favorable para el apelante, pero no constituía prueba exculpatoria. El señor Martínez Morales no recurrió ante este Tribunal de Apelaciones con respecto a dicha determinación. Pero, no

fue hasta el 16 de enero de 2019 que el apelante presentó una moción de descalificación y una segunda moción de desestimación por violación al debido proceso de ley. Debido que el TPI declaró No Ha Lugar a ambas solicitudes al entender que la omisión en la entrega del documento no causó perjuicio, el señor Martínez Morales presentó un recurso de *certiorari* que un Panel Hermano de este Tribunal determinó no expedir el auto. El 5 de junio de 2019 el señor Martínez Morales solicitó por tercera ocasión la desestimación del caso en su contra, pero la misma fue denegada por el TPI.

Sobre lo anterior, el Ministerio Público está obligado a revelar aquella evidencia favorable para una persona acusada, sea exculpatoria o para impugnar un testigo, basado en un análisis sobre la materialidad de la información en torno a cambiar el resultado del proceso. En tal caso, los tribunales estamos llamados a evaluar si a la luz de todo el expediente, existe una probabilidad razonable de que el resultado hubiese sido distinto. Para ello, la persona acusada tiene el deber de realizar una demostración *prima facie* convincente sobre la materialidad de la prueba. De ser material y haberse socavado la confianza en el resultado del juicio, debemos revocar la convicción. En tal ejercicio, es necesario subrayar que el señor Martínez Morales no efectuó un ápice de demostración *prima facie* convincente para colocar a este Tribunal en posición de realizar el concerniente análisis de materialidad de la carta que alegó ser prueba exculpatoria. En cambio, el apelante se centró en hacer alegaciones basadas en el carácter de la fiscal por un informe que presentó la OPG para ese entonces. Al respecto, resulta imprescindible aclarar que el análisis de la materialidad de la carta debió fundamentarse en el carácter del documento para cambiar el resultado de su convicción, más no en el carácter de la fiscal. Véase *United States v. Agurs, supra*, pág. 110. Pese a lo anterior, al realizar un análisis de la totalidad del

expediente, concluimos que no existía probabilidad razonable de un resultado distinto con respecto al señor Martínez Morales u otro apelante del Ministerio Público haber revelado desde un inicio la carta del 13 de marzo de 2017. Esto, máxime que posteriormente la representación legal del apelante tuvo tiempo suficiente para examinar el documento y prepararse para el juicio. El hecho de que el Ministerio Público haya demorado la entrega o inspección del referido documento no privó al señor Martínez Morales ni otro apelante de un juicio justo, tal como lo garantiza la cláusula del debido proceso de ley. Por ello, el TPI no cometió un error al celebrar el juicio, en vista de que no coartó el derecho constitucional al descubrimiento de prueba que les asistía a los acusados.

Como segundo señalamiento de error de derecho, el señor Danois Román planteó que el TPI abusó de su discreción al imponer una pena de restitución de $500,000.00 sin evaluar su capacidad de pago. El apelante entendió que su falta de capacidad de pago convertía la pena de restitución en la posibilidad de ser ingresado a prisión. Sobre este particular, basta señalar que tal y como se estableciera en la parte expositiva del Derecho aplicable, a diferencia de la pena de multa, el Código Penal no proveía para la reclusión subsidiaria en defecto del pago de la restitución. De otra parte, de un examen del expediente, resulta palpable que el TPI ejerció su sana discreción de imponerle al apelante la correspondiente pena de restitución para los delitos debidamente probados y que el ordenamiento jurídico le otorgaba la facultad de imponer tal pena. Esto, de conformidad con la prueba presentada por el Ministerio Público y las circunstancias particulares del señor Danois Román en el informe pre-sentencia. Sabido es que los tribunales apelativos no debemos intervenir en la facultad discrecional del tribunal sentenciador en la imposición de pena del TPI, salvo claro abuso de

discreción. Véase *Pueblo v. Rodríguez Santana, supra.* En ausencia de tal abuso de discreción, concluimos que el TPI no incidió al imponerle al señor Danois Román una pena de restitución de $500,000.00, cantidad que consideró fue obtenida ilícitamente por el apelante mediante la comisión de los delitos que el Foro Primario consideró probados.

**V.**

Por los fundamentos que anteceden, confirmamos las sentencias emitidas por el TPI.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones